CONFIDENTIAL

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

| | | |
|---|---|---|
| A.J. and Q.C., | * | |
| | * | |
| Plaintiffs, | * | |
| vs. | * | Civil Action No. |
| | * | 1:23-cv-04247-JPB |
| MASP, LLC | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |

# Expert Report of Dr. Kimberly Mehlman-Orozco
# CEO of Break the Chain LLC
# P.O. Box 678 Gainesville, VA 20156
# (703) 362-9405

**SUBMITTED BY DR. KIMBERLY MEHLMAN-OROZCO on August 14, 2024.**[1]

---

[1] I may prepare graphic or illustrative exhibits based on the information reviewed and/or my analyses for use at trial. I reserve the right to amend my analysis, opinions, and this report should additional information be made available.

CONFIDENTIAL

## Table of Contents

*I.*   *INTRODUCTION* ............................................................................. 5

*II.*   *DEFINITIONS* ............................................................................. 11

*III.*  *SUMMARY OF OPINIONS* ........................................................... 15

*IV.*   *HUMAN TRAFFICKING OVERVIEW* ........................................... 18

*V.*   *LIMITATIONS OF HUMAN TRAFFICKING DATA* ........................ 20

*Prevalence* ............................................................................................. 20

*Evidence-Based Interventions* ............................................................... 23

*Sensitivity and Specificity* ..................................................................... 26

*Low Specificity* ...................................................................................... 27

Human Trafficking "Indicators" in Aviation ......................................... 27
Human Trafficking "Indicators" in Hospitality ..................................... 30

*VI.*   *MISIDENTIFICATION OF HUMAN TRAFFICKING VICTIMS* ...... 33

*Misidentification by Law Enforcement* ................................................. 33

*Available Protocols for Identification* ................................................... 38

*VII. SEX TRAFFICKING* ................................................................... 40

*Sex Trafficker Characteristics* .............................................................. 40

*Human Trafficking Victim Characteristics* ............................................ 40

*Affected Industries* ................................................................................ 41

*VIII.*   *ACTUAL OR CONSTRUCTIVE KNOWLEDGE* ......................... 43

*General "State of the Art" Knowledge* .................................................. 44

*"State of the Art" Knowledge in Georgia* .............................................. 45

*"State of the Art" Knowledge on Minor Victims of Trafficking* .............. 48

*Summary* ................................................................................................ 51

*IX.  CASE SUMMARY* ....................................................................... 53

*Overview* ................................................................................................ 53

*Claims Regarding "General Knowledge" of Sex Trafficking* ................. 57

*Claims Regarding "Specific Knowledge" of Sex Trafficking* ................. 66

*X.*   *MISIDENTIFICATIONS AS SENTINEL EVENTS* ........................ 70

*XI.  CONCLUSION* ............................................................................ 73

*APPENDIX A. Curriculum Vitae* ........................................................... 75

2

CONFIDENTIAL

*APPENDIX B. Expert Witness Testimony* ........................................................ *98*

*APPENDIX C. Materials Reviewed and Considered* ................................... *103*

*APPENDIX D. International Labour Office's Operational Indicators of Commercial Sexual Exploitation of Children* ..................................................................... *104*

*APPENDIX E. ERASE Child Trafficking Incorporation of Dr. Mehlman-Orozco's Book into Law Enforcement, Beginning in 2018* ....................................... *105*

*APPENDIX F. Preliminary Analysis: Law Enforcement Training May Increase Hotline Reporting* ............................................................................................. *106*

*APPENDIX G. Preliminary Analysis: Hotelier Training May Have No Effect on Hotline Reporting* ............................................................................................. *108*

CONFIDENTIAL

**TABLE OF FIGURES**

Figure 1. Post-TVPA Timeline of Burgeoning Data on Human Trafficking .................. 19
Figure 2. Trafficking Reports at Hotels/Motels by Year in Georgia ............................... 21
Figure 3. Mehlman-Orozco Critique and Response from Authors of A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign .................................................................................................. 26
Figure 4. Aviation Personnel "Indicators" ........................................................................ 27
Figure 5. Human Trafficking in America's Schools "Indicators" of Child Sex Trafficking and Labor Trafficking ...................................................................................................... 37
Figure 6. Polaris Project Matrix on Human Trafficking Types by Industry ..................... 42
Figure 7. Timeline of Georgia-Based Information Dissemination in Relation to A.J. and Q.C.'s Allegations .......................................................................................................... 47
Figure 8. National Juvenile Arrests for Prostitution or Commercialized Vice by Year ... 48
Figure 9. Georgia Juvenile Arrests for Prostitution or Commercialized Vice by Year .... 49
Figure 10. Typical Motel Trash Can ................................................................................... 59
Figure 11. Example of Condom Wrappers Littering Affluent Neighborhood in Atlanta, Georgia in 2024 ................................................................................................................ 59
Figure 12. Screengrab from Ring Camera Footage of  a Mid-Town Atlanta Residence on May 23, 2024 ..................................................................................................................... 66
Figure 13. "Swiss Cheese Effect" Regarding Trafficking Intervention .......................... 71

**TABLE OF TABLES**

Table 1. Maryland Scientific Methods Scale (SMS) ........................................................ 25
Table 2. Examples of Human Trafficking "Red Flag" Indicia Resulting in False Allegations and Claims of Racial Profiling ........................................................................ 28
Table 3. Sample of Blue Campaign "Indicia" and Countervailing Information .............. 30
Table 4. Comparison of Testimony by A.J. and Q.C. ...................................................... 54
Table 5. Sample of Plaintiffs' "Basic Premise" and Overview of Countervailing Information ......................................................................................................................... 58
Table 6. Plaintiffs' Source of General Industry Knowledge in Context with Countervailing Information ............................................................................................... 60
Table 7. Complaint Claims Regarding "Specific Knowledge of Sex Trafficking" and Countervailing Information ............................................................................................... 66

CONFIDENTIAL

# I.    INTRODUCTION

I have been engaged by MASP, LLC[2] in the matter of *A.J. and Q.C. v. MASP, LLC, No.* 1:23-cv-04247-JPB, to provide opinions as an expert on human trafficking.

The scope of my assignment was to evaluate the evidence and testimony in the present matter and provide expert opinions that would be probative to the trier of fact. My opinions are based on my education, training, and experience in the field of criminology and social scientific research, as well as the materials that I reviewed in this matter, which are cited throughout and listed in Appendix C. The opinions I have presented in this report are based on state-of-the-science research and are founded upon reliable methods, techniques, and approaches that are generally accepted by the criminology and social scientist research communities.

Over the past eighteen years, I have accumulated a variety of work experiences that contribute to my qualifications as an expert on human trafficking (see Appendix A for a copy of my Curriculum Vitae). As the CEO of Break the Chain, LLC and former CEO of Mahn, Mehlman & Associates, LLC, I regularly serve as an expert witness for human trafficking cases (see Appendix B for a list of cases). I also provide *pro bono* expert witness services for human trafficking survivors and currently serve on the advisory network for anti-trafficking non-profit Empower Her Network, where I assisted in building the qualitative measurement tools used by their organization for the last five years.

I am the author of a book on the different forms of human trafficking, which is titled *Hidden in Plain Sight: America's Slaves of the New Millennium*. For this book, I performed extensive primary and secondary research, including:

(1) A systematic review of over 300 human trafficking cases;
(2) Content analyses on more than 1,000 media reports of human trafficking arrests;
(3) Qualitative interviews of human trafficking victims;
(4) Qualitative interviews of convicted human traffickers;
(5) Qualitative interviews of consenting sex workers; and
(6) Qualitative interviews of commercial sex consumers.

My book was incorporated into the three-day Advanced Human Trafficking Law Enforcement Class curriculum used by ERASE Child Trafficking to train law enforcement in the United States on human trafficking identification and investigation.[3] The book also received a variety of advanced praise from experts within the field.[4]

---

[2] Also referred to as the "Defendant."
[3] For example, San Bernadino County Sheriff's Department, San Bernardino Police Department, City of Fontana Police Department, and Redlands Police Department.
[4] For example, from Louise I. Shelley, Omer L. and Nancy Hirst Professor of Public Policy at the Schar School of Policy and Government at George Mason University in Virginia and Director, Terrorism, Transnational Crime and Corruption Center and John Cotton Richmond, Former Federal Human Trafficking Prosecutor and Founding Director of the Human Trafficking Institute.

CONFIDENTIAL

In addition, I formally served as an adjunct human trafficking subject matter expert for RAND Corporation, a non-profit institution that helps improve policy and decision-making through research and analysis, where I worked on three study proposals:

> (1) Research design to evaluate the National Human Trafficking Hotline;
> (2) Development of an evidence-based human trafficking risk assessment tool for organizations working with minors; and
> (3) Evaluating the outcomes of housing services for adult and juvenile human trafficking survivors.

In these capacities, I have had the opportunity to train various law enforcement agencies around the country on my human trafficking research for investigations, including Homeland Security Investigations in Buffalo, New York; Montebello Police Department in Montebello, California; the North Carolina State Bureau of Investigation; and the Royal Canadian Mounted Police in Halifax, Nova Scotia, among others. I have also presented my research at various human trafficking summits and conferences and served on the Greater Prince William County Human Trafficking Task Force as the data collection sub-committee chair, as well as on the Prince George's County Human Trafficking Task Force. In 2019, I served as an invited panelist for the Police Executive Research Forum's *Critical Issues in Policing Conference—The Police Response to Human Trafficking*, which led to a published report in 2020.[5]

I have conducted primary research into recruitment and control schemes, advertisements, the mechanics of commercial sex exchanges, and the distinction between sex trafficking and consenting commercial sex. Various aspects of my research have been presented to law enforcement agencies, including but not limited to special agents for Homeland Security Investigations in Buffalo, New York; fire marshals in Fairfax, Virginia; and law enforcement officers in Martin County and Palm Beach County.

In addition to my work on human trafficking, I have received formal training, as well as quantitative and qualitative research experience, during my graduate coursework at George Mason University. Specifically, I served as a research associate on the Trinidad and Tobago Crime Reduction Project, which involved government-sanctioned surveys of both police officers and members of the community in Trinidad. I also led participant outreach for the Office of Juvenile Justice and Delinquency Prevention (OJJDP) Census of Juveniles on Probation and served as the Clinical Trial Search Coordinator for the Cochrane[6] Justice Health Field.

In addition to my practical and research experience, I also formally taught about human trafficking as part of my course material at George Mason University and the University

---

[5] *How Local Police Can Combat the Global Problem of Human Trafficking: Collaboration, Training, Support for Victims, and Technology Are Keys to Success*, Police Executive Research Forum (PERF) (2020), retrieved from: https://www.policeforum.org/assets/CombatHumanTrafficking.pdf.

[6] The Cochrane Library is a collection of high-quality, independent evidence to inform healthcare decision-making.

CONFIDENTIAL

of Maryland, College Park, the #1 ranked criminology doctoral program in the nation.[7]

I hold a Ph.D. in Criminology, Law and Society from George Mason University, as well as a M.S. in Justice, Law, and Crime Policy and a B.S. *cum laude* in Administration of Justice.

My research on the efficacy of anti-trafficking interventions has been published in the *Journal of Social Inclusion*,[8] which was guest edited by leading human trafficking expert Siddharth Kara, an Adjunct Lecturer at Harvard University and author of "Sex Trafficking: Inside the Business of Modern Slavery." My qualitative interviews with convicted human traffickers were also published in the journal *Trends and Organized Crime*.[9] Additionally, my work has also been published through magazines such as the *Diplomatic Courier*[10] and in media outlets, such as *USA Today*,[11] *Politico*,[12] *The Houston Chronicle*,[13] *The Hill*,[14]

---

[7] While at University of Maryland, College Park, I contributed to and was named as a faculty member for the U.S. Department of Homeland Security, U.S. Customs and Border Protection, CBP Leadership Institute grant proposal, which was awarded in 2014.

[8] Kimberly Mehlman-Orozco, *Safe Harbor Policies for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice*, 3 Social Inclusion 52 (2015).

[9] Kimberly Mehlman-Orozco, *Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers*, 23 Trends in Organized Crime 95, 105-106 (2017).

[10] See, for example, Kimberly Mehlman-Orozco, *America's Symbolic, Not Effective, Anti-Trafficking Policy*, Diplomatic Courier (May 31, 2016), retrieved from: https://www.diplomaticcourier.com/posts/americas-symbolic-not-effective-anti-trafficking-policy; Kimberly Mehlman-Orozco, *Sex Slaves or Prostitutes?: How Human Trafficking is Hidden in Plain Sight in America's Capital*, Diplomatic Courier (May 4, 2016), retrieved from: https://www.diplomaticcourier.com/posts/sex-slaves-prostitutes-human-trafficking-hidden-plain-sight-americas-capital; or Kimberly Mehlman-Orozco, *Devoid of Research: An Evaluation of Human Trafficking Interventions*, Diplomatic Courier (Mar. 18, 2014), retrieved from: https://www.diplomaticcourier.com/posts/devoid-of-research-an-evaluation-of-human-trafficking-interventions.

[11] See, for example, Kimberly Mehlman-Orozco, *Jeffrey Epstein's deal with Alexander Acosta wasn't out of line with what I have seen*, USA Today (July 10, 2019), retrieved from: https://www.usatoday.com/story/opinion/2019/07/10/jeffrey-epstein-alexander-acosta-donald-trump-sex-trafficking-agreement-column/1686687001/; Kimberly Mehlman-Orozco and William Snyder, *Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie*, USA Today (Apr. 4, 2019), retrieved from: https://www.usatoday.com/story/opinion/2019/04/04/robert-kraft-lawyers-sex-trafficking-conviction-difficult-column/3325857002/; and Mehlman-Orozco, Kimberly (2023). 'Sound of Freedom' is a box office hit. But does it profit off trafficking survivors? USA Today. Retrieved from: https://www.usatoday.com/story/opinion/2023/08/04/sound-freedom-trafficking-secondary-exploitation/70464194007/.

[12] See, for example, Kimberly Mehlman-Orozco, *How to Fight Sex Trafficking*, Politico (Feb. 24, 2019), retrieved from: https://www.politico.com/magazine/story/2019/02/24/sex-trafficking-225203/.

[13] See, for example, Kimberly Mehlman-Orozco and Simon Hedlin, *Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking*, The Houston Chronicle (Jan. 19, 2017), retrieved from: https://www.houstonchronicle.com/opinion/outlook/article/Mehlman-Orozco-Hedlin-Stop-criminalizing-10869881.php.

[14] See, for example, Kimberly Mehlman-Orozco and William D. Snyder, *Legalizing prostitution could end sex-trafficking investigations*, The Hill (Mar. 19, 2019), retrieved from: https://thehill.com/opinion/criminal-justice/434272-legalizing-prostitution-could-end-sex-trafficking-investigations/#:~:text=Research%20suggests%20that%20legalization%20would,it%20would%20hamper%20trafficking%20investigations; Kimberly Mehlman-Orozco, *Trafficking victims get lost under unjust criminal convictions*, The Hill (Dec. 8, 2017), retrieved from: https://thehill.com/opinion/civil-

CONFIDENTIAL

*The Washington Post*,[15] *The Baltimore Sun*,[16] *The Crime Report*,[17] *Thomson Reuters*,[18] and

---

rights/363902-trafficking-victims-get-lost-under-unjust-criminal-convictions/; Kimberly Mehlman-Orozco, *Decriminalize sex work to bring trafficking victims out of the shadows*, The Hill (Oct. 21, 2017), retrieved from: https://thehill.com/opinion/civil-rights/356512-decriminalize-sex-work-to-bring-trafficking-victims-out-of-the-shadows/; Kimberly Mehlman-Orozco, *Sex Trafficking is often hidden in plain sight*, The Hill (Oct. 21, 2016), retrieved from: https://thehill.com/blogs/pundits-blog/immigration/302150-sex-trafficking-is-often-hidden-in-plain-sight/; and Kimberly Mehlman-Orozco, *What happens after a human trafficking victim is 'rescued'?*, The Hill (July 29, 2016), retrieved from: https://thehill.com/blogs/congress-blog/judicial/289709-what-happens-after-a-human-trafficking-victim-is-rescued/.

[15] See, for example, Kimberly Mehlman-Orozco, *Decriminalizing sex work would help bring victims out of the shadows*, The Washington Post (Dec. 20, 2017), retrieved from: https://www.washingtonpost.com/opinions/decriminalizing-sex-work-would-help-bring-victims-out-of-the-shadows/2017/10/20/4b7d8be8-b38a-11e7-9b93-b97043e57a22_story.html; and Kimberly Mehlman-Orozco, *Vilifying Backpage.com won't help fight sex trafficking*, The Washington Post (July 18, 2017), retrieved from https://www.washingtonpost.com/opinions/vilifying-backpagecom-wont-help-fight-sex-trafficking/2017/07/18/101b0d34-6b12-11e7-abbc-a53480672286_story.html.

[16] See, for example, Kimberly Mehlman-Orozco, *Sex trafficking bill likely to do more harm than good*, The Baltimore Sun (March 22, 2018), retrieved from: https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0323-fosta-trafficking-20180322-story.html; Kimberly Mehlman-Orozco, *What every parent should know about sex trafficking*, Baltimore Sun. (Mar. 28, 2017), retrieved from: https://www.baltimoresun.com/opinion/op-ed/bs-ed-sex-trafficking-20170328-story.html; and Kimberly Mehlman-Orozco, *Consenting prostitutes or trafficked victims?*, Baltimore Sun (June 19, 2016), retrieved from: https://www.baltimoresun.com/opinion/op-ed/bs-ed-sex-trafficking-20160619-story.html.

[17] See, for example, Jennifer Lowery-Keith and Kimberly Mehlman-Orozco, *'Justice Denied': A Sex Trafficking Survivor Tells Her Story*, The Crime Report (Feb. 28, 2022), retrieved from: https://thecrimereport.org/2022/02/28/justice-denied-a-sex-trafficking-survivor-tells-her-story/; Kimberly Mehlman-Orozco and Greg Bristol, *Suing Social Media Sites Won't Curb Sex Trafficking: Advocates*, The Crime Report (Nov. 30, 2021), retrieved from: https://thecrimereport.org/2021/11/30/suing-social-media-sites-wont-curb-sex-trafficking-advocates/; Kimberly Mehlman-Orozco and Marisa Trasatti, *Does 'Nirvana' Lawsuit Undermine Struggle Against Trafficking?*, The Crime Report (Aug. 31, 2021), retrieved from: https://thecrimereport.org/2021/08/31/does-nirvana-lawsuit-undermine-struggle-against-trafficking/;
Kimberly Mehlman-Orozco, *The 'Racialization' of Sex Trafficking in America*, The Crime Report (May 4, 2021), retrieved from: https://thecrimereport.org/2021/05/04/1294014/; Kimberly Mehlman-Orozco, *COVID-19, the Commercial Sex Industry and Sex Trafficking*, The Crime Report (Mar. 22, 2021), retrieved from: https://thecrimereport.org/2021/03/22/covid-19-the-commercial-sex-industry-and-sex-trafficking/; Kimberly Mehlman-Orozco, *Why the Stop Enabling Sex Traffickers Act is the Wrong Solution*, The Crime Report (Sept. 13, 2017), retrieved from: https://thecrimereport.org/2017/09/13/why-the-stop-enabling-sex-traffickers-act-is-the-wrong-solution/; Kimberly, Mehlman-Orozco, *Child Trafficking: The Tragedy of 'Princess'*, The Crime Report (July 10, 2017), retrieved from: https://thecrimereport.org/2017/07/10/child-trafficking-the-tragedy-of-princess/; Kimberly Mehlman-Orozco, *Hunting the Internet's Sex Predators*, The Crime Report (June 14, 2017), retrieved from: https://thecrimereport.org/2017/06/14/hunting-the-internets-worst-predators/; Kimberly Mehlman-Orozco, *Sex Trafficking: A Surprising Rescue Story*, The Crime Report (May 17, 2017), retrieved from: https://thecrimereport.org/2017/05/17/sex-trafficking-a-surprising-rescue-story/; and Kimberly Mehlman-Orozco, *Why Do We Criminalize Young Victims of Sex Trafficking?*, The Crime Report (Jan. 17, 2017), retrieved from: https://thecrimereport.org/2017/01/17/why-do-we-criminalize-young-victims-of-sex-trafficking/.

[18] Kimberly Mehlman-Orozco, *Why cracking down on websites won't stop online sex trafficking*, Thomson Reuters Foundation (Mar. 2, 2018), retrieved from: https://news.trust.org/item/20180302174534-se03q/; Kimberly Mehlman-Orozco, *Why we should question the FBI's recent human trafficking sting*, Thomson Reuters Foundation (Oct. 24, 2017), retrieved from: https://news.trust.org/item/20171024161910-x96o5; Kimberly Mehlman-Orozco, *To sue or not to sue third-party businesses for sex trafficking?*, Thomson Reuters Foundation (July 3, 2017), retrieved from: https://news.trust.org/item/20170703203545-k6b8z; and Kimberly Mehlman-Orozco, *Will shutting down Backpage.com end the scourge of child sex trafficking in*

CONFIDENTIAL

others. Moreover, I am frequently interviewed and consulted by the media on topics related to human trafficking; for example, most recently by *Forbes*,[19] as well as by CNN, NBC, CBS, Fox News, among others.

I also serve as a peer-reviewer for empirical research articles on human trafficking, for example with the *Journal of Human Trafficking* and *American Journal of Evaluation,* and as a peer-reviewer for grant applications for human trafficking research. Most recently, I was invited by the *Journal of Human Trafficking* to review a manuscript entitled "*A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign.*" Additionally, in June 2022, I served as an invited peer-reviewer for the U.S. Department of Justice, Office of Justice Programs, National Institute of Justice Research and Evaluation on Trafficking in Persons. Previously, I was invited by the Office of Justice Programs and National Institute of Justice to serve as a peer-reviewer for FY 2020 Research on Law Enforcement Responses to Sex Trafficking of Minors.

At present, I have testified in court for a total of eleven cases:

1. Five criminal cases in California state court for purposes of trial;
2. One criminal case in federal court in California for purposes of trial;
3. One criminal case in federal court in New Mexico for purposes of a *Daubert* hearing, where I was admitted, that subsequently ended in a plea bargain;
4. One criminal case in New York state court for purposes of a *Frye* hearing for another expert;
5. One criminal case in Virginia state court for purposes of a *Daubert* hearing, where I was admitted and subsequently ended in a plea bargain;
6. One civil case in federal court in Virginia for purposes of trial; and
7. One criminal case in federal court in Arizona for purposes of trial.

I have also sat for depositions for a total of eleven cases:

1. Four civil cases in state court in Georgia;
2. Two civil cases in federal court in New York;
3. One civil case in federal court in Virginia;
4. Two civil cases in federal court in California;
5. One civil case in federal court in Oklahoma; and
6. One civil case in federal court in Ohio.

Additionally, there are four orders recognizing the admissibility of my expert witness testimony:

---

*America?*,   Thomson   Reuters   Foundation   (May   30,   2017),   retrieved   from: https://news.trust.org/item/20170530154532-pjag0.

[19] Thomas Brewster, *Sex Traffickers Used America's Favorite Family Safety App To Control Victims*, Forbes (Apr. 6, 2023), retrieved from: https://www.forbes.com/sites/thomasbrewster/2023/04/06/sex-traffickers-use-parenting-apps-like-life360-to-spy-on-victims/?sh=92d15c864c3a.

CONFIDENTIAL

1. One civil case in federal court in Virginia[20];
2. Two criminal cases in federal court in New Mexico;
3. One criminal case in federal court in California; and
4. One case in federal civil court in Georgia.

For example, in *United States v. Matthew Woods*, case number 1:17-cr-01235-WJ United States District Court, District of New Mexico , where I was proffered as an expert on behalf of the prosecution, Chief United States District Judge William P. Johnson issued an Order on November 5, 2020 that read in part "*Dr. Mehlman-Orozco considers herself a leading expert in cases on sex trafficking and the Court agrees with that self-description*." This is one of several instances where I have been retained as a human trafficking expert in criminal matters both by state and federal prosecutors. I have also consulted on dozens, if not hundreds, more.

---

[20] Note: I was also admitted in state court in Virginia, but the challenge was withdrawn before an order was issued.

CONFIDENTIAL

## II.   DEFINITIONS

In order to facilitate precision in language, which is undoubtedly important when evaluating the present claims, I proffer the following definitions, which reflect commonly accepted understanding of key concepts in the sex trafficking literature or social scientific research.  In addition, I may also from time-to-time use terms that are defined in the United States Code.  I am not a lawyer and these definitions do not and are not intended to supplant the Court's legal interpretations.  I am not offering, and do not intend to offer, any legal opinions.

**Automatic:** A term denoting a sex trafficking victim's "automatic" routine when her trafficker is out of town, in jail, or otherwise not in direct contact with those he is trafficking. Victims are expected to comply with the rules and often do so out of fear of punishment or because they have been psychologically manipulated into a sense of loyalty or love. **_All money_** generated is "automatically" turned over to the trafficker. If the trafficker is in jail, this money may be used to support his concession/phone account or to pay his bond[21]. This term can also be referenced in regard to a consenting arrangement between a prostitute and a pimp.[22]

**Consenting Sex Worker:** an adult who chooses to engage in sexual activities in exchange for payment. Also referred to as a "prostitute," "whore,"[23] "outlaw", or "renegade[24]."

**Survival Sex:** trading commercial sex for money, drugs, or other needs.[25]

**Trick:** committing an act of prostitution (verb), or the person buying it (noun).[26] A victim is said to be "turning a trick" or "with a trick."[27]

---

[21] See, for example, Shared Hope International. N.d. Trafficking Terms. Retrieved from: https://sharedhope.org/the-problem/trafficking-terms/ Also, Language/Terms Used "In the Life. Retrieved from: https://portal.ct.gov/-/media/dcf/humantrafficking/pdf/termsusedinthelifepdf.pdf?la=en#:~:text=Renegade%3A%20A%20person%20involved%20in%20prostitution%20without%20a%20pimp.

[22] See, for example, Department of Justice published terms. Retrieved from: https://www.justice.gov/sites/default/files/usao-edwi/pages/attachments/2015/03/06/ht_terms_-_slang_01_15_2015.pdf

[23] Gira Grant, Melissa. (2014). *Playing the Whore: The Work of Sex Work*. Verso.

[24] A person who engages in prostitution and is generally successful in avoiding control by pimps. See, for example, Department of Justice published terms. Retrieved from: https://www.justice.gov/sites/default/files/usao-edwi/pages/attachments/2015/03/06/ht_terms_-_slang_01_15_2015.pdf Also, Shared Hope International. N.d. Trafficking Terms. Retrieved from: https://sharedhope.org/the-problem/trafficking-terms/

[25] Clingan, S. E., Fisher, D. G., Reynolds, G. L., Janson, M. A., Rannalli, D. A., Huckabay, L., & Nguyen, H. D. (2020). Survival Sex Trading in Los Angeles County, California, USA. Journal of Sex Research, 57(7), 943–952. https://doi.org/10.1080/00224499.2019.1703885.

[26] A "commercial sex consumer" can be referred to as a "John" or a "Trick" by sex traffickers, victims of sex trafficking, or consenting sex workers; however, these men generally refer to themselves as "mongers" or "hobbyists."

[27] Shared Hope International. N.d. Human Trafficking Terms, retrieved from: https://sharedhope.org/the-problem/trafficking-terms/.

CONFIDENTIAL

**Commercial Sex Consumer:** An individual who patronizes sex workers. Synonyms: monger, John, hobbyist, or trick.[28]

**Bottom or "Bottom Bitch":** Female victim of a sex trafficker who has been indoctrinated enough to facilitate the recruitment, control, and exploitation of other sex workers despite being exploited herself. When and if the Bottom also significantly benefits from the financial exploitation of other victims, she may be considered a sex trafficker or co-conspirator by law enforcement.[29]

**GFE:** An acronym for "Girlfriend Experience— A commercial sex companionship that mimics a conventional relationship, in addition to sexual services.[30]

**Venture:** defined in 18 U.S.C. 1591(e) as "any group of two or more individuals associated in fact, whether or not a legal entity."

**Family/Folks**: the term used to describe the other individuals under the control of the same pimp. He plays the role of father (or "Daddy") while the group fulfills the need for a "family."[31]

**The Game/The Life:** the subculture of prostitution, complete with rules, a hierarchy of authority, and language. Referring to the act of pimping as 'the game' gives the illusion that it can be a fun and easy way to make money, when the reality is much harsher. Women and girls will say they've been "in the life" if they've been involved in prostitution for a while.[32]

**Two-Call System:** a commercial sex exchange tactic to evade third party detection. The commercial sex consumer will call twice for in-call commercial sex providers: first, to set up an appointment time and obtain general directions to the in-call location, and second, to obtain specific information on which hotel room or apartment the sexual services will be provided.[33]

**In-Call:** any location where the commercial sex consumer travels to the commercial provider for services, such as the sex worker's place of residence or hotel room.

**Out-Call:** any location where the commercial sex worker travels to the consumer for services, such as the hobbyist or monger's place of residence or hotel room. Also known as TOS or "take-out service."

**Trap Phone:** A prepaid cellular telephone utilized for illicit exchanges, including but not limited to the sale of drugs or commercial sex.

---

[28] Mehlman-Orozco, K., *Hidden in Plain Sight: America's Slaves of the New Millennium*, Praeger (2017).
[29] *Ibid*.
[30] *Ibid*.
[31] *Ibid*.
[32] *Ibid*.
[33] *Ibid*.

CONFIDENTIAL

**Trap House:** A house, townhouse, or apartment where illicit exchanges occur, including but not limited to the sale of drugs or commercial sex.

**Track/Blade:** An area where commercial sex is advertised outside.

**Exploit:** Benefit unfairly from the work of (someone), typically by overworking and underpaying them.

**Ecological Fallacy:** Inferences about the characteristics/behavior of individuals are derived from inferences about the group to which the individuals belong.[34]

**Fallacy of Composition**: The error of assuming that what is true of a member of a group is true for the group as a whole.

**Sensitivity:** The ability of law enforcement, service providers, and other third parties to correctly identify true victims of human trafficking (true positive).

**Specificity:** The ability of law enforcement, service providers, and other third parties to correctly identify persons who are not victims of human trafficking (true negative).

**Methodology:** The specific methods, procedures, or practices needed to derive or interpret data within the scope of a particular discipline.

**Reliability:** The degree to which the result of a methodology can be depended on to be accurate (e.g., through the overall consistency of a measure by using a statistical approach).

**Confirmation Bias:** The tendency to process information by looking for, or interpreting, information that is consistent with an existing belief.

**Hindsight Bias:**[35] The *ex post* tendency to overestimate the *ex ante* likelihood of an outcome, relative to what one would have actually guessed before the event. Because most legal judgments are made *ex post*, they are vulnerable to this bias, as documented in a variety of experimental studies.[36]

---

[34] J.T. Walker, "Ecological fallacy," 2 Encyclopedia of Research Methods in Criminology and Criminal Justice, 478-482 (2021).

[35] In the present matter, this can also be understood as the tendency, upon learning an outcome of a criminal case to overestimate a third party's ability to have foreseen the crime.

[36] See, for example, R. MacCoun, in International Encyclopedia of the Social & Behavioral Sciences, 2001; Rachlinski, J. J. (1998). A positive psychological theory of judging in hindsight. The University of Chicago Law Review, 65(2), 571-625; Harley, E. M. (2007). Hindsight bias in legal decision making. Social Cognition, 25(1), 48-63; and Arkes, H. R., & Schipani, C. A. (1994). Medical malpractice v. the business judgement rule: Differences in hindsight bias. *Or. L. Rev.*, *73*, 587.

CONFIDENTIAL

**Secondary Exploitation:** The act of making use of or benefiting from a human trafficking survivor's victimization or the human trafficking phenomenon.[37]

**Epistemic Trespassing:** Epistemic trespassers are thinkers who have competence or expertise to make good judgments in one field, but move to another field where they lack competence—and pass judgment nevertheless. We should doubt that trespassers are reliable judges in fields where they are outsiders.[38]

---

[37] See, for example, Mehlman-Orozco, Kimberly (2024). Sex Trafficking or Secondary Exploitation: The Truth Behind America's Failing War Against Modern Slavery. *International Journal of Academic Research in Public Policy and Governance*; Mehlman-Orozco, K., *Hidden in Plain Sight: America's Slaves of the New Millennium*, Praeger (2017); Cojocaru, Claudia. *My experience is mine to tell: Challenging the abolitionist victimhood framework*. Anti-Trafficking Review 7 (2016): 12-38; and Mehlman-Orozco, Kimberly. 2023. 'Sound of Freedom' is a box office hit. But does it profit off trafficking survivors?. *USA Today*.

[38] Ballantyne, Nathan. Knowing Our Limits. Oxford University Press (2019).

14

CONFIDENTIAL

# III.   SUMMARY OF OPINIONS[39]

a.   Sex trafficking is a clandestine crime.

b.   Sex trafficking victims are difficult to identify and are frequently misidentified.

c.   As a consequence of misidentification, sex trafficking victims are often erroneously criminalized by the judicial system.

d.   Indicia of prostitution are often erroneously conflated with indicia of sex trafficking.

e.   Minors involved in the commercial sex industry were criminalized by law enforcement for crimes such as prostitution before and during the alleged trafficking period at issue in the present matter.

f.   Minors involved in the commercial sex industry continue to be criminalized by law enforcement for crimes such as prostitution.

g.   Indicia of "sex trafficking" in the hospitality industry have not been adequately evaluated for sensitivity or specificity.

h.   I am not aware of any reliable or generally accepted empirical research to estimate the prevalence of sex trafficking at hotels or motels in the United States, much less in Georgia.

i.   I am not aware of any reliable or generally accepted empirical research that adequately evaluates the efficacy of the Blue Campaign signs and indicators of sex trafficking or the efficacy of training on the prevention of sex trafficking.

j.   I am not aware of any reliable or generally accepted empirical research that adequately evaluates the efficacy of the Polaris signs and indicators of sex trafficking or the efficacy of training on the prevention of sex trafficking.

k.   I am not aware of any reliable or generally accepted empirical research that adequately evaluates the efficacy of the ECPAT signs and indicators of sex trafficking or the efficacy of training on the prevention of sex trafficking.

l.   I am not aware of any human trafficking training that has been empirically validated, with high rates of sensitivity and specificity.

---

[39] All of my opinions are stated to a reasonable degree of social scientific probability in my profession as an expert in human trafficking and Ph.D. educated criminologist.

CONFIDENTIAL

m. To a reasonable degree of social scientific certainty, mandatory training would not have led to the Plaintiffs' identification as victims of sex trafficking.

n. There is no empirical evidence to suggest that extant anti-trafficking interventions for hoteliers or franchisors would have had a statistically significant effect on the prevalence of sex trafficking or the identification of victims or offenders.

o. Many extant anti-trafficking interventions and trainings for hoteliers or franchisors are based on misinformation, unsupported speculation or subjective belief, or ecological fallacies, and are not supported by reliable principles and scientific methods.

p. At the time of the alleged trafficking period in the present matter, law enforcement officers and judicial officials in Georgia misidentified both adult and minor victims of sex trafficking due to the clandestine nature of the crime and burgeoning data.

q. At present, there are no data supported by reliable principles and scientific methods to suggest that the purported "visible signs" of human trafficking discussed in the complaint would have any preventative effect on sex trafficking. Any suggestion otherwise is based on misinformation, unsupported speculation or subjective belief, or ecological fallacies.

r. At present, there are no data supported by reliable principles and scientific methods to suggest that the purported "signs of human trafficking" discussed in the complaint would have led to A.J.'s or Q.C.'s identification as a victim. Any suggestion otherwise is based on misinformation, unsupported speculation or subjective belief, or ecological fallacies.

s. Based on the evidence in this case and my expertise on the identification of sex trafficking victims, it is not reasonable to conclude that the Defendant knew or should have known that the Plaintiffs were victims of sex trafficking.

CONFIDENTIAL

The following sections of this report provide a summary and further explanation as to the evidentiary, empirical, and basis for each of the aforementioned opinions:

*Section IV. Provides an overview on human trafficking;*

*Section V. Explores the limitations of human trafficking data;*

*Section VI. Highlights the challenges related to identification and intervention;*

*Section VII. Discusses sex trafficking characteristics and interactions with various industries;*

*Section VIII. Reviews actual or constructive knowledge standards regarding third-party liability trafficking claims;*

*Section IX. Outlines the present case allegations in the context of state-of-the-science data;*

*Section X. Conceptualizes human trafficking misidentifications as sentinel events; and*

*Section XI. Summarizes the opinions in the conclusion.*

CONFIDENTIAL

## IV.  HUMAN TRAFFICKING OVERVIEW

The modern concept of human trafficking did not start becoming internationally popularized until the year 2000.

On October 28, 2000, the U.S. Congress enacted the Trafficking Victims Protection Act (TVPA), which set up actions to combat trafficking in persons. Specifically to:

1. Coordinate and monitor anti-trafficking activities through an interagency task force;
2. Prevent human trafficking through vocational training, education, and human trafficking public awareness campaigns;
3. Protect human trafficking survivors by not detaining them in correctional facilities, providing them with medical care and other assistance, and protecting them and their families from revictimization and/or deportation; and
4. Strengthening prosecution and punishment of human traffickers.[40]

Less than two months after the TVPA was adopted in the United States, the United Nations met in Palermo, Italy, and adopted the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime—colloquially known as the Palermo Protocol.

In December 2008, Congress amended the TVPRA to provide human trafficking survivors with a civil claim against not only criminal perpetrators of trafficking, but anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act of human trafficking." The TVPA was reauthorized through the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2003, 2005, 2008, 2013, 2017, and 2018.[41]

Since 2000, there has been a burgeoning public awareness of human trafficking, which has seen a more substantial increase in the last decade. There are more anti-trafficking task forces, hotlines, and survivor services than ever before. In addition to federal legislation, more states (including Georgia) have also passed legislation to combat trafficking.

However, even today, there are still critical gaps between the human trafficking narrative, reality, and policy. Although more people are aware of the human trafficking concept, few understand how this crime manifests in real life, and there is little empirical data to support generalizable information. Typically, victims are coerced, defrauded, and deceived into exploitive situations, where they are manipulated into complacency. Many organizations and anti-trafficking authorities provide information on how to identify the red flags of

---

[40] U.S. Department of Justice. N.d. *Human Trafficking: Key Legislation*, retrieved from: https://www.justice.gov/humantrafficking/key-legislation
[41] Id.

CONFIDENTIAL

human trafficking; however, these "red flags" are not yet empirically tested for sensitivity and specificity, especially in the hospitality industry, and even trained law enforcement and service providers frequently misidentify victims. Figure 1 illustrates the burgeoning knowledge on human trafficking, which remains in development.



**Figure 1. Post-TVPA Timeline of Burgeoning Data on Human Trafficking**

CONFIDENTIAL

# V.    LIMITATIONS OF HUMAN TRAFFICKING DATA

### *Prevalence*

While social science researchers have begun to use qualitative data to develop themes on the recruitment and control techniques that are utilized by human traffickers, quantitative statistics should be discussed with caution. Although anti-trafficking advocates and the media cite data on the prevalence and characteristics of human trafficking crimes, a growing body of research suggests that these statistics are questionable at best, due to a combination of methodological weaknesses and gaps in data, among a number of other discrepancies.[42] Despite increases in anti-trafficking law enforcement and legislative initiatives, social scientists have continued to experience difficulty in empirically evaluating the largely unobserved crime of human trafficking.[43] Organizations influencing anti-trafficking legislation make robust claims on the prevalence of this crime, the efficacy of interventions, and the need for legislative changes; however, researchers caution "inadequate data collection methods might result in descriptions that have little to do with reality."[44]

For example, in 2013, the U.S. Department of State Trafficking in Persons Report suggested that there were as many as 27 million men, women, and children being trafficked at any given time. However, that statistic was later publicly debunked in the media. In response, a State Department official said, "The major problem we have always faced with human trafficking is finding good data. For now, this is still a guesstimate, but the best guesstimate there is."[45] In addition to prevalence estimates, authorities have been caught citing erroneous statistics on the characteristics of victims[46] and the amount of illicit income from human trafficking enterprises.[47]

---

[42] Chuang, J.A., *Exploitation Creep and the Unmaking of Human Trafficking Law*, The American Journal of International Law, 108 (4): 609-659 (2014); Cwikel, J., & Hoban, E., *Contentious issues in research on trafficked women working in the sex industry: study designs, ethics and methodology*, Journal of Sex Research, 42(4), 306-316 (2005); Goodey, J., *Human trafficking: sketchy data and policy responses*, Criminology & Criminal Justice, 8(4), 421-442 (2008); Van der Laan, P. H., Smit, M., et al., *Cross-border Trafficking In Human Beings: Prevention and Intervention Strategies for Reducing Sexual Exploitation*. Campbell Systematic Reviews (2011); Weitzer, R., *The Movement to Criminalize Sex Work in the United States*, Journal of Law and Society, 37 (1): 61-84 (2010); Schroeder, E., Edgemon, T. G., Aletraris, L., Kagotho, N., Clay-Warner, J., & Okech, D. (2022). A review of prevalence estimation methods for human trafficking populations. *Public Health Reports*, 137(1_suppl), 46S-52S; and Nawyn, S. J., Birdal, N. B. K., & Glogower, N. (2013). Estimating the extent of sex trafficking: Problems in definition and methodology. *International Journal of Sociology*, *43*(3), 55-71.

[43] Brunovskis, A., & Tyldum, G., *Describing the Unobserved: Methodological Challenges in Empirical Studies on Human Trafficking*, International Migration, 43 (1-2): 17-34 (2005).

[44] *Id.*, at 17.

[45] Kessler, G., *Why you should be wary of statistics on 'modern slavery' and 'trafficking*,' The Washington Post (Apr. 24, 2015), available at: https://www.washingtonpost.com/news/fact-checker/wp/2015/04/24/why-you-should-be-wary-of-statistics-on-modern-slavery-and-trafficking/.

[46] Kessler, G., *Indiana AG touts a debunked and rejected 'fact' on sex trafficking*, The Washington Post (June 8, 2016).

[47] Kessler, G., *The false claim that human trafficking is a '$9.5 billion business' in the United States*, The Washington Post (June 2, 2015).

CONFIDENTIAL

Although there are new efforts to track incidents, arrests, and criminal offenses related to human trafficking, prevalence estimates are still lacking and/or unreliable in the United States. Despite promises to standardize data from law enforcement about human trafficking, reported cases are still remarkably low and there is a large gulf between these data and the prevalence estimates purported by anti-trafficking advocates.[48]

To this effect, it is important to note that individuals who engage in epistemic trespassing may attempt to cite purported prevalence data from organizations such as Polaris as if it is based in empiricism or as if has some generalizable application to cases such as the present matter. However, this practice is misguided and not based in reliable, scientific methods.

For example, an epistemic trespasser may cite to the National Human Trafficking Hotline (NHTH) to erroneously claim that trafficking is "prevalent" or a frequent occurrence at hotels or motels. However, even those data, while limited and unreliable, do not support that claim. For some unknown reason, in 2024 Polaris removed "hotel/motel" from one of the reported venues for sex trafficking on their main pages reporting data from the National Human Trafficking Hotline[49]. As such, there is now missing data for 2007-2014, 2017-2019, and 2022-2023. However, in 2015, 20 out of 733 reports to the hotline suggested a hotel or motel may have been a venue for sex trafficking in Georgia. In 2016, this ratio was 42 out of 775, in 2020 it was 41 out of 1,079, and in 2021 it was 35 out of 983. Although these data are limited, compared to the total number of signals per year, the use of hotels or motels as a venue for trafficking could be interpreted as a relatively rare occurrence (see Figure 2).



**Figure 2. Trafficking Reports at Hotels/Motels by Year in Georgia**

---

[48] Farrell, A. & Reichert, J., *Using U.S. Law-Enforcement Data: Promise and Limits in Measuring Human Trafficking*, Journal of Human Trafficking, 3 (1) 39-60 (2017).

[49] See: https://humantraffickinghotline.org/en/statistics/georgia

CONFIDENTIAL

Even more recent research acknowledges that it is not possible to determine the true volume of sex trafficking and the precision of estimates remain a significant limitation. For example, one study in 2022 concluded that, "little research has estimated the prevalence of minor sex trafficking in the United States. The existing studies examine different areas and populations and use different categories to estimate the problem. The estimates reviewed here should be cited cautiously. Future research is needed on this important topic, including methodologies to produce more representative estimates of this hard-to-reach population."[50] It is generally accepted that only recently, "research in human trafficking has passed its **infancy** and is now at an adolescent stage."[51]

Leading up to the alleged trafficking period in the present matter and thereafter, anti-trafficking efforts were plagued by a long recognized shortage of human trafficking data.[52] Some critics even questioned the legitimacy of a movement built upon unsubstantiated claims.[53] Others simply recognized that, "human trafficking research, data and statistics often have a bad reputation. Despite considerable investment in legislation, policy-making and interventions to counter trafficking, the research base remains notoriously scant."[54]

Ultimately, the trafficking literature has remained fragmented and underdeveloped, especially in the United States.[55] Among the numerous criticisms are the predominance of weak research designs, poor-quality data, insufficient methodological clarity, questionable assumptions, emotive or politicized rhetoric, ill-founded inferences and conclusions not

---

[50] See, for example, Franchino-Olsen, H., Chesworth, B. R., Boyle, C., Rizo, C. F., Martin, S. L., Jordan, B. & Stevens, L. (2022). The prevalence of sex trafficking of children and adolescents in the United States: A scoping review. Trauma, Violence, & Abuse, 23(1), 182-195.

[51] Emphasis added. Zhang, S. X. (2022). Progress and challenges in human trafficking research: two decades after the Palermo protocol. Journal of human trafficking, 8(1), 4-12.

[52] See, for examples Gozdziak, E. M., & Collett, E. A. (2005). Research on human trafficking in North America: A review of literature. International Migration, 43(1-2), 99-128; Laczko, F., & Gramegna, M. A. (2003). Developing better indicators of human trafficking. The Brown Journal of World Affairs, 10(1), 179-194.; and Tyldum, G., & Brunovskis, A. (2005). Describing the unobserved: Methodological challenges in empirical studies on human trafficking. International Migration, 43(1-2), 17-34.

[53] See, for example, Weitzer, R. (2011). Sex trafficking and the sex industry: The need for evidence-based theory and legislation. J. Crim. L. & Criminology, 101, 1337; Weitzer, R. (2014). New directions in research on human trafficking. The ANNALS of the American Academy of Political and Social Science, 653(1), 6-24; and Zhang, S. X. (2012). Measuring labor trafficking: a research note. *Crime, Law and Social Change*, *58*(4), 469-482.

[54] Cockbain, E., Bowers, K., & Vernon, L. (2020). Using law enforcement data in trafficking research. The Palgrave international handbook of human trafficking, 1709-1732. Also, see: Efrat, A. (2016). Global efforts against human trafficking: The misguided conflation of sex, labor, and organ trafficking. *International Studies Perspectives*, *17*(1), 34-54; Goodey, J. (2008). Human trafficking: Sketchy data and policy responses. Criminology & Criminal Justice, 8(4), 421-442. Chicago; Van der Laan, P. H., Smit, M., et al., *Cross-border Trafficking in Human Beings: Prevention and Intervention Strategies for Reducing Sexual Exploitation*, Campbell Systematic Reviews (2011); and Cockbain, E. (2018). *Offender and victim networks in human trafficking*. Routledge.

[55] Even the European countries that preceded the United States in addressing trafficking in persons are plagued by limited data. See, for example, Laczko, F., Von Koppenfels, A. K., & Barthel, J. (2002). *Trafficking in women from Central and Eastern Europe: A review of statistical data* (pp. 153-173). TMC Asser Press.

properly grounded in the empirical research.[56] There are also thematic skews, whereby the dominant focus is on victims, international movements and sexual exploitation: offenders, internal (domestic) trafficking and other exploitation types (e.g. labor or domestic servitude) are comparatively neglected.[57] Such criticisms obviously do not mean there is no good research on trafficking but rather that robust, rigorous and high-quality empirical studies are the exception rather than the rule and this has resulted in significant limitations to the development of evidence-based interventions to combat trafficking in persons.

### Evidence-Based Interventions

In addition to the dearth of research on human trafficking prevalence, effective evidence-based interventions have yet to be identified.

Within the field of criminology, it is generally accepted that randomized controlled trials (experiments) are considered the gold-standard—the highest quality research—for evaluating the effectiveness of an intervention. In order to promote more evidence-based

---

[56] See, for examples: Andrees, B., & Van der Linden, M. N. (2005). Designing trafficking research from a labour market perspective: The ILO Experience1. *International migration*, *43*(1-2), 55-73; Aronowitz, A. A. (2001). Smuggling and trafficking in human beings: the phenomenon, the markets that drive it and the organisations that promote it. *European journal on criminal policy and research*, *9*, 163-195; Aronowitz, A. A. (2009). *Human trafficking, human misery: The global trade in human beings*. Bloomsbury Publishing USA; Aronowitz, A. A. (2009). The smuggling–trafficking nexus and the myths surrounding human trafficking. In *Immigration, crime and justice* (pp. 107-128). Emerald Group Publishing Limited; Cockbain, E., Bowers, K., & Dimitrova, G. (2018). Human trafficking for labour exploitation: the results of a two-phase systematic review mapping the European evidence base and synthesizing key scientific research evidence. *Journal of Experimental Criminology*, *14*, 319-360.; Di Nicola, A., & Cauduro, A. (2007). Review of official statistics on trafficking in human beings for sexual exploitation and their validity in the 25 EU Member States from official statistics to estimates of the phenomenon. In *Measuring human trafficking: Complexities and pitfalls* (pp. 73-94). New York, NY: Springer New York.; Feingold, D. A. (2010). Trafficking in numbers: The social construction of human trafficking data. *Sex, drugs, and body counts: The politics of numbers in global crime and conflict*, *46*, 51; Goodey, J. (2008). Human trafficking: Sketchy data and policy responses. Criminology & Criminal Justice, 8(4), 421-442. Chicago; Kelly, E. (2002). *Journeys of jeopardy: A review of research on trafficking in women and children in Europe*. United Nations.; Kelly, L. (2005). "You can find anything you want": A critical reflection on research on trafficking in persons within and into Europe. *International Migration*, *43*(1-2), 235-265.; Goździak, E. M. (2014). Data matters: Issues and challenges for research on trafficking. Global human trafficking, 23-38; Laczko, F., & Gozdziak, E. Data and Research on Human Trafficking: A Global Survey, 2005. *International Organization for Migration, Geneva*; Lehti, M., & Aromaa, K. (2006). Trafficking for sexual exploitation. *Crime and justice*, *34*(1), 133-227; Tyldum, G. (2010). Limitations in research on human trafficking. International Migration, 48(5), 1-13.; Tyldum, G., Tveit, M., & Brunovskis, A. (2005). Taking stock. *A review of the existing research on trafficking for sexual exploitation. Fafo-report*, *493*; and Tyldum, G., & Brunovskis, A. (2005). Describing the unobserved: Methodological challenges in empirical studies on human trafficking. *International migration*, *43*(1-2), 17-34.

[57] Andrees, B., & Van der Linden, M. N. (2005). Designing trafficking research from a labour market perspective: The ILO Experience1. *International migration*, *43*(1-2), 55-73; Kleemans, E. R. (2011). Expanding the domain of human trafficking research: introduction to the special issue on human trafficking. *Trends in Organized Crime*, *14*(2), 95-99; Laczko, F., & Gozdziak, E. Data and Research on Human Trafficking: A Global Survey, 2005. *International Organization for Migration, Geneva*; and Winterdyk, J., & Reichel, P. (2010). Introduction to special issue: human trafficking: issues and perspectives. *European Journal of Criminology*, *7*(1), 5-10.

interventions to effectively combat crime, criminologists have taken a distinct "experimental turn" and the sheer number of quantitative experiments in criminology has increased dramatically in recent decades.[58] Most evidence-based criminological interventions have dozens of experiments supporting their efficacy. For example, Braga, Welsh, and Schnell (2015) conducted a meta-analysis of 30 randomized experimental and quasi-experimental tests of disorder policing.[59] However, there is remarkably less research evaluating the efficacy of human trafficking interventions, including trainings.

In an assessment of extant research, Van der Laan et. al. (2011) conducted a systematic review of evaluations for interventions aimed to prevent and suppress trafficking in human beings in conjunction with the Campbell Collaboration.[60] The search identified 144 studies, but there was no methodologically rigorous evaluation of interventions aimed to prevent and suppress trafficking in human beings.[61] Therefore, the researchers could not draw any conclusions on actual outcomes or impacts of these interventions.[62] More recent research again finds that information available to service professionals and the public through the media and public awareness campaigns has also been shown to add confusion on what is considered human trafficking.[63] For example, Mapp, Hornung, D'Almeida, and Juhnke (2016) found no significant relationship between training received and knowledge about trafficking and available services for survivors.[64] Recognizing human trafficking is remarkably difficult, even for trained law enforcement[65] and prosecutors.[66] This is further complicated by a lack of standardized awareness about what is and is not human trafficking for first responders, frontline staff, crisis hotlines, child protective services, and foster care

[58] Sampson, R.J., *Gold Standard Myths: Observations on the Experimental Turn in Quantitative Criminology*, J. Quantitative Criminology, 26, 489–500 (2010), available at: https://doi.org/10.1007/s10940-010-9117-3. Page 182.

[59] Braga, A.A., Welsh, B. C., et al., *Can Policing Disorder Reduce Crime? A Systematic Review and Meta-analysis*, Journal of Research in Crime and Delinquency, 52(4), 567–588 (2015), available at: https://doi.org/10.1177/0022427815576576.

[60] Campbell Collaboration is a social science research network that produces high quality, open access evidence synthesis in the field of criminology.

[61] No study was at least level 3 of the Maryland Scientific Methods Scale (SMS), i.e., a controlled design with both pretest and posttest measures and comparable control conditions.

[62] Van der Laan, P. H., Smit, M., et al., *Cross-border Trafficking in Human Beings: Prevention and Intervention Strategies for Reducing Sexual Exploitation*, Campbell Systematic Reviews (2011).

[63] Preble, K. M., Tlapek, S., & Koegler, E. (2020). Sex trafficking knowledge and training: Implications from environmental scanning in the American Midwest. *Violence and victims*, *35*(3), 363-381; Preble, K. M., Basham, R., Mengo, C., & Richards, T. A. (2016). Human trafficking: An exploratory review of training videos. Journal of Human Trafficking, 2(3), 221–234 https://doi.org/10.1080/23322705.2015.1121732; and Sanford, R., Martinez, D., & Weizter, R. (2016). Framing human trafficking: A content analysis of recent U.S. newspaper articles. Journal of Human Trafficking, 2(2), 139–155. https://doi.org/10.1080/23322705.2015.1107341.

[64] Mapp, S., Hornung, E., D'Almeida, M., & Juhnke, J. (2016). Local law enforcement officers' knowledge of human trafficking: Ability to define, identify, and assist. Journal of Human Trafficking, 2(4), 329–342. https://doi.org/10.1080/23322705.2016.1143764.

[65] For example, Dr. Koegler cites in one of her own articles, which was published in 2020, "Farrell and Reichert (2017) found general confusion about how to identify human trafficking across various states and recommended increasing and enhancing human trafficking training for law enforcement officers."

[66] Preble, K. M., Tlapek, S., & Koegler, E. (2020). Sex trafficking knowledge and training: Implications from environmental scanning in the American Midwest. *Violence and victims*, *35*(3), 363-381.

CONFIDENTIAL

workers. Even years after the Plaintiffs' alleged trafficking period, large gaps continue to exist in our knowledge about the effectiveness of sex trafficking training. [67]

In order to be considered "high quality," a study would at least need to have a Level 3 on the Maryland Scientific Methods Scale (SMS) (see Table 1).

**Table 1. Maryland Scientific Methods Scale (SMS)[68]**

| Level | Study Design |
|---|---|
| 1 | Correlation between a prevention program and a measure of crime at one point in time. |
| 2 | Measures of crime before and after the program, with no comparable control condition. |
| 3 | Measures of crime before and after the program in experimental and comparable control conditions. |
| 4 | Measures of crime before and after the program in multiple experimental and control units, controlling for other variables that influence crime. |
| 5 | Random assignment of program and control conditions to units. |

Within the field of criminology, it is generally accepted that a certain amount of data/research would be a prerequisite to a program or intervention being required. For example, crime prevention programs may be considered to be "working" if there is at least two level-3 to level-5 evaluations showing statistically significant and desirable results and the preponderance of all available evidence showing effectiveness.[69] However, at present, I am not aware of even a single published Level 1 study evaluating the efficacy of the human trafficking victim identification protocols and/or "red flags" espoused by the Plaintiff. Although, there is possibly some research underway that may be slated to "examine" and purportedly "validate" the Blue Campaign signs and indicators, [70] that research has not been published to date and was certainly not available at the time when the Plaintiffs allege that they were trafficked. Moreover, it is questionable whether this research will actually test the sensitivity and specificity[71] of these interventions using a rigorous methodology.

For example, I was invited by the Journal of Human Trafficking to serve as a peer-reviewer for the evaluation of a manuscript entitled *A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign*, which

---

[67] Preble, K. M., Tlapek, S., & Koegler, E. (2020). Sex trafficking knowledge and training: Implications from environmental scanning in the American Midwest. Violence and victims, 35(3), 363-381.

[68] Farrington, D. P., Gottfredson, D. C. et al., *The Maryland Scientific Methods Scale: In Evidence-Based Crime Prevention*, pp. 27-35, Routledge (2003).

[69] For example, see Welsh, B. C., & Farrington, D. P. (2006). Evidence-based crime prevention. In *Preventing crime: What works for children, offenders, victims, and places* (pp. 1-17). Dordrecht: Springer Netherlands.
http://ndl.ethernet.edu.et/bitstream/123456789/46483/1/14.Brandon%20C.%20Welsh.pdf#page=10

[70] U.S. Department of Homeland Security, *DHS Partners with Harvard University to Support Blue Campaign*, S&T Public Affairs (Mar. 12, 2021), available at: https://www.dhs.gov/science-and-technology/news/2021/03/12/news-release-dhs-partners-harvard-university-support-blue-campaign.

[71] Defined *supra* Section II and discussed *infra* in the current section.

was submitted and co-authored by researchers at Harvard and the Department of Homeland Security.[72]

One of my initial critiques to this paper was regarding the "limitations and the serious flaws with the Blue Campaign," which include the issues with the sensitivity and specificity (false positives and false negatives) associated with the Blue Campaign indicators. In response to my critiques, the authors, which as mentioned earlier included a "DHS scientist," responded by saying "we agree with the reviewer and have now pointed out this strong limitation in several parts of the discussion and specific section on 'limitations'"[73] (see Figure 3).  Therefore, it is evident that even the developers of the Blue Campaign indicia accept the fact that these indicia are presently unsupported by reliable empirical research.

Overall, while this study does contribute to a growing knowledge base, it should more adequately discuss its limitations and the serious flaws with the Blue Campaign before being published. Information retention, especially if the information is erroneous, will not translate into the prevention of trafficking crimes or protection of victims. Please consider revising to better discuss the issues with the sensitivity and specificity (false positives and false negatives) associated with the Blue Campaign Indicators.

Response: We agree with the reviewer and have now pointed out this strong limitation in several parts of the discussion and specific section on "limitations".

**Figure 3. Mehlman-Orozco Critique and Response from Authors of A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign**

Currently, instead of relying on state of the science research methods, businesses, service providers, and other practitioners are limited to implementing speculative "best practices" with relatively unknown efficacy. However, a growing number of qualitative and anecdotal data suggests that there are significant issues with misidentification, as discussed further below.

### Sensitivity and Specificity

Although the efficacy of available interventions for sex trafficking victim identification is relatively unknown, I can, to a reasonable degree of social scientific certainty, opine that many of the "red flags" being touted by the Plaintiffs have low rates of sensitivity and specificity.

Herein, the term sensitivity is defined as the ability of law enforcement, service providers, and other third parties to correctly identify true victims of human trafficking (true positive). The term specificity refers to the ability of law enforcement, service providers, and other third parties to correctly identify persons who are not victims of human trafficking (true negative).

In regard to sex trafficking victim identification, low sensitivity means that even if these protocols were implemented, victims of human trafficking would continue to be misidentified as non-victims, criminals, or co-conspirators. Low specificity means that even if these protocols were implemented, persons who are not victims of human trafficking would be misidentified as being possible victims.

---

[72] Savoia, E., et al. "A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign." Journal of Human Trafficking (2023): 1-20.

[73] *Journal of Human Trafficking*. Manuscript Draft Submission: JHT-D-22-00077R1. Response to Reviewers.

These hypotheses are informed by my background, training, and expertise on the high rates of misidentification of victims by even trained professionals, including law enforcement. Moreover, there is a growing body of civil litigation regarding misidentification resulting from misguided "red flag" training on human trafficking.

### *Low Specificity*

A human trafficking "red flag" training with low specificity can be criticized as being too eager to find a positive result, even when it is not present. Implementing a human trafficking "red flag" training that has not been tested for sensitivity or specificity could result in false accusations/investigations of human trafficking against law abiding citizens.

<u>Human Trafficking "Indicators" in Aviation</u>

For example, the FAA Extension, Safety, and Security Act of 2016, requires air carriers to provide initial and annual flight attendant training regarding recognizing and responding to potential human trafficking victims. The Blue Lightning Initiative (BLI), led by the Department of Transportation, the Department of Homeland Security, and U.S. Customs and Border Protection, is an element of the DHS Blue Campaign. The BLI trains aviation industry personnel to identify potential traffickers and human trafficking victims, and to report their suspicions to federal law enforcement.



**Figure 4. Aviation Personnel "Indicators"**

The BLI training was developed based on feedback from aviation industry "experts" and human trafficking survivors.  The training is 25 minutes in length, and is comprised of four lessons that include:

1. What is Human Trafficking?;
2. Indicators of Human Trafficking Activity;
3. Reporting Suspected Human Trafficking;
4. Indicator Challenge.[74]

One of the supposed "indicators" or "red flags" that airlines were trained on was "a non-genuine relationship; particularly parent/guardian-child" (see Figure 4).[75] However, there was absolutely no empirical evidence to support

---

[74] U.S. Department of Transportation, *Blue Lightning Initiative*, available at: https://www.transportation.gov/administrations/office-policy/blue-lightning-initiative.

[75] Blue Lightning Initiative, *A Guide for Aviation Personnel to Recognize and Report Suspected Human Trafficking*, available at: http://hiddeninplanesight.org/wp-content/uploads/afa-cobranded-blue-lightning-pocket-guide-5.pdf.

CONFIDENTIAL

this "indicator" or "red flag" as being a valid sign of trafficking and anecdotal evidence suggests that it may have remarkably low rates of specificity.

According to multiple airline patrons, employees began falsely accusing and/or initiating investigations for trafficking against predominately mixed-race passengers, even though they were law abiding (for examples, see Table 2).

**Table 2. Examples of Human Trafficking "Red Flag" Indicia Resulting in False Allegations and Claims of Racial Profiling**

| Case Name/Number | Year | Allegations |
|---|---|---|
| PETER DELVECCHIA, et al., Plaintiffs, v. FRONTIER AIRLINES, Inc., et al., Defendants. Case No. 2:19-cv-01322-KJD-NJK | 2019 | Plaintiff Peter DelVecchia ("Peter") and his twelve-year old son, Plaintiff A.D., contracted with Defendant Frontier Airlines to fly from North Carolina to Las Vegas. Plaintiff Peter is Caucasian and his son, A.D. is African-American. Defendant Warren then falsely accused Peter of engaging in illegal human trafficking and sexual assault. Based upon the allegations of the complaint, the assault and the accusations were based on Warren's belief that an older white man should not be traveling with a younger black child. Warren had discussed these beliefs with the rest of the flight crew, the other defendants. They concurred in his belief that the situation was "improper" and that Peter showed inappropriate affection to A.D. Warren then forced A.D. to leave his seat and father. He was forced to sit in the rear of the plane where an adult male sat between A.D. and the aisle. The father and the son were not allowed to reunite for the duration of the flight.[76] |
| MARY MACCARTHY, M.M., a minor child, Plaintiffs, v. SOUTHWEST AIRLINES, INC. Defendant. Case No. 1:23-cv-01975-MEH | 2021 (filed 2023) | Mary MacCarthy of Los Angeles and her 10-year-old daughter, Moira, were flying to Denver. When they arrived in Denver, MacCarthy said, she and her daughter were met on the jetway by two Denver police officers. The mother and daughter were cleared, but the police report noted that officers were responding to a "possible Human Trafficking reported by Southwest flight attendant," which Ms. MacCarthy believed was racial profiling.[77] |
| N/A | 2021 | Lakeyjanay Bailey, a 21-year-old Black woman, was traveling from Denver to Dallas with her 4-year-old adoptive sister, Olivia, who is white. When the pair landed at Dallas Fort Worth International Airport, authorities were waiting for them inside the gate. The incident report said that Frontier Airlines requested police to investigate the matter after a passenger on the plane was concerned about a possible human trafficking incident involving a female born in 2001 who was traveling with a female born in 2017.[78] |
| N/A | 2015 | Kathleen Chan and Jay Serrano, are residents of Astoria, Queens, who were returning from a holiday trip to the Dominican Republic. When their American Airlines flight landed at JFK Airport, the flight captain asked everyone to stay seated. After about 20 |

---

[76] *See* case information, available at: https://casetext.com/case/delvecchia-v-frontier-airlines-1.

[77] Jenn, S. & Lemos, G., *Mom says Southwest Airlines thought she was trafficking her biracial daughter*, CNN (Nov. 8, 2021), available at: https://www.cnn.com/2021/11/07/us/southwest-airlines-human-trafficking-accusation/index.html.

[78] Wang, B., *Black Aurora woman questioned for trafficking white sister at Dallas airport*, Denver7 (July 21, 2021), available at: https://www.thedenverchannel.com/news/local-news/black-aurora-woman-questioned-for-trafficking-white-sister-at-dallas-airport.

| Case Name/Number | Year | Allegations |
|---|---|---|
| | | minutes, three-armed Port Authority police officers entered the plane and asked Chan to escort them outside. Chan, an Asian woman, and Serrano, a Puerto Rican man, were told that the flight crew had alerted the police that it was a possible case of sex trafficking,[79] even though the couple were in a consenting adult relationship and actually lived together. |
| N/A | 2017 | Brian Smith, from Arizona, was travelling back from a trip to Florida with his wife Renee and their three children, including Georgianna, 16, who the couple adopted from China. Mr. Smith said as the family got off their Southwest Airlines flight in Phoenix, he was approached by police who said a flight attendant had "some concerns about the person you're with." Southwest Airlines later released a statement: "Our flight attendants do receive training in recognizing expert-identified, common behavioral indicators of human trafficking. Following conversations with authorities on the ground after the flight, we're continuing our conversation with the family and with our employees whose valuable vigilance is aimed at aiding law enforcement in successfully stopping a growing number of trafficking situations."[80] |
| N/A | 2017 | Osvaldo Maciel had been flying back to New York from a trip to Cancun to visit family with his fairer skinned young daughter on March 1, when another passenger accused him of child trafficking. When the plane touched down at Newark Airport, Mr. Maciel and his daughter were allegedly approached by a number of officers from the Port Authority and Customs and Border Patrol, escorted off the plane and interrogated. Mr. Maciel's wife stated the incident was based on nothing more than a racially charged observation.[81] |

Additionally, persons erroneously accused of trafficking and/or reported to the police as victims have started to file lawsuits alleging defamation. For example, Marcia Festen and E.L. recently filed a lawsuit against Eastside Medical Center LLC, Robin Lowman White, Elizabeth Davlantes, and Jane Marilyn Pineda on July 3, 2022 (Case No. 1:22-cv-02646-MHC) in the United States District Court for the Northern District of Georgia Atlanta Division asserting claims of defamation, slander and libel because E.L. was erroneously reported to the police as a suspected victim of trafficking.

Ultimately, although anti-trafficking training and interventions may be well-intentioned, they are largely untested or unsupported by rigorous empirical research. Extant information suggests that many "indicia" have low rates of specificity and misidentification persists.

---

[79] Nolan Brown, E., *Another Asian Air Traveler Detained Over Suspicions She's Being Sex Trafficked*, Reason (Jan. 14, 2016), available at: https://reason.com/2016/01/14/another-asian-woman-detained-at-airport/.

[80] News.com.au, *Man wrongly accused of human trafficking teenage daughter*, (Dec. 22, 2017), available at: https://www.news.com.au/travel/travel-updates/incidents/man-wrongly-accused-of-human-trafficking-teenage-daughter/news-story/0b541932de32ad24c66894fd86bc7ce4.

[81] News.com.au, *Father interrogated for child trafficking because his daughter did not look like him*, (Apr. 21, 2017), available at: https://www.news.com.au/travel/travel-updates/incidents/father-interrogated-for-child-trafficking-because-his-daughter-did-not-look-like-him/news-story/dad68db2c0d0a3425a80b04c545fa245.

CONFIDENTIAL

Human Trafficking "Indicators" in Hospitality

Since its launch in 2010 by the Department of Homeland Security, Office of Partnership and Engagement (OPE), the Blue Campaign has been offering training to law enforcement agencies and others to increase detection and investigation of human trafficking, protect victims, and bring suspected traffickers to justice. However, even as of 2023, data scientists for DHS recognize that their training and educational materials are not based on empirical evidence and their reliability is unknown, if not questionable.

As of the Plaintiffs' alleged trafficking period in March 2013, the Blue Campaign's guidance to private businesses was not yet specific to the hotel industry and provided only high-level information, for awareness as opposed to intervention. The potential "indicators" of trafficking in these materials as of July 2012 were not empirically validated and included very few "signs" that would typically be observable by hotel staff.
Similar to the aviation industry, the Department of Homeland Security Blue Campaign later released a toolkit for identifying human trafficking in the hospitality industry in or about July or August of 2016,[82] several years after the Plaintiffs' alleged trafficking period at the Days Inn Stockbridge in this case.

The Blue Campaign hospitality toolkit shared four sets of "indicators," which were still not empirically tested or validated,[83] for different types of staff:

1. Hotel and Motel Staff;
2. Housekeeping, Maintenance, and Room Service Staff;
3. Concierge, Bellman, Front Desk, Security, and Valet Staff;
4. Food and Beverage Staff.

This toolkit includes a number of "general indicators," which lack any empirical support. For examples, see Table 3.

Table 3. Sample of Blue Campaign "Indicia" and Countervailing Information

| Applicable Staff | Blue Campaign "General Indicator" | Countervailing Information |
|---|---|---|
| All hotel and motel staff | Individuals have few or no personal items—such as no luggage or other bags. | There is no empirical evidence to support this purported "indicium." Publicly criticized for potentially ensnaring female |

---

[82] U.S. Department of Homeland Security, *Human Trafficking and the Hospitality Industry* (Released on Aug. 10, 2016), available at: https://www.dhs.gov/blog/2016/08/10/human-trafficking-and-hospitality-industry. However, other sources state it was released in July of 2016.

[83] Dr. Mehlman-Orozco personally interviewed Mick McKeown, who was Executive Director of the Homeland Security Advisory Council and Campaign Office during the time this toolkit was created, and he confirmed absolutely no research was used in the development of these indicators or to test their sensitivity or specificity for identifying potential trafficking on premises.

CONFIDENTIAL

| Applicable Staff | Blue Campaign "General Indicator" | Countervailing Information |
|---|---|---|
| | | travelers traveling alone, particularly for business.[84] |
| Housekeeping, Maintenance, and Room Services | Refusal of cleaning services for multiple days. | There is no empirical evidence to support this purported "indicium." Refusal of cleaning services is common and, for disease safety, many hotels did not/do not provide it without explicit request. |
| Housekeeping, Maintenance, and Room Services | Smell of bodily fluids and musk. | There is no empirical evidence to support this purported "indicium." Publicly criticized for potentially ensnaring sexual activity between consenting adults and violations to rights to privacy.[85] |
| Housekeeping, Maintenance, and Room Services; as well as Concierge, Bellman, Front Desk, Security, and Valet Staff | The same person reserving multiple rooms. | There is no empirical evidence to support this purported "indicium." Larger families with more than four people, reserve multiple, adjacent rooms. |
| Housekeeping, Maintenance, and Room Services | Evidence of pornography. | There is no empirical evidence to support this purported "indicium." Publicly criticized for potentially ensnaring sexual activity between consenting adults and violations to rights to privacy.[86] |
| Housekeeping, Maintenance, and Room Services | Provocative clothing and shoes. | There is no empirical evidence to support this purported "indicium." Publicly criticized for policing adult female clothing choice and violations to rights to privacy.[87] |
| Housekeeping, Maintenance, and Room Services | Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.). | There is no empirical evidence to support this purported "indicium." Publicly criticized for potentially ensnaring sexual activity between consenting adults and violations to rights to privacy.[88] |
| Concierge, Bellman, Front Desk, Security, and Valet Staff | Room paid for with cash or pre-loaded credit card. | There is no empirical evidence to suggest that paying cash for a room is a reliable indicium of trafficking. Moreover, this is a common need for homeless populations, as well as for survivors of domestic violence and other persons in need of emergency and |

[84] *See*, for example: Nolan Brown, E., *Are You a Woman Traveling Alone? Marriott Might Be Watching You*, Reason (2019), available at: https://reason.com/2019/02/05/hotel-surveillance-state-sex-trafficking/; Song, S., *When Anti-Sex Trafficking Policies like the Marriott's Do More Harm Than Good*, Paper Magazine (Jan. 30, 2019), available at: https://www.papermag.com/marriott-hotels-sex-trafficking-training-2627520121.html?rebelltitem=9#rebelltitem9.

[85] *See*, for example: Nolan Brown, E., *Are You a Woman Traveling Alone? Marriott Might Be Watching You*, Reason (2019), available at: https://reason.com/2019/02/05/hotel-surveillance-state-sex-trafficking/; Song, S., *When Anti-Sex Trafficking Policies like the Marriott's Do More Harm Than Good*, Paper Magazine (Jan. 30, 2019), available at: https://www.papermag.com/marriott-hotels-sex-trafficking-training-2627520121.html?rebelltitem=9#rebelltitem9.

[86] *Id*.

[87] *Id*.

[88] *Id*.

CONFIDENTIAL

| Applicable Staff | Blue Campaign "General Indicator" | Countervailing Information |
|---|---|---|
| | | temporary housing. Claiming that "accepting cash" is an indication of human trafficking is not only unsupported by empirical research, but suggests an elitist, unreliable, and subjective perception of reality. Denying rooms to homeless populations, simply due to mode of payment, can have legal repercussions.[89] |
| Concierge, Bellman, Front Desk, Security, and Valet Staff | Individuals leaving room infrequently, not at all, or at odd hours. | There is no empirical evidence to support this purported "indicium." |

Ultimately, given the lack of qualitative or quantitative evidence to support the efficacy of these "indicia" and interventions, they should be applied cautiously, if at all. While these "indicia" have not been adequately empirically tested, extant reliable principles and scientific methods suggest that implementation and training of these "indicia" will have no bearing on a business' ability to prevent, identify, or intervene against human trafficking on premises and may actually result in high rates of false accusations. At present, any suggestion otherwise is based on unsupported speculation or subjective belief. Moreover, as discussed above, Blue Campaign did not even put these purported "indicia" into circulation until years after Plaintiffs' alleged trafficking.

---

[89] In Ireland, a homeless family was awarded €22,000 in compensation after a hotel refused to honor their booking without a credit card. *See* Lucey, S., *Hotel discriminated against homeless family by demanding credit card*, Irish Legal News (Mar. 2, 2022), available at: https://www.irishlegal.com/articles/hotel-discriminated-against-homeless-family-by-demanding-credit-card.

CONFIDENTIAL

# VI.   MISIDENTIFICATION OF HUMAN TRAFFICKING VICTIMS

Many experts agree that "the anti-trafficking field is a strikingly 'rigor-free zone' when it comes to defining the concept's legal parameters."[90] It is believed that key aspects of the legal definition were intentionally left vague in order to achieve legislative consensus, but this has resulted in the indiscriminate conflation of legal concepts and misidentification of victims.[91] Even law enforcement, medical health providers, educators, and social workers are not consistently trained and, even when trained, they misidentify victims of sex trafficking with frequency.

## Misidentification by Law Enforcement

Given the lack of empirical evidence on human trafficking indicia and identification strategies, the likelihood of U.S. law enforcement officials actually identifying a victim has historically been relatively low, and even lower when it comes to private businesses.

For example, using a nationally representative survey of police organizations, Farrell, McDevitt, & Fahy (2010) found that between 2000 and 2006, less than 10% of police agencies identified a human trafficking case. Even with increases in awareness and new, more comprehensive legislation at the disposal of law enforcement, few human trafficking cases are ever identified (Farrell, Owens, & McDevitt, 2013).

In evaluating why many law enforcement agencies have identified relatively few cases, Farrell (2013) analyzed data from municipal police agencies in the United States. Her research found that despite changes in legislation, police agencies might still be unprepared to identify and respond to human trafficking locally. In part, the study found that due to theoretical and practical barriers with effectuating organizational change within police agencies, policy developments have not necessarily manifested into changes in practice.

As of 2014, Polaris Project reported that only 32 states mandate or encourage training of law enforcement on human-trafficking crimes.[92] Even when the police have received basic training about human trafficking, they generally have been unable to identify a broad range

---

[90] Chuang, J. A., *Exploitation Creep and the Unmaking of Human Trafficking Law*, The American Journal of International Law, (108) 4: 609-649 (2014).

[91] *Ibid*.

[92] Polaris Project, *2014 State Ratings on Human Trafficking Laws* (2015), available at: https://polarisproject.org/wp-content/uploads/2019/09/2014-State-Ratings.pdf.

CONFIDENTIAL

of human trafficking.[93] Law-enforcement officials often struggle to distinguish human-trafficking crimes from other previously existing crimes such as prostitution. As a result, law enforcement commonly misclassifies human-trafficking victims as offenders.[94]

To retroactively correct the erroneous criminalization faced by human trafficking victims in the criminal justice system, an increasing number of states have passed vacatur statutes and safe harbor laws.[95] These laws provide post-conviction relief for survivors of human trafficking by completely erasing criminal convictions related to their victimization. By one count, 18 states had passed vacatur statutes and another 10 states had enacted partial vacatur laws by 2017.[96] By 2013, 18 states had passed safe harbor laws.[97]

Ultimately, misidentifications of trafficking victims by law enforcement were even more prevalent during the trafficking period alleged in this case. As such, there is no reliable basis to conclude that private businesses such as hotels should have been held to a higher standard or required to be better trained than law enforcement.

<u>Misidentification by Healthcare Providers</u>

Similar to law enforcement officers, the likelihood of medical and mental health providers successfully identifying a victim is also very low. Training on human trafficking for these professionals is also not evidence-based or universally mandated. For example, in *Psychiatry's Role in the Management of Human Trafficking Victims: An Integrated Care Approach,* which was published in 2018, the authors wrote that "Victims are often underrecognized and there are few guidelines for how best to identify, care for, and safely reintegrate victims back into the community."[98] Additionally, the authors found that there were no integrated care models that provide decisional guidelines at different points of intervention for human trafficking patients and that highlight the important role of

---

[93] Farrell, A. & Pfeffer., R., *Policing Human Trafficking: Cultural Blinders and Organizational Barriers,* The ANNALS of the American Academy of Political and Social Science (2014); Gallagher, A. & Holmes, P., *Developing an Effective Criminal Justice Response to Human Trafficking: Lessons from the Front Line,* International Criminal Justice Review (2008), available at: http://togetherletsstoptraffick.org/assets/OnlineDocuments/ICJR-GALLAGHER-HOLMES.pdf.; Wilson, J.M. & Dalton, E., *Human Trafficking in the Heartland: Variation in Law Enforcement Awareness and Response,* Journal of Contemporary Criminal Justice, pp. 296-313 (2008).

[94] Farrell, A., Owens, C., & McDevitt, J., *New laws but few cases: understanding the challenges to the investigation and prosecution of human trafficking cases,* Crime, Law and Social Change, 661, 139-168 (2013); Farrell, A., Pfeffer, R., & Bright, K., *Police perceptions of human trafficking,* Journal of Crime and Justice, 38(3): 1-19 (2015).

[95] Mehlman-Orozco, K. B. & Hedlin, S., *Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking,* The Houston Chronicle (Jan. 19, 2017), available at: https://www.houstonchronicle.com/opinion/outlook/article/Mehlman-Orozco-Hedlin-Stop-criminalizing-10869881.php.

[96] Rabjan, J., *State Advocacy, Fact Sheet: Vacatur Laws,* National Council of Jewish Woman, available at: https://www.ncjw.org/wp-content/uploads/2017/07/Fact-Sheet_Vacatur-Laws_Updated-2016.pdf.

[97] Mehlman-Orozco, K. B., *Safe Harbor legislation for juvenile victims of sex trafficking: A myopic view of improvements in practice,* Social Inclusion, Open Access Journal, 3. 1: 52-62 (2015).

[98] Gordon, Mollie, et al., *Psychiatry's Role in the Management of Human Trafficking Victims: An Integrated Care Approach,* Journal of Psychiatric Practice, 24.2 pp. 79-86 (2018).

CONFIDENTIAL

psychiatric consultation. In another article, *What are the Human Trafficking Policies of Professional Medical Organizations?*, which was published in 2021, the authors wrote that "human trafficking is an international public health concern in which healthcare professionals are in a unique position to intervene. It is unclear how professional medical organizations have responded to the need to identify and assist trafficked patients."[99] Even in 2021, only eight out of 265 national medical organizations had policies regarding human trafficking and "although human trafficking is recognized as a public health issue, research on the health effects of human trafficking and best intervention practices is limited."[100]

Failed opportunities for identification by medical and criminal justice professionals are a common experience by most victims of trafficking, especially considering that it is estimated that 88% of trafficking victims reported seeing an accredited healthcare professional during the time that they were trafficked.[101]

While the "red flags" of trafficking that can be screened for in the medical fields are not empirically supported by rigorous and reliable research, they are beginning to be referred to as "best practices" and included in trainings and published guidance (for example, pelvic trauma, neglected care, and even "tattoos indicating ownership or sex work;" which include "names," "dollar signs," "references to money," and "tattoos on the neck or pelvis," among others).[102] Although, it should be clear, the medical and mental health communities have largely not yet adopted and/or generally accepted these indicia for identifying victims of trafficking and the "human trafficking" phenomenon was relatively recently introduced to the medical and mental health fields. At present, I am not aware of any empirically validated, medical "red flags" that were detected during the period that the Plaintiffs allege they was trafficked at the Days Inn, nor would a "red flag" for the medical or mental health setting be appropriate to assess in a business setting.[103]

Ultimately, like most service providers, private businesses, and members of the public, health care providers often have misconceptions and stereotypes about what trafficking looks like and these pre-judgements can impede identification. Moreover, it is generally

---

[99] Fang, S., et al., *What are the Human Trafficking Policies of Professional Medical Organizations?*, Journal of Human Trafficking (2021), available at: https://www.tandfonline.com/doi/abs/10.1080/23322705.2019.1698895.

[100] Jain, J., et al., *Creating a collaborative trauma-informed interdisciplinary citywide victim services model focused on health care for survivors of human trafficking*, Public Health Reports 137.1_suppl: 30S-37S (2022).

[101] Gordon, Mollie, *Human Trafficking: In Plain Sight – Health Care Response to Trafficking: Recognize, Respond & Refer*, available at: https://www.youtube.com/watch?v=nJxtfN9siLY.

[102] Fang, S., et al., *Tattoo recognition in screening for victims of human trafficking*, The Journal of Nervous and Mental Disease, 206.10: 824-827 (2018). Note: none of these are sufficiently alleged in the present complaint.

[103] Generally, trauma-informed screening for trafficking typically occurs with interviews by law enforcement or social services professionals.

CONFIDENTIAL

accepted within the field that there is extreme "difficulty understanding the difference between commercial sex and sex trafficking."[104]

Misidentification by Educators

Similar to law enforcement officers, as well as medical and mental health providers, the likelihood of educators successfully identifying a victim is also incredibly low. Although educators are often the number one source of child abuse reports by mandated reporters, in educators/school personnel only accounted for 1% of reports to the human trafficking hotline, both nationally[105] and in the state of Georgia in 2021[106]

Training on human trafficking for these professionals is also not evidence-based or universally mandated and is relatively recent. The purported indicia for educators overlap

---

[104] See, for example, HanniStoklosa, M. D., & Miller, C. L. (2020). Barriers to Identification of Trafficked Persons in Health Care Settings. *Human Trafficking: A Treatment Guide for Mental Health Professionals*, 49.

[105] https://humantraffickinghotline.org/sites/default/files/2023-01/National%20Report%20For%202021.docx%20%283%29.pdf

[106] Georgia State Report. 2021. National Human Trafficking Hotline. Retrieved from: https://humantraffickinghotline.org/sites/default/files/2023-01/Georgia%20State%20Report%20For%202021.docx%20%281%29%20%281%29.pdf

CONFIDENTIAL

with the "red flags" or "signs" of trafficking in other industries. These supposed indicia are largely unobservable with low rates of sensitivity and specificity (See Figure 5).



▸ Approached by a trafficker or engaged with people involved in trafficking
▸ Multiple sex partners
▸ Frequent travel to other cities or out of state
▸ Frequently seen at hotels/motels or other sites where commercial sex exploitation is known to occur
▸ Sudden decline in academic performance
▸ Change in behavior or relationships
▸ New phones, clothes, or other material possessions
▸ Change in personal hygiene
▸ Uncharacteristic promiscuity and/or references to sexual situations or terminology beyond age-specific norms, highly sexualized online persona, or possession of unexplained sexual paraphernalia
▸ A "boyfriend" or "girlfriend" who is noticeably older and/or controlling
▸ Tattoos suggesting "ownership" by trafficker
▸ Has large amounts of cash or prepaid credit cards

▸ Exhaustion, depression, or symptoms of post-traumatic stress disorder (PTSD)
▸ Poor physical health or malnourishment
▸ Physical trauma, such as scars or bruises
▸ Untreated medical issues, such as sexually transmitted infections, occupational injuries, or exposure
▸ Lacks control over money, ID, travel documents, or personal schedule
▸ Exhibits self-destructive behavior
▸ Coached or rehearsed responses to questions

▸ Works but is unpaid, paid very little, or paid only through tips
▸ Accrues debt to employer while at work, or has responsibility for working off a large debt
▸ Recruited for work with promise of easy money
▸ Not allowed to quit a job
▸ Employed but doesn't have a school-authorized work permit, if required by state
▸ Has a school-authorized work permit if required, but works outside the permitted hours for students
▸ Defers personal or educational decisions to an employer
▸ Has more chores or responsibilities than are typical or age appropriate
▸ Pays family rent, food, clothes, and so on, or lives in inadequate quarters
▸ Lives with "parents" who are not biological or legal guardians, or has employer listed as caregiver
▸ Has received threats of harm to self, friends, or family; deportation; or reports to law enforcement

The indicators in Figure 2 are common in sex and labor trafficking situations. It is important to remember, however, that some students who have been trafficked won't show any of these signs. In fact, some students affected by trafficking see school as a safe haven where they can participate in normal peer activities and excel in their academic work.

**Figure 5. Human Trafficking in America's Schools "Indicators" of Child Sex Trafficking and Labor Trafficking**

As an example of how these indicators are speculative and not based on research or evidence, this list omits one of the most common indicia of trafficking among children—

CONFIDENTIAL

denial of access to education[107]—and glosses over the importance of IEP teams in identifying at-risk youth.

Ultimately, like most service providers, private businesses, and members of the public, educators and school employees also tend to have misconceptions and stereotypes about what trafficking looks like and these pre-judgements can impede identification. More importantly, given the clandestine nature of the crime, overt disclosures are rare,[108] which likely hinder the probability of intervention by mandated reporters who work for schools. Nevertheless, businesses have been documented as reporting trafficking incidents to the hotline at comparable or higher rates than mental health professionals and airline/airport staff[109]; legal professionals, students, and the press[110]; as well as educators and faith-based representatives.[111] This suggests that state of the art knowledge on trafficking identification is being comparably disseminated across industries. Unfortunately, anti-trafficking prevention and identification continues to be challenging because the available protocols for identification remain limited in efficacy.

<u>Available Protocols for Identification</u>

While empirical evidence on "risk factors" and "indicia" of trafficking specific to the hotel industry is questionable and still in development, there are some protocols available regarding human trafficking identification in general. For example, one of the first protocols for methodically screening and identifying human trafficking was published in 2009 by the International Labour Office. The protocol was developed from a Delphi methodology, which involved two successive electronic surveys of human trafficking experts: a first survey in April 2008 to collect indicators from the expert group; and a second one in July 2008 to establish a rating of the indicators. Experts were selected from the 27 EU Member States from police, government, academic and research institutes, NGOs, international organizations, labor inspectorates, trade unions and judiciaries.

Findings from the survey suggested there are six "dimensions" of trafficking indicators: (1) deceptive recruitment, (2) coercive recruitment, (3) recruitment by abuse of vulnerability, (4) exploitive conditions of work, (5) coercion at destination, and (5) abuse of vulnerability at destination. The indicia for each dimension were ranked "strong,"

---

[107] While truancy is listed as a "symptom of trauma" it isn't sufficiently identified as a red flag of active victimization.

[108] See, for examples, Mehlman-Orozco, Kimberly B. (2017). Hidden in Plain Sight: America's Slaves of the New Millennium. ABC-CLIO/Praeger; Shoop, L. (2019). Uncovering the 'Hidden Crime' of Human Trafficking by Empowering Individuals to Respond. *Ga. St. UL Rev.*, *36*, 1173; Farrell, A., & Pfeffer, R. (2014). Policing human trafficking: Cultural blinders and organizational barriers. *The Annals of the American Academy of Political and Social Science*, *653*(1), 46-64; Dank, M. L., Khan, B., Downey, P. M., Kotonias, C., Mayer, D., Owens, C., ... & Yu, L. (2014). Estimating the size and structure of the underground commercial sex economy in eight major US cities; and Farrell, A., Dank, M., de Vries, I., Kafafian, M., Hughes, A., & Lockwood, S. (2019). Failing victims? Challenges of the police response to human trafficking. *Criminology & Public Policy*, *18*(3), 649-673.

[109] See, for example, Trafficking Hotline Data Reports by Signaler Type for 2021 and Trafficking Hotline Data Reports by Signaler Type for 2015.

[110] See, for example, Trafficking Hotline Data Reports by Signaler Type for 2016.

[111] See, for example, Trafficking Hotline Data Reports by Signaler Type for 2015.

CONFIDENTIAL

"medium," or "weak" for each type of trafficking: (1) trafficking of adults for labor, (2) trafficking of adults for sex, (3) trafficking of children for labor, and (4) trafficking of children for sex.

Each of the six dimensions of trafficking were assessed independently from the others and the result of the assessment was positive if the dimension included at least: (1) two strong indicators, or (2) one strong indicator and one medium or weak indicator, or (3) three medium indicators, or (4) two medium indicators and one weak indicator.

After an assessment was done for each dimension, the final analysis involved combining the six elements to identify potential victims of trafficking—in the case of adults, the presence of deception, coercion, abuse and exploitation and in the case of children simply the presence of exploitation.

A full scale test of these indicators took place in Moldova in the second half of 2008, using a sample of migrants. The final analysis of the dataset gave the ratio of migrants to victims of deceptive or coercive recruitment, exploitation, and coercion at destination. Based on the results, migrants were qualified as successful migrants (no deception, no exploitation, no coercion), exploited migrants (exploitation without deception or coercion), victims of deception and exploitation (without coercion) and victims of trafficking for forced labor (deception, exploitation, and coercion).

A full list of the International Labour Organization's Operational Indicators of Commercial Sexual Exploitation of Minors is included in Appendix D. A summary of "Strong Indicators," across all trafficking types, are listed below:

- *Deceptive recruitment:* being deceived about the nature of the job, location, or employer, or deceived about access to education opportunities.
- *Coercive recruitment:* violence, abduction, forced marriage, forced adoption or selling of the victim, debt bondage, or threats of violence.
- *Abuse of vulnerability:* no identified strong indicators.
- *Exploitation:* excessive working days, excessive working hours, or hazardous work.
- *Coercion at destination:* confiscation of documents, debt bondage, forced into illicit/criminal activities, forced tasks or clients, isolation, confinement, surveillance, threats of violence against victim, or violence against victim.
- *Abuse of vulnerability at destination:* dependency on exploiters.

Ultimately, given the dearth of empirical research on human trafficking "red flags" and indicia, it is important to consider the totality of the circumstances, as well as available qualitative research and evidence when making a determination of human trafficking. In contrast, it is inappropriate to ignore certain pieces of evidence and rely instead on abstract presumptions or unsupported generic allegations.

# VII.  SEX TRAFFICKING

## *Sex Trafficker Characteristics*

Earlier research on recruitment and control in the commercial sex industry explored tactics used by "pimps" as opposed to "sex traffickers." Pimps recruited women into the commercial sex industry through one or a combination of five techniques: (1) love (romantic relationships), (2) debt (through extravagant introductory gifting), (3) drugs, (4) the "gorilla" technique (brute force), and (5) position of authority (parents or family).[112]

Similarly, sex traffickers in the United States conceal their exploitive intentions through entrapment and enmeshment schemes, portraying themselves as boyfriends/lovers or faux family, as well as using ruses involving debt bondage or coerced co-offending to gain compliance, while diminishing human trafficking victim credibility, likelihood of escape, and cooperation with law enforcement.

In conducting my own interviews with convicted human traffickers, I found that sex traffickers typically projected themselves to be honest heroes and lovers, while concealing their true self-identity as skilled manipulators.[113] Each human trafficker I interviewed claimed to truly love their victims and believed their actions helped improve their victims' lives, despite being convicted for sex trafficking.

In addition, the sex traffickers I interviewed rationalized their crimes through a common understanding of the commercial sex industry counterculture—also known as "The Game" or "The Life"—which was perceived as being misunderstood by mainstream conformists.

## *Human Trafficking Victim Characteristics*

Law enforcement and direct service providers regularly encounter victims of human trafficking who do not view themselves as victims and in many cases decline assistance. Many victims can be led to believe that they are "in love" with their trafficker or were "rescued" by their trafficker and feel compelled to return, even after being liberated by law enforcement.[114] The emotional and social attachment described by victims is explained as "trauma bonding" by experts in the field.

Trauma bonding is generally defined as the complex emotional relationship that often

---

[112] Mehlman-Orozco, K., *Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers*, Trends in Organized Crime, 23(2), pp. 95-114 (2017).

[113] *Ibid.*

[114] *Ibid.*

CONFIDENTIAL

exists between human traffickers and their victims. In order to facilitate a trauma bond with a victim, human traffickers will use a combination of emotional manipulation, feigned affection, physical and emotional abuse, common goals, and other tactics in order to maintain control and obedience for sexual exploitation. Their attachment with the perpetrator of the trauma/trafficker can serve as a coping mechanism for victims, while leading to distrust of law enforcement, family, and others, as well as failure to report victimization or delayed reporting, omissions, errors, and discrepant accounts.

While these counterintuitive reactions are described as byproducts of trauma bonding, they are also partially explained by the restricted life-choices of victims, prior to and following their commercial sexual exploitation. These victims are typically raised in dysfunctional environments, being in-and-out of various parts of the social services system including private NGOs, foster homes, and runaway shelters. Even after they are rescued from the commercial sex industry, there are limited resources to assist victims of human trafficking with housing, vocational placement, or education. Given the limited or non-existent resources for victims, human traffickers often portray themselves as "honest heroes," who rescued America's "disposable people."

The dysfunctional attachment between victims and human traffickers can hinder identification and impede prosecution by reducing the likelihood of cooperation with law enforcement, thus perpetuating the exploitation.

### Affected Industries

In 2018, two years after the alleged trafficking in the present case, the anti-trafficking non-profit Polaris Project released a report entitled *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking,* which included a section on recommendations for *Hotels and Motels*.[115] The survey included only 127 respondents and was not regulated by any institutional review board (IRB) process, which is standard practice for empirical research. While a nationwide sample of 127 respondents is too small to draw any generalizable inferences and the methodology was limited,[116] resulting in empirically unreliable data, some named experts rely upon the findings of this study when discussing industries affected by sex trafficking.

---

[115]    Available    at:    https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf.

[116] For example, the survey was completed online and respondents were not asked for any kind of confirmation of victim status. Respondents were not selected randomly and were compensated for their participation. Results did not account for social desirability bias, nonresponse bias, or sampling bias.

CONFIDENTIAL

The report identified eight industries that encounter human trafficking crimes:

1. Financial Services;
2. Housing and Homelessness Systems;
3. Social Media;
4. Temporary Work Visas;
5. Transportation;
6. Business Regulatory Systems;
7. Healthcare; and
8. Hotels and Motels.

Of those different industries, Hotels and Motels encountered the fewest forms of trafficking (see Figure 6), and other industries were alleged to "facilitate" these crimes more.

Ultimately, the reality is that human trafficking is a clandestine crime. Traffickers go to great lengths to conceal their activities from third parties. Therefore, even though a variety of industries may encounter trafficking victims on their platforms or premises, more often than not these encounters are obscured.

| | Financial Services Industry | Hotels & Motels | Housing & Homelessness Systems | Social Media | Temporary Work Visas | Transportation | Business Regulatory Systems | Health Care |
|---|---|---|---|---|---|---|---|---|
| Escort Services | ● | | | ● | | | ● | ● |
| Illicit Massage Businesses | ● | | ● | ● | ● | | ● | ● |
| Outdoor Solicitation | | ● | ● | ● | | | ● | ● |
| Residential Sex Trafficking | ● | | ● | | | ● | | |
| Domestic Work | ● | | ● | | ● | ● | | ● |
| Bars, Strip Clubs, & Cantinas | | ● | | ● | | | ● | |
| Pornography | ● | | | ● | | | ● | ● |
| Traveling Sales Crews | ● | | ● | | | ● | ● | |
| Restaurants & Food Service | ● | | ● | | ● | ● | ● | ● |
| Peddling & Begging | | | | ● | | | | |
| Agriculture & Animal Husbandry | ● | | ● | | | ● | ● | ● |
| Personal Sexual Servitude | | | | ● | | | | ● |
| Health & Beauty Services | ● | | | | ● | | ● | ● |
| Construction | | | | | | ● | ● | |
| Hospitality | ● | ● | | | | ● | ● | ● |
| Landscaping | ● | | | | | ● | ● | ● |
| Illicit Activities | ● | | | | | ● | ● | |
| Arts, Sports & Entertainment | | | | ● | | ● | ● | |
| Commercial Cleaning Services | ● | ● | ● | | | ● | ● | |
| Factories & Manufacturing | | | ● | | | ● | | ● |
| Remote Interactive Sexual Acts | | | ● | ● | | | | |
| Carnivals | ● | | | | | ● | ● | |
| Forestry & Logging | ● | | | | | ● | ● | ● |
| Health Care | ● | | ● | | | ● | | ● |
| Recreational Facilities | ● | ● | | | | ● | ● | |

**Figure 6. Polaris Project Matrix on Human Trafficking Types by Industry**

CONFIDENTIAL

# VIII. ACTUAL OR CONSTRUCTIVE KNOWLEDGE

When analyzing the foreseeability of the Plaintiffs' alleged trafficking and the standard of care determining reasonableness of conduct owed to the Plaintiffs by the Defendant in the present matter, it is imperative to have a robust understanding about what was "knowable" and "foreseeable," as well as what constituted "proper care" by experts and practitioners, such as law enforcement and judicial officials, as well as industry executives, also known as the "state of the art."

The "state of the art" as a negligence defense is perhaps most well-documented regarding the civil litigation on asbestos,[117] but has also been applied to Trafficking Victims Protection Reauthorization Act (TVPRA) cases,[118] as well as strict products liability,[119] among other areas of law.

Prior to and at the time of A.J and Q.C.'s alleged trafficking period, there was a dearth of data on human trafficking, there was no reliable empirical research to support the sensitivity or specificity of interventions, and victims of trafficking were still misidentified by law enforcement (for reference, see *supra* Figure 1 and discussed throughout the report). Historically, available information was also based predominately on unsupported speculation, subjective belief, ecological fallacies and fallacies of composition, or secondarily exploitative misinformation.

The following sections discuss:

1. The modern and general "State of the Art" on human trafficking;
2. The modern and Georgia-specific "State of the Art" on human trafficking; and
3. The evolving "State of the Art" on the perception of minor victims of trafficking.

---

[117] See, for examples: Paustenbach, D. J., Finley, B. L., Lu, E. T., Brorby, G. P., & Sheehan, P. J. (2004). Environmental and occupational health hazards associated with the presence of asbestos in brake linings and pads (1900 to present): a "state-of-the-art" review or Journal of Toxicology and Environmental Health, Part B, 7(1), 25-80; Egilman, D. S., Ardolino, E. L., Howe, S., & Bird, T. (2012). Deconstructing a state-of-the-art review of the asbestos brake industry. NEW SOLUTIONS: A Journal of Environmental and Occupational Health Policy, 21(4), 545-571.

[118] Trassati, Marisa and Kevin A. Foreman. 2021. United States: FDCC's Insights Features Article By Trasatti And Foreman On Human Trafficking And The Travel Industry. Wilson Elser. https://www.mondaq.com/unitedstates/trials-appeals-compensation/1081352/fdcc39s-insights-features-article-by-trasatti-and-foreman-on-human-trafficking-and-the-travel-industry and Trassati, Marisa and Kevin A. Foreman. 2021. "The Travel Industry on Trial: The 'State of the Art' of Human Trafficking Awareness and the Impact of Third-Party Civil Cases" Spring 2021 edition of the Federation of Defense & Corporate Counsel's newsletter, Insights.

[119] For reference: Murray Jr, J. T. (1973). The State of the Art Defense in Strict Products Liability. *Marq. L. Rev.*, *57*, 649.

CONFIDENTIAL

### General "State of the Art" Knowledge

In general, alleged victims of sex trafficking involving third parties may assert that there were subtle "red flags" that should have been noticed, making their alleged trafficking "foreseeable" or "knowable" to the third parties. For example, in the hotel industry, plaintiffs and purported experts may contend that asking for extra towels, turning down room service, having multiple cell phones, or having "excessive" condoms in the room are "red flags" of trafficking that hotel staff should have noticed and acted upon. I am not aware of any empirical evidence to support the reliability of these "red flags" and anecdotal data suggests that these supposed "red flags" have low rates of sensitivity and specificity in a business setting. Moreover, even if these purported "red flags" were reported by employees to law enforcement, most of them are not illegal and are therefore unactionable. As such, even if accepted as true that these purported "red flags" were evident in a particular case, they do not rise to the level of establishing that it should have been foreseeable to a private business that an individual was being sex trafficked, such that the business would have owed that plaintiff a heightened duty of care.

Moreover, although most sex workers are not victims of trafficking,[120] many civil claims involving third parties allege that businesses should treat purported indicia of sex work as indicia of sex trafficking; thus, asking private citizen employees to assume all suspected sex workers are potentially trafficked victims.  In a private business setting, relying on the stereotype of what an average citizen thinks a sex worker might look like is not supported by empirical research and may expose the business to allegations of civil rights violations and/or defamation.

For instance, as previously mentioned, one of the supposed "indicators" or "red flags" that private businesses in the aviation industry were trained on was "a non-genuine relationship;

---

[120] Due to the clandestine nature of the crimes, reliable prevalence estimates are difficult to come by for both sex trafficking and consenting adult sex workers. However, available estimates suggest there are between one million to two million sex workers in the United States, while there are only estimated to be 15,000 to 300,000 victims of sex trafficking (a broad range in and of itself, underscoring the challenges of identification). Even if the highest estimates are assumed to be true, this suggests that far less than 30% of sex workers are victims of trafficking, and the number could be potentially less than 1%. Small sample studies of sex worker populations support the reality that most sex workers are not trafficked. For example, according to Conflict and Agency Among Sex Workers and Pimps: A Closer Look at Minor Domestic Sex Trafficking (2016), pimps were responsible for initiating into sex work 16 percent of the females, 1 percent of the males, and none of those who were transgendered. At 8.1 percent overall, pimp initiation was far less common than peer initiation by a friend (47 percent) or customer initiation (23 percent). In Atlantic City where the researchers interviewed sex workers who were 16 to 24 years old, they found that those who first entered when over 18 years of age reported being approached by a pimp at nearly twice the rate of those whose entry occurred when they were minors, and "self- initiation" was roughly twice as common among minors as those who entered after 18 years of age.

CONFIDENTIAL

particularly parent/guardian-child" (see *Supra* Figure 4).[121] However, there was absolutely no empirical evidence to support this "indicator" or "red flag" as being a valid indicium of trafficking and anecdotal evidence suggests that it may have remarkably low rates of specificity. According to multiple airline patrons, employees began falsely accusing and/or initiating investigations for trafficking against predominately mixed-race passengers, even though they were law abiding (for example, see *Delvecchia v. Frontier Airlines, Inc.*, Case No. 2:19-cv-01322-KJD-NJK (N.D. Ga.)).

### *"State of the Art" Knowledge in Georgia*

Officials in the State of Georgia have certainly made some efforts to combat trafficking in line with other legislative and judicial agencies. These efforts include in 2007, Georgia enacted an anti-trafficking law that defined trafficking as any person who: knowingly recruits, entices, harbors, transports, provides, obtains, maintains another person for the purpose of labor or "sexual servitude." This law did NOT treat minors involved in the commercial sex industry as *de facto* victims of trafficking, but instead, allowed sentencing enhancement for minors coerced or deceived into being trafficked[122].

Safe harbor was not offered to minors involved in the commercial sex industry in Georgia until approximately 8 years later in 2015. After the alleged trafficking period in the present matter, Georgia became "a leader" in the fight against the trafficking of children by passing the Safe Harbor/Rachel's Act and committing to ending the criminalization of child victims[123].

In 2017, although Georgia did have trafficking training statutorily mandated for law enforcement since around 2011[124], this training did not specifically address commercial sexual exploitation of children.[125] Other anti-trafficking efforts in Georgia have been more recent and the state continues to face challenges in combatting this pernicious crime (see *Infra* Figure 7).

For example, in 2019 Senate Bill 158, or the "Anti-Human Trafficking Protective Response Act," extended protection for victims, or suspected victims, of human trafficking by requiring law enforcement agencies or the Division of Family and Children Services

---

[121] Blue Lightning Initiative, *A Guide for Aviation Personnel to Recognize and Report Suspected Human Trafficking*, Hidden in Plain Sight, available at: http://hiddeninplanesight.org/wp-content/uploads/afa-cobranded-blue-lightning-pocket-guide-5.pdf.

[122] See, for example, presentation by Camila Wright for the GA Attorney General's Office. Human Trafficking 101. Note: This GA Attorney General training also cites to debunked myth and misinformation.

[123] Wilbanks Child Endangerment and Sexual Exploitation Clinic. 2023. Child Sex Trafficking: Enhancing Georgia's Response. Retrieved from: https://cease.law.uga.edu/wp-content/uploads/2023/02/2023-Child-Sex-Trafficking-and-Proposed-Legislation-in-Georgia.pdf

[124] This had been mandated since 2011 with House Bill 200, which increased penalties for trafficking, required training for law enforcement, and emphasized the need to treat those who were being commercially exploited as victims rather than criminals. See: https://www.legis.ga.gov/api/legislation/document/20112012/115045

[125] Shared Hope International. National State Law Survey: Law Enforcement Officer Training on Human Trafficking. Retrieved from: http://sharedhope.org/wp-content/uploads/2016/03/NSL_Survey_Law-Enforcement-Officer-Human-Trafficking-Training.pdf

CONFIDENTIAL

(DFCS) to refer children suspected of commercial sexual exploitation or trafficking to a certified victim services organization[126].

However, in 2023, Georgia's anti-trafficking legislation was graded overall as a "D" by non-profit Shared Hope, in part because of failures in prevention and training regarding identification and response to victims[127]. Child welfare departments, juvenile justice agencies, law enforcement agencies, prosecutors, and school personnel continue to have "training gaps" and frequently misidentified victims.[128] In the areas of "Identification of and Response to Victims" and "Prevention and Training", Georgia earned a "F.[129]"

As of last year, Georgia still only protected some, not all minors, from being criminalized for crimes related to their victimization.[130] For example, Georgia has not met the Shared Hope goals of:

1. Mandating juvenile justice agencies to conduct trauma-informed CSEC screening of children at risk of sex trafficking;
2. Prohibiting the criminalization of child sex trafficking victims for status offenses, and misdemeanor and non-violent felony offenses committed as a result of their trafficking victimization;
3. Prohibiting the criminalization of child sex trafficking victims for sex trafficking and commercial sexual exploitation offenses, including accomplice and co-conspirator liability, committed as a result of their trafficking victimization;
4. Providing child sex trafficking victims with an affirmative defense to violent felonies committed as a result of their trafficking victimization; or
5. Mandating a process for coordinating access to specialized services for child sex trafficking victims that does not require involvement in child-serving systems[131].

---

[126] "Anti-Human Trafficking Protective Response Act" Signed into Law. Retrieved from:
https://senatepress.net/anti-human-trafficking-protective-response-act-signed-into-law.html
[127] Safe Harbor. 2023. Report Cards on Child and Youth Sex Trafficking. Shared Hope. Retrieved from:
https://reportcards.sharedhope.org/wp-content/uploads/2024/02/2023-State-Report-GA.pdf
[128] *Ibid.*
[129] *Ibid.*
[130] *Ibid.*
[131] Safe Harbor. 2023. Report Cards on Child and Youth Sex Trafficking. Shared Hope. Retrieved from:
https://reportcards.sharedhope.org/wp-content/uploads/2024/02/2023-State-Report-GA.pdf

CONFIDENTIAL



Figure 7. Timeline of Georgia-Based Information Dissemination in Relation to A.J. and Q.C.'s Allegations

Individuals who engage in epistemic trespassing or those who have a superficial understanding of the "state of the art" knowledge on the progression of trafficking awareness in the United States often fail to recognize the challenges to identification, which is a critical oversight.

Until 2000, pimping was treated as a misdemeanor in Georgia, which was rarely prosecuted. For example, in January 2001 the Atlanta Constitution published "Selling Atlanta's Children"— a three-part series expose about 10 and 11 year old girls, who were being prosecuted for prostitution, while their pimps went free[132]. In fact, the article reported that "no one went to prison for just pimping" since 1972.

Perhaps in response to this exposé, pimps started to get charged with felonies for exploiting women and minors shortly thereafter, such as Charles Floyd Pipkins a.k.a. Sir Charles and Andrew Moore, Jr. a.k.a. Batman[133]. In November of 2001, Pipkins and Moore were two of fifteen Atlanta pimps who were arrested for exploiting minors in southwest Atlanta in an area around Metropolitan Avenue (formerly called Stewart Avenue) known as the "track" at the time.

Pipkins was known as a "player"—a pimp who was successful, established, and "well-respected" within the community. He was also involved as a producer of the infamous VHS, "Really Really Pimpin' in Da South", which outlined the rules of the pimping subculture in Atlanta and pre-dated the more well-known, but similar, VHS of "Pimp's

---

[132] Quoting original article and Hansen, Jane. 2015. Selling Atlanta's children: What has and hasn't changed. CNN. Retrieved from: https://www.cnn.com/2015/07/17/us/child-sex-trafficking-update-hansen/index.html

[133] U.S. v. Pipkins, CRIMINAL ACTION NO. 1:01-CR-0074-1-JOF, CIVIL ACTION NO. 1:06-CV-2629-JOF (N.D. Ga. Oct. 31, 2007)

CONFIDENTIAL

Up, Ho's Down," which featured Ice-T and Don "Magic" Juan. However, while Ice-T went on to play a police officer in Law & Order SVU and Don "Magic" Juan has since redefined himself as an "American preacher, hip hop personality, actor, fashion designer and former pimp," Pipkins was sentenced to 30 years in prison and Moore was sentenced to 40 years in prison.

The length of the sentences was due to the fact that the evidence at trial demonstrated that Pipkins and Moore prostituted juvenile females-at least one of whom was as young as 12—from at least 1997 until their arrest in late 2001.   The Defendants were convicted of conspiracy, in violation of 18 U.S.C. §  1962(d), to violate the Racketeering Influenced Corrupt Organizations Act ("RICO"), and of violations of a host of other criminal statutes.

Thereafter, an increasing number of pimps started to get prosecuted for commercial sexual exploitation or trafficking. Additionally, there was a significant decrease in the number of children being charged with crimes related to prostitution and commercialized vice. This evolving understanding of minor involvement in the commercial sex industry is discussed further in the section below.

### *"State of the Art" Knowledge on Minor Victims of Trafficking*

Since 2000, the TVPA definition of human trafficking requires a minor to be **induced** into providing a **commercial sex act**.

While the word "induced" literally means that a person is persuaded or influenced to do something, the practical definition in the anti-trafficking space is essentially that the minor is providing the commercial sex act for some reason other than their own financial benefit. Typically, this involves a third party taking the money earned from the minor commercial sex provider.



**Figure 8. National Juvenile Arrests for Prostitution or Commercialized Vice by Year**

CONFIDENTIAL

The inducement of minors into the commercial sex industry is often unobservable and difficult to identify, which is why minors can be arrested for crimes related to prostitution, especially leading up to A.J. and Q.C.'s alleged trafficking period.



**Figure 9. Georgia Juvenile Arrests for Prostitution or Commercialized Vice by Year**

For example, reported data from law enforcement agencies across the United States[134] illustrate that juveniles were arrested for prostitution or commercialized vice across the country, which continued even after the passage of the Trafficking Victims Protection Act and Safe Harbor laws[135] (See Figure 8). Similarly, according to the FBI Uniform Crime Report,[136] data on the number of arrests by age for crimes such as prostitution and commercialized vice illustrate children being arrested in Georgia as well (See Figure 9)[137].

While these graphs certainly illustrate how the understanding of trafficking has evolved, a "state of the art" analysis requires a clear understanding of the fact that minors engaged in commercial sex have historically been criminalized, misidentified, and underidentified, especially during the period of relevance in the present matter.  For examples, In re. N.C.,[138] In re. M.V.,[139] In re. M.D.,[140] and In re. Aarica S.[141] all involved juveniles criminalized for prostitution.  In fact, according to the Office of Juvenile Justice and Delinquency

---

[134] OJJDP Statistical Briefing Book. Estimated number of arrests by offense and age group, 1999. Retrieved from: https://www.ojjdp.gov/ojstatbb/crime/ucr.asp?table_in=1&selYrs=1999&rdoGroups=1&rdoData=c.

[135] Mehlman-Orozco, K., Safe Harbor legislation for juvenile victims of sex trafficking: A myopic view of improvements in practice, Social Inclusion, Open Access Journal, 3. 1: 52-62 (2015).

[136] Puzzanchera, C. and Kang, W., *Easy Access to FBI Arrest Statistics 1994-2014*, Online. OJJDP's EZAUCR (2017). Retrieved from:  https://www.ojjdp.gov/ojstatbb/ezaucr/asp/ucr_display.asp.

[137] Note: Data on Georgia was missing from the OJJDP database from 1994 and 1996-2011.

[138] THE PEOPLE, Plaintiff And Respondent, V. N.C., Defendant And Appellant. IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA FIRST APPELLATE DISTRICT DIVISION TWO A146637

[139] 225 Cal.App.4th 1495 Court of Appeal, First District, Division 4, California. IN RE M.V., a Person Coming Under

the Juvenile Court Law. The People, Plaintiff and Respondent, v. M.V., Defendant and Appellant. A137348

[140] 231 Cal.App.4th 993 Court of Appeal, First District, Division 3, California. IN RE M.D., a Person Coming Under the Juvenile Court Law. The People, Plaintiff and Respondent, v. M.D., Defendant and Appellant. A139888

[141] 223 Cal.App.4th 1480 Court of Appeal, Second District, Division 4, California.

IN RE AARICA S., a Person Coming Under the Juvenile Court Law. The People, Plaintiff and Respondent, v. Aarica S., Defendant and Appellant. B248010

CONFIDENTIAL

Prevention, in 2018 there were 260 children under the age of 18 arrested for prostitution and/or commercialized vice, 50 of which were under the age of 15.[142]

Although all commercially sexually involved minors are not *de facto* treated as victims of trafficking[143], it is recommended for them to receive treatment and services instead of criminalization and this understanding has clearly evolved in recent years.

An example of the shifting perception and treatment of minors involved in the commercial sex industry is the case of Cyntoia Denise Brown.[144] In 2004, Ms. Brown was a child victim of sex trafficking in Tennessee when she killed a commercial sex consumer who had purchased her for sexual abuse, but despite her status as a victim of trafficking, she was sentenced to life in prison for murder. Fifteen years later Ms. Brown was granted clemency.[145]

Another example is the case of Sara Jessimy Kruzan. In 1995 Sara Jessimy Kruzan was convicted of first degree murder of her trafficker, George Gilbert Howard, who had groomed her for commercial sex from the age of 11. Kruzan was a 16-year-old victim of sex trafficking at the time of her offense, but was initially sentenced to life-imprisonment without parole. When Kruzan petitioned for a new trial in 2012, Kamala Harris issued an initial opinion where she stated that Kruzan's ***"relationship with her pimp was a professional and financial one or at worst criminal[146],"*** even though she was a child. Kruzan was later released after serving 18 years in prison and in 2022 she was granted a full and unconditional pardon by Governor Gavin Newsom[147].

Ultimately, until very recently exiting data suggests that the overwhelming majority of judicial officials believed that minors could be consenting sex workers, deserving of

---

[142] OJJDP. Estimated number of arrests by offense and age group, 2018.
https://www.ojjdp.gov/ojstatbb/crime/ucr.asp?table_in=1

[143] It should be noted that in their complaint A.J. and Q.C. erroneously state that "A person under the age of 18 cannot consent to having sex in exchange for money. Any sale of sex in exchange for money involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal law 18 U.S.C. § 1591(a). Minor sex trafficking does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a)(1), et seq. Every person who engages in commercial sex with a minor is trafficking that minor under 18 U.S.C. § 1591(a)(1)." This is not accurate. The TVPA does require a minor to be ***induced*** into commercial sex and minors were not *de facto* treated as victims of trafficking, especially during the alleged trafficking period in the present matter.

[144] *State of Tennessee v. Cyntoia Denise Brown*, No. M2007-00427-CCA-R3-CD, 2009 Tenn. Crim. See also: https://tncourts.gov/sites/default/files/browncyntoiadeniseopn.pdf

[145] Gafas, M. and T. Burnside. (2019). Cyntoia Brown is granted clemency after serving 15 years in prison for killing man who bought her for sex. CNN. Retrieved from: https://www.cnn.com/2019/01/07/us/tennessee-cyntoia-brown-granted-clemency/index.html

[146] Sharma, Amita. 2012. California Attorney General Kamala Harris Lauds Record On Fighting Human Trafficking. KPBS. Retrieved from: https://www.kpbs.org/news/politics/2012/04/26/california-attorney-general-kamala-harris-lauds-re

[147] Alund, Natalie. 2022. Woman who was convicted as teen for killing her sex trafficker pardoned by Gov. Newsom. USA Today. Retrieved from:
https://www.usatoday.com/story/news/nation/2022/07/05/california-gov-newsom-pardons-sara-kruzan/7809296001/

CONFIDENTIAL

prosecution, and that trafficking could only be established through proving force, fraud, or coercion, even when a minor was involved.[148]

### Summary

In the present matter, available knowledge in anti-trafficking efforts is a central factor in measuring reasonableness of conduct and "state of the art." Human trafficking remains challenging to prevent and combat. It can occur online, on the street, in residential locations, or at businesses; it most often manifests in a manner that is hidden or clandestine and victims, including minors, are often under identified or misidentified.

The importance of data cannot be overstated. During A.J. and Q.C.'s alleged trafficking period, there was no evidence-based information on the reliability of training content, red flags, or intervention strategies and minors were actively criminalized for commercial sex activity. Even at present, there is no reliable empirical evidence to suggest that trained individuals are better equipped at identifying or combating trafficking, although it speculatively is treated as a purported "best practice." As opposed to specific training on "red flags," a more widely accepted and industry adopted procedure is to implement a common sense "see something, say something" expectation by the actual owner-operators of hotels themselves.

Moreover, Polaris in recent years has shifted its focus to stopping trafficking by educating persons that may be close to victims (friends, family, educators) instead of third-party businesses. "Chances are there's going to be nothing visible, nothing that you can see from across the room, or even from up close, that should alert you that a stranger is being trafficked. That may come as a surprise – especially if you have been to a training where you have been taught the 'signs' or indicators of trafficking, such as a person looking disheveled, upset or scared. But as we learn more about how trafficking really works, we are also learning that the best way to help is to pay attention to people you actually know or interact with – your students, your tenants, your children, your patients, your co-workers. It is all about two magic words: context and proximity."[149]

To this effect, it should be noted that the most common "signaler type" for calls to the human trafficking hotline in Georgia are typically:

1. Victims of human trafficking[150];

---

[148] See, for specific example, the case involving a 16-year-old runaway from Georgia and Jonathan David Cohen. As discussed in Nelson, Katie. October 10, 2016. Trafficking charge hinges on proving coercion, intent. Argus Leader. Retrieved from: https://www.argusleader.com/story/news/crime/non-emergency/2016/10/10/trafficking-charge-hinges-proving-coercion-intent/91727348/  See also, the case of Michael Moore in Ohio. For example, as discussed: https://www.wtol.com/article/news/ex-tpd-detective-found-not-guilty/512-87316a67-acb4-4638-af6f-4dbf601290de

[149] https://polarisproject.org/recognizing-human-trafficking/

[150] Ranked number 1 in 2015 (23.7%); ranked number 1 in 2016 (24%); ranked #1 in 2020 (32%); and ranked #1 in 2021 (32%).

CONFIDENTIAL

    2. Community members[151];
    3. NGO representatives[152]; and
    4. Victims of other forms of crime.[153]

These reporters are consistently ranked above law enforcement and legal professionals, as well as medical and mental health professionals, and educators likely because of context and proximity.

---

[151] Ranked number 2 in 2015 (23.1%), ranked number 2 in 2016 (22.8%); ranked number 2 in 2016 (21%); and ranked #2 in 2021 (13%).
[152] Ranked number 3 in 2015 (10.8%); ranked number 3 in 2016 (8.1%); and ranked number 5 in 2020 (7%).
[153] Ranked number 3 in 2020 (9%) and ranked number 3 in 2020 (11%).

# IX.   CASE SUMMARY

### *Overview*

According to their complaint, A.J. and Q.C. allege that in March of 2013, when they were 14 years old, they were sold for sex at the Days Inn Stockbridge.[154] A.J. and Q.C.'s do not claim that their alleged trafficker—Craig Alexander Hill aka "Chris Brown" [155] or his "bottom[156]" Tkeyah Aigner Adams aka "Ke-Ke"[157]— were ever employed by or affiliated with the Days Inn property. Craig Alexander Hill and his "bottom" Tkeyah Aigner Adams were indicted for multiple sex trafficking related offenses[158] on December 18, 2013[159]. Craig Alexander Hill later plead guilty to keeping a place of prostitution and pimping, while the "human trafficking" offenses were *nolle prossed[160]*. Similarly, Tkeyah Aigner Adams plead guilty to keeping a place of prostitution, while her other offenses were *nolle prossed.[161]*

A.J. and Q.C. both testified that they ran away in March of 2013[162] and first hid from the authorities and/or their parents at the trailer of an adult—"Rosa" aka "Lydia".[163] Even at the time of their deposition, A.J. and Q.C. perceived that this adult woman, who was hiding two 14-year-old girls from their parents at trailer park, was ***"helping"*** them[164] and ***"hadn't done anything wrong."***[165]

Both Plaintiffs also agree that Q.C. ran away first and that neither of them called their mothers for help, even though they had access to a phone[166]. When the Plaintiffs did call the police;[167] they did not intervene. A.J. had run away previously, just a few months earlier in December of 2012, and both Plaintiffs didn't reach out to their families for help because

---

[154] A.J. and Q.C. Complaint Page 6, Paragraph 14.
[155] Plaintiff QC's Response to Interrogatory 3, Page 6.
[156] See, *Supra* Section II.
[157] See, for example, Q.C. Deposition, Page 172 and A.J. Deposition, Pages 188-189.
[158] Trafficking a person for sexual servitude, keeping a place of prostitution, pimping, enticing a child for indecent purposes, and interference with custody.
[159] See Indictment 2013 CR 02540-6 12.13.2013.
[160] Criminal Action # 2013CR02540-06 Final Disposition and Felony Probation. 6/23/2014. Plaintiffs A.J. and Q.C. 00005-00011.
[161] Criminal Action # 2013CR02540-06 Final Disposition. Plaintiffs A.J. and Q.C. 00011.
[162] A.J. Deposition, Page 91 and Q.C. Deposition, Page 46.
[163] A.J. Deposition, Pages 102-103 and Q.C. Deposition, Page 60-62.
[164] A.J. Deposition, Page 103.
[165] Q.C. Deposition, Page 63.
[166] Q.C. Deposition, Page 107. A.J. Deposition, Page 108
[167] A.J. Deposition, Page 124.

CONFIDENTIAL

they wanted to avoid being punished[168]. However, that is where their recollection of events begins to diverge (see Table 4).

**Table 4. Comparison of Testimony by A.J. and Q.C.**

| Topic | A.J. Testimony | Q.C. Testimony |
|---|---|---|
| Reason Q.C. ran away. | A.J. testified that Q.C. ran away because her mom took her phone and was going through her phone, which revealed that she was texting boys in violation of her mother's rules[169]. | Q.C. testified that she first ran away because she was afraid of getting in trouble with her mom for missing the school bus that day[170]. When Q.C. returned home, her mother met her in the driveway and hit her, after asking where she had been[171] and taking her cell phone.[172] Q.C. entered the house and then left again out of the back door, returning to her "friend" Rosa's house[173] for a second time. |
| Reason A.J. ran away. | A.J. left her house to be with Q.C.[174] | A.J. left her house because she had also gotten in a dispute with her mother.[175] |
| First location. | A.J. testified that she first ran away to Q.C.'s "friend's" trailer—an adult named "Lydia".[176] | Q.C. testified that she first ran away to her "friend's" trailer—an adult named Rosa, but her testimony suggests that A.J. was not with her.[177] |
| First failed attempt at intervention. | A.J. does not recall the police,[178] but instead testified that her mother and Q.C.'s mother came to look for them at "Rosa" aka "Lydia's" trailer. | Q.C. testified that on the first night that she went to Rosa's trailer, the police came to look for her[179], but she hid and later slept on the sofa[180]. Her testimony suggests that A.J. was not with her, but testified that she told A.J. about what had occurred the following day through Facebook.[181] |
| After the first failed attempt at intervention | A.J. didn't remember where she slept that night. She testified that she believe a man came and picked them up and took them to another location.[182] | Q.C. testified that after the police left, she came out of hiding, and slept at Rosa's house on the sofa.[183] |

---

[168] A.J. Deposition, Page 119. Q.C. Deposition Pages 179-180.
[169] A.J. Deposition Pages 100-101.
[170] Q.C. Deposition, Page 46.
[171] Q.C. Deposition, Page 49.
[172] Q.C. Deposition, Page 52.
[173] Q.C. Deposition, Page 50.
[174] A.J. Deposition, Page 91.
[175] Q.C. Deposition, Pages 92-93.
[176] A.J. Deposition, Pages 102-103.
[177] Q.C. Deposition, Pages 47-48 and 55.
[178] A.J. Deposition, Page 104.
[179] Q.C. Deposition, Page 57.
[180] Q.C. Deposition, Pages 65 and 69.
[181] Q.C. Deposition, Page 72.
[182] A.J. Deposition, Pages 104-105.
[183] Q.C. Deposition, Pages 67-68.

CONFIDENTIAL

| Topic | A.J. Testimony | Q.C. Testimony |
|---|---|---|
| After Rosa's | A.J. testified that she didn't remember what she did for the next few days[184]. She only remembered "getting in trouble," hiding from her mom, and not wanting to go home.[185] She remembered hiding the stuff at a beach/lake house[186], before going to Jaylen Ping's house[187], and then to a different trailer park[188]. A.J. then testified that they went to one apartment complex,[189] before going to another apartment complex.[190] A.J. testified that she stayed at an apartment for two or three days.[191] | Q.C. testified that she met with A.J. the following day at Walmart[192] and then went to a neighborhood and slept outside.[193] |
| First hotel | A.J. testified that she doesn't remember the name of her "friend" who first got them a hotel room at the Southside Inn, but it may have been Jamaal.[194] | Q.C. testified that after sleeping outside, A.J. introduced her to Jamaal, who got them a room.[195] |
| Second failed attempt at intervention. | While at the first non-subject hotel, A.J. testified that someone started grabbing on the door handle, trying to open up the door, so the Plaintiffs got "very paranoid" and called the police[196]. The front desk of the hotel informed the Plaintiffs to call the police.[197] A.J. testified that the spoke to the police, who told them to "stay safe," use the door safety latch and consider propping a chair up for additional protection[198]. The officers informed the Plaintiffs that they would sit around in the parking lot in case it happened again.[199] However, the officers neglected to request the Plaintiffs' identification or intervene in their situation. | Q.C. testified that while staying at the first hotel, the front desk called the police because the Plaintiffs reported that someone was trying to open the door and they were scared. Law enforcement told them they would "watch the door" after a brief interaction.[200] However, the officers neglected to request the Plaintiffs' identification. Q.C. reported feeling "relieved" after law enforcement left, but the police had been there to help them[201]. |
| After the first hotel. | A.J. testified that they left before the man who rented the room returned to pick them | Q.C. recalled going to a Travelodge for a brief amount of time, which was a different |

---

[184] A.J. Deposition, Page 105.
[185] A.J. Deposition, Pages 105-106.
[186] A.J. Deposition Page 107.
[187] A.J. Deposition Page 110.
[188] A.J. Deposition, Page 111.
[189] A.J. Deposition, Page 113.
[190] A.J. Deposition, Page 117.
[191] A.J. Deposition, Page 121.
[192] Q.C. Deposition, Pages 92-93.
[193] Q.C. Deposition, Page 107.
[194] A.J. Deposition, Pages 117-118 and 127-128.
[195] Q.C. Deposition, Page 107.
[196] A.J. Deposition, Page 123.
[197] A.J. Deposition, Page 124.
[198] A.J. Deposition, Page 125.
[199] A.J. Deposition, Page 124.
[200] Q.C. Deposition, Page 135.
[201] Q.C. Deposition, Page 136-137.

| Topic | A.J. Testimony | Q.C. Testimony |
|---|---|---|
| | up because they were scared [202]. A.J. testified that they stayed there for at most one night[203] and then went to the Days Inn in Stockbridge.[204] A.J. testified that she didn't recall anyone named "Kane". Her testimony also suggests that she went to two hotels—one of which was the "Travelodge," which had changed its name to the "Southside Inn" by the time of the deposition[205]. | hotel from the Southside Inn. There, she testified that A.J. had sex with a man named "Kane."[206] However, Q.C. later changed her testimony and stated that the Travelodge was first and the Southside Inn was second.[207] Ultimately, she testified that they went to three hotels during the alleged trafficking period—each paid for by a different man.[208] |
| Introduction to alleged trafficker. | A.J. testified that she met Craig Hill off of the website Date Hookup[209]. | Q.C. testified that after the police incident, she remembers A.J. talking with Craig Hill aka "Chris" and he showed up with a woman and a baby.[210] |

The Plaintiffs concealed their whereabouts from their parents and the authorities. Multiple third parties encountered the Plaintiffs, but did not identify them as victims of sex trafficking or successfully intervene with their situation. For example, Rosa, Jamaal, A.J.'s brothers. Q.C.'s sister, the Plaintiffs' school, restaurant staff, retail staff, hotelier staff, and law enforcement.

For examples, Q.C.'s mother asked A.J. to help her find her daughter, but Q.C. lied and told her that she didn't know where she was,[211] even though she knew that Q.C. was at a trailer park in front of their neighborhood.[212] Q.C. wasn't sure if the school notified her mother regarding her absence,[213] but she told her sister.[214] Similarly, A.J. testified that she told her brothers where she was going, but they didn't ask any questions or stop her.[215] Rosa hid Q.C. and A.J. in her trailer. Law enforcement encountered A.J. and Q.C. at the Southside Inn, but did not ask them for identification or make any effort to rescue them or return them to their parents.

The Plaintiffs went to great lengths to avoid returning home. A.J. testified that her mother and Q.C.'s mother were "nothing nice[216]," so they didn't want to return home, even though they were running out of options on places to go.

---

[202] A.J. Deposition, Page 122.
[203] A.J. Deposition, Page 127.
[204] A.J. Deposition, Page 128.
[205] A.J. Deposition, Pages 151-152.
[206] Q.C. Deposition, Pages 115-116.
[207] Q.C. Deposition, Page 128.
[208] Q.C. Deposition, Page 101.
[209] A.J. Deposition, Page 128.
[210] Q.C. Deposition, Page 101.
[211] A.J. Deposition, Page 92.
[212] A.J. Deposition, Page 93.
[213] Q.C. Deposition, Page 49.
[214] Q.C. Deposition, Pages 47-48.
[215] A.J. Deposition, Page 99.
[216] A.J. Deposition, Page 119.

CONFIDENTIAL

Their complaint suggests that they were having sex with men in 15-minute intervals[217] and Q.C. testified she had sex with four men before police came[218]. This could suggest that she may have been present at the subject property for a remarkably short period of time, likely a few days[219] but possibly as little as a few hours considering that the other women who were with their alleged trafficker told law enforcement that they arrived at the property on the same day that police intervened[220].

Ultimately, on March 16, 2013, the Clayton County Police Department was called by A.J.'s mother after she discovered that her 14-year-old child was being advertised for sex on Backpage.com[221]. Plaintiffs A.J. and Q.C. were subsequently rescued from the hotel on March 22, 2013[222], but initially denied performing commercial sex acts[223].

Despite their claims, no employee of the Defendant was investigated, arrested, or convicted of any crime related to A.J. or Q.C.'s allegations.

Regarding the basic premise of the case, the Plaintiffs' complaint centers on generic claims of "general knowledge" and purported "specific knowledge" on sex trafficking. However, this alleged "knowledge" of trafficking is either erroneous, circulated after the fact, or limited by confirmation bias and hindsight bias (as defined in *Supra* Section II and discussed further in the sections below).

### *Claims Regarding "General Knowledge" of Sex Trafficking*

In their complaint, A.J. and Q.C. state:

> *A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e. "minor sex trafficking") is criminal sex trafficking under federal law whether the minor had a trafficker/pimp and does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a); Every person who engages in commercial sex with a minor is trafficking that minor under 18 U.S.C. § 1591(a)(1).[224]*

As previously discussed, although juveniles *should* be considered victims of trafficking *if* they were exploited, commercially sexually exploited minors continue to be criminalized in the United States, including in Georgia. This is mostly likely due to the fact that some

---

[217] A.J. and Q.C. Complaint Page 9, Paragraph 23.
[218] Q.C. Deposition, Page 167
[219] See, for example, A.J. deposition Page 174.
[220] Hill picked them up and took them to Days Inn room 123 on 3/22/2013. (see Warrant Application Affidavit).
[221] Police Case # 13017078 Warrant Application Affidavit.
[222] A.J. and Q.C. Complaint Page 10, Paragraph 26.
[223] See, for example, Plaintiffs A.J. and Q.C. 1369- DW_D0205.wav
[224] A.J. and Q.C. Complaint Page 2, Paragraph 3.

minors involved in commercial sex are not actively exploited, but instead are engaging in "survival sex." The fact that juveniles involved in the commercial sex industry are not *de facto* considered victims of sex trafficking is even recognized by research organizations such as Urban Institute, which published a research report in 2015 stating:

> "Stop arresting youth engaged in survival sex. Federal, state, and local laws **should** ban arrest and court proceedings for youth involved in prostitution or prostitution-related activity, including survival offenses.[225]."

In fact, when they were first interviewed, the Plaintiffs confided that they were threatened with criminalization at one point[226].

Moreover, the fact that minors were arrested in the state of Georgia before and after the Plaintiffs' alleged trafficking period (e.g. see *Supra* Figure 9) challenges the Plaintiffs' contention that all minors are *de facto* victims of sex trafficking.

Additionally, the Plaintiffs attempt to rest their theory on what they allege were "well-known and visible signs" of trafficking. However, these are not supported by state-of-the-science research or any reliable data (see Table 5 for examples). Instead, the Plaintiffs appear to be attempting to hold the Defendant to a higher standard than law enforcement and to a standard that is not supported by social science on intervention efficacy.

**Table 5. Sample of Plaintiffs' "Basic Premise" and Overview of Countervailing Information**

| Alleged "Well-Known and Visible Signs" | Evidence Base |
|---|---|
| "Young age and inappropriate dress[227]" | I am not aware of any reliable empirical evidence to support this purported "well-known and visible sign". It is unclear how "inappropriate dress" or "young age" would be defined or operationalized. It seems as if this would be highly subjective with low sensitivity and specificity, especially in places like Atlanta, where "club attire" may be perceived by some as inappropriate.<br><br>Moreover, perceived "young age" and "inappropriate dress" is unlikely to catalyze law enforcement intervention. In fact, I have interviewed law enforcement officers in Georgia who stated that minors dressed provocatively were not viewed as possible victims of trafficking until around 2020[228] and still present a challenge for law enforcement intervention. |
| "Monitoring and control by their trafficker[229]" | Given my knowledge and expertise on trafficking, it is unlikely for this type of monitoring to be evident or visible in public view at a business. Moreover, at the time of the alleged |

---

[225] Dank, Meredith et. al. 2015. Locked In: Interactions with the Criminal Justice and Child Welfare Systems for LGBTQ Youth, YMSM, and YWSW Who Engage in Survival Sex. Urban Institute. Retrieved from: https://www.urban.org/sites/default/files/publication/71446/2000424-Locked-In-Interactions-with-the-Criminal-Justice-and-Child-Welfare-Systems-for-LGBTQ-Youth-YMSM-and-YWSW-Who-Engage-in-Survival-Sex.pdf ; Bold and italic emphasis added.
[226] Plaintiffs A.J. and Q.C. 1369- DW_D0205.wav
[227] A.J. and Q.C. Complaint Page 10, Paragraph 25.
[228] Interviews with four Fulton County police officers on June 22, 2024 on Fulton Industrial Boulevard. Interview with one City of Atlanta police officer on June 13, 2024.
[229] A.J. and Q.C. Complaint Page 10, Paragraph 25.

| Alleged "Well-Known and Visible Signs" | Evidence Base |
|---|---|
| | trafficking period and even currently, perceived "monitoring" more often than not, fails to prompt law enforcement intervention. |
| "Frequently, the trash cans int eh room in which the Plaintiffs were trafficked contained an extraordinary number of used condoms and condom wrappers." "The room contained multiple boxes of condoms.[230]" | I am not aware of any reliable empirical evidence to support this purported "well-known and visible sign". It is unclear how "extraordinary number of used condoms and condom wrappers" would be defined or operationalized. It seems as if this would be highly subjective with low sensitivity and specificity. Publicly criticized for potentially ensnaring sexual activity between consenting adults and violations to rights to privacy[231]. During the course of my career I have never seen any crime scene photograph with a trash can containing an "extraordinary number of used condoms and condom wrappers." Although search warrants can be executed and reveal large/"value pack" sized boxes of condoms, these are typically casually hidden from both commercial sex consumers and hotel/motel staff. It should also be noted that in the present matter, law enforcement executed a warrant on the Days Inn room and found six unopened trojan condoms and 5 open trojan magnum condoms.[232]<br><br><br>**Figure 10. Typical Motel Trash Can**<br><br>During my systematic social observations of motel rooms, I have never seen any motel room with an "extraordinary number of used condoms and condom wrappers." Typically, these items are disposed of in a trashcan and comingled with other discarded items, such as drinks and food containers (e.g., soda cans and chip bags), tissues, tampons, floss, packaging for toiletries, etc. For example, see Figure 10.<br><br>Moreover, the presence of condoms is typically not actionable by law enforcement and there are residential communities in Atlanta littered with condoms without effective response from law enforcement or prevention (see Figure 11).[233]<br><br><br><br>**Figure 11. Example of Condom Wrappers Littering Affluent Neighborhood in Atlanta, Georgia in 2024** |
| "Plaintiffs frequently requested an excessive | I am not aware of any reliable empirical evidence to support this purported "well-known and visible sign". It is unclear how requesting extra towels would be defined or |

[230] A.J. and Q.C. Complaint Page 8-9, Paragraph 22.

[231] See, for example: Nolan Brown, Elizabeth. (2019). Are You a Woman Traveling Alone? Marriott Might Be Watching You. Reason. Retrieved from https://reason.com/2019/02/05/hotel-surveillance-state-sex-trafficking/  and Song, Sandra. (2019). When Anti-Sex Trafficking Policies like the Marriott's Do More Harm Than Good. Paper Magazine. Retrieved from: https://www.papermag.com/marriott-hotels-sex-trafficking-training-2627520121.html?rebelltitem=9#rebelltitem9

[232] Warrant Application Affidavit 5/31/2013 (ORR_Hill_Craig).

[233] Mehlman-Orozco, Kimberly. 2024. Sex trafficking and prostitution are happening all over Atlanta: Residents and businesses do their best to deter commercial sex work, but police often don't do much. Atlanta Journal-Constitution. Retrieved from: https://www.ajc.com/opinion/opinion-sex-trafficking-and-prostitution-are-happening-all-over-atlanta/U6BUS7P7HBD7RB2ID5LX36JMBY/

| Alleged "Well-Known and Visible Signs" | Evidence Base |
|---|---|
| number of towels from housekeeping." | operationalized (i.e., how many towels would be considered "excessive" or a "red flag"). It seems as if this would be highly subjective with low sensitivity and specificity. Also, in full disclosure, I ask for extra towels at every hotel I patronize. Moreover, this can often be unobservable if guests take towels off of the housekeeping cart when it is unattended. |
| "Multiple cell phones." | I am not aware of any reliable empirical evidence to support this purported "well-known and visible sign". It seems as if this would be highly subjective with low sensitivity and specificity. Also, in full disclosure, I have multiple cell phones and when I travel with family, there could be up to 5 cell phones in one room. Many government employees and law enforcement officers also have multiple cell phones. |

Other purported "red flags" that are not based in reliable empirical research, include but are not limited to:

1. Asking for additional room keys;
2. Asking for additional tissues;
3. Poor hygiene;
4. Physical "deterioration;" and
5. Cars parked backward.

Throughout the complaint, the Plaintiffs cite to a curated selection of information that is either erroneous, taken out of context, or applied through ecological fallacies or fallacies of composition. For examples, see Table 6).

**Table 6. Plaintiffs' Source of General Industry Knowledge in Context with Countervailing Information**

| Purported Source of Industry Knowledge | Context |
|---|---|
| Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons[234]. | This was not widely disseminated. The majority of law enforcement officers were not aware of human trafficking in 2000. It is unclear why the Plaintiffs appear to be attempting to hold a private business to a higher standard than law enforcement. |
| Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Days Inn Stockbridge. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000. Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in | Here, the Plaintiffs cite to a report from the Urban Institute on the size and structure of the underground commercial sex economy[236]. Again, it is erroneous and misleading to conflate prostitution and sex trafficking, as the Plaintiffs have done here in their complaint. Although this article does not provide the purported general industry knowledge as erroneously claimed by the Plaintiffs, it does however provide information that is counter to the Plaintiffs' claims in the present matter. Specifically, an Atlanta police officer interviewed by The Urban Institute was quoted as saying, *"The thing about the juvenile prostitution… they're hiding them out in rooms.* |

---

[234] A.J. and Q.C. Complaint Page 13, Paragraph 35.
[236] Urban Institute. 2014. Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities. https://www.urban.org/sites/default/files/publication/22376/413047-estimating-the-size-and-structure-of-the-underground-commercial-sex-economy-in-eight-major-us-cities_0_1.pdf

| Purported Source of Industry Knowledge | Context |
|---|---|
| metro Atlanta alone. Defendant has received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiffs and other minors[235]. | *They're not going to walk these girls where people can see them and see that they're underage because somebody's going to call the police and tip them you would think... My opinion, what I've observed is they're only staying a couple days because they don't want anybody to come get onto them...They're not going to stay in one place for any length of time because that increases the chance of somebody seeing the girls coming in and out and seen with this guy."* |
| Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking," and as "the number one city for child sex trafficking[237]." | First, the Plaintiffs misquote this source, which is an obscure set of remarks delivered by Acting Attorney General Sally Quillian Yates for National Slavery and Human Trafficking Prevention Month in 2015.  Specifically, Ms. Yates actually says, "there are varying reports, some identifying Atlanta as the number one city for child sex trafficking***, others ranking it somewhat lower***.  I think ***that it's actually hard to quantify those numbers***, but it is clear that whatever the number, it is way too high[238]." Therefore, not only is this purported "reputation" not well-published, but there are no reliable data establishing Atlanta as the number one city for child sex trafficking or an epicenter. As such, it is wholly unreasonable and misleading to assert that the Defendant "knew or should have known" this erroneous information. |
| Defendant knew or should have known that hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).[239] | Interestingly, the Plaintiffs are citing a Supreme Court case which facially invalidated a Los Angeles municipal code compelling hotel operators to gather certain information about guests and provide it to police on demand[240]. |
| Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that ninety-two percent of the calls it received involving hotels and motels reported sex trafficking, and another two percent | Even if this "statistic" is accepted as true, it is unclear what exactly the Plaintiffs expect the Defendant to have deduced. This should not be interpreted to impute correlation, much less causation. Moreover, according to the data on the national hotline, of the 6,656 phone calls, emails and online tip reports received over the course of five |

[235] A.J. and Q.C. Complaint Page 13-14, Paragraph 36.
[237] A.J. and Q.C. Complaint Page 14, Paragraph 37.
[238] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, Jan. 29, 2015, available at https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (emphasis added).
[239] A.J. and Q.C. Complaint Page 14, Paragraph 38.
[240] Harvard Law Review. 2015. City of Los Angeles v. Patel. Retrieved from: https://harvardlawreview.org/print/vol-129/city-of-los-angeles-v-patel/

CONFIDENTIAL

| Purported Source of Industry Knowledge | Context |
|---|---|
| reported a combination of sex and labor trafficking[241]. | years (January 1, 2012 to December 31, 2016), approximately a third referenced information of potential trafficking (2,386). And of the 2,386 *potential* cases of trafficking, 91.41% (2,181) were allegations of sex trafficking and a smaller percent potentially occurred at hotels or motels. The fact that Polaris reports 1,755 cases of potential sex trafficking based at hotels/motels over the course of five years, which averages around 350 per year, counters the narrative of sex trafficking being at "epidemic" proportions at hotels/motels. |
| A 2012 study found that 63 percent of trafficking incidents occurred in hotels[242]. | This purported "statistic" is not based on reliable or generalizable data. It is sourced from a study of "probable cause reports" on 67 cases of sex trafficking related crimes prosecuted in King County, Washington over the course of over four years (October 2008 to January 2012). Of the 67 cases, 63% were alleged to take place in hotels or motels, which is approximately 42 cases, across various hotels, over the course of four years. Businesses Ending Slavery and Trafficking (BEST) is known to disseminate misinformation in their training. Data from King County, Washington is not generalizable to Arkansas. Moreover, King County has approximately 2,269,675 inhabitants per recent Census data and, according to one consulting firm, a supply of 26,809 hotel rooms in Seattle[243]. If there are fewer than one trafficking case per month, that reflects a very small proportion of alleged illicit activity. Additionally, BEST is known for disseminating misinformation. For example, BEST suggests that most sex workers are victims of trafficking[244], when that is not supported by extant empirical data[245]. Ultimately, even BEST's report acknowledges that their training fails to show a "definite change" in the ability of trained hoteliers to identify trafficking cases[246]. |
| And the Polaris Project found that "75% of [trafficking] survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation . . . . Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff[247]." | This "statistic" is taken out of context and includes no evaluation of the methodological rigor of The Polaris Project's survey.  The content of The Polaris Project's *Hotels and Motels Recommendations* was an excerpt from a larger report entitled *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt* |

---

[241] A.J. and Q.C. Complaint Page 15, Paragraph 39.
[242] A.J. and Q.C. Complaint Page 15, Paragraph 39.
[243] See, for example, https://www.hvs.com/article/7907-in-focus-seattle-wa
[244] See BEST: Businesses Ending Slavery and Trafficking. Inhospitable to Human Trafficking Program Evaluation. 194.
[245] See *Supra*, Section VIII.
[246] See BEST: Businesses Ending Slavery and Trafficking. Inhospitable to Human Trafficking Program Evaluation. Footnote 10.
[247] A.J. and Q.C. Complaint Page 15, Paragraph 39.

| Purported Source of Industry Knowledge | Context |
|---|---|
| | *Human Trafficking*.[248] The survey included only 127 respondents and did not include any institutional review board (IRB) process, which is standard practice for empirical research. A nationwide sample of 127 is too small to draw any inferences and should not have been cited as "fact" by the Plaintiff. The survey was completed online and respondents were not asked for any kind of confirmation of victim status. Respondents were not selected randomly and were compensated for their participation. While the report did state that 75% of survivors in the Polaris survey reported coming into contact with hotels at some point during their trafficking situation, the very next line of the report is "This means traffickers in all 50 states are taking advantage of ***unwitting*** hotel franchisees…" Moreover, of the sample 45% sought shelter in hotels or motels during their exits[249] and 18% lived independently at a hotel. Only 4% reported being trafficked by a hotel and 3% reported being trafficked by a hotel subcontractor, neither of which is alleged to have happened at the Defendant's property.<br><br>In addition to hotels/motels, the report identified seven other industries that encounter human trafficking crimes:<br><br>1. Financial Services;<br>2. Housing and Homelessness Systems;<br>3. Social Media;<br>4. Temporary Work Visas;<br>5. Transportation;<br>6. Business Regulatory Systems; and<br>7. Healthcare.<br><br>Of those different industries, Hotels & Motels encountered the fewest forms of trafficking and other industries are alleged to "facilitate" these crimes more. For example, one respondent alleged that "technology is being used to hurt" them; specifically, social media platforms. |
| Defendant knew or should have known that attorneys for the hotel industry estimated and reported to hotel industry representatives that eight out of ten human trafficking arrests occur in or around hotels, and that the industry had been warned, among other things, to "Make sure hotel not complicit," "Manager not looking the | It is unclear why the Plaintiffs assert that the Defendant should have known about obscure remarks delivered by an attorney at the Academy of Hospitality Industry Attorneys Conference in 2013. There is no rigorous empirical research to validate that eight out of ten human trafficking arrests occur in or around hotels. |

---

[248] https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf
[249] When a victim escapes her trafficker and "exits 'The Life,' seeking refuge at hotels.

| Purported Source of Industry Knowledge | Context |
|---|---|
| other way," and "No pay off for silence or lack of curiosity." | |
| Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child- Protection Code of Conduct (the "Code") in the United States in 2004. Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:<br>a. establish corporate policy and procedures against sexual exploitation of children;<br>b. train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;<br>c. include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;<br>d. provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and<br>f. report annually on the company's implementation of Code- related activities. Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels[250]. | Despite the claims by Plaintiffs, The Code's purported "best practices" contain misinformation and there are no data to suggest that their "six simple steps" have any measurable impact on preventing sex trafficking. In fact, many of hotel brands that have signed The Code and taken their trainings have still been sued for TVPRA claims. For example, even after donating money to ECPAT-USA, taking their training, and signing The Code, Marriott[251] and Hilton Worldwide[252] were sued as third parties to human trafficking allegations. Additionally, every major hotelier, including CWT, are implicated by commercial sex consumers online as still being locations where commercial sex is exchanged[253], despite their adherence to ECPAT's The Code. This is because trafficking is a clandestine crime, which is difficult to identify even for trained law enforcement, but more so for businesses. |
| Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as: | Please see *Supra* Section V for a more in-depth discussion of the limitations of the DHS indicia. However, more importantly, it is unclear why the Plaintiffs spend nearly two pages of their complaint referencing these purported "red flags," considering they were not published until 2016[254], which is after A.J. and Q.C.'s alleged trafficking period in the present case. |

---

[250] A.J. and Q.C. Complaint Page 15-16, Paragraphs 40-42.

[251] Law.com. August 10, 2021. Craigslist, Hilton, Marriott Sued Over Alleged Sex Trafficking Activity in South Florida. Retrieved from https://www.law.com/dailybusinessreview/2021/08/10/craigslist-hilton-marriott-sued-over-alleged-sex-trafficking-activity-in-south-florida/

[252] Law.com. August 10, 2021. Craigslist, Hilton, Marriott Sued Over Alleged Sex Trafficking Activity in South Florida. Retrieved from https://www.law.com/dailybusinessreview/2021/08/10/craigslist-hilton-marriott-sued-over-alleged-sex-trafficking-activity-in-south-florida/

[253] See for example, www.USASexGuide.nl

[254] While DHS did have generic indicia before 2016, these were not designed specifically for use in the hospitality industry.

CONFIDENTIAL

| Purported Source of Industry Knowledge | Context |
|---|---|
| a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;<br>b. persons who lack freedom of movement or are constantly monitored;<br>c. persons who have no control over or possession of money or ID;<br>d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;<br>e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;<br>f. the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;<br>g. extended stay with few or no personal possessions in the room;<br>h. excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);<br>i. the same person reserves multiple rooms;<br>j. a room is rented hourly, less than a day, or for an atypical extended stay;<br>k. attempts to sell items to or beg from patrons or staff;<br>l. cars in the parking lot regularly parked backward, so the license plates are not visible;<br>m. loitering and solicitation of male patrons;<br>n. waiting at a table or bar and picked up by a male (trafficker or customer);<br>o. persons asking staff or patrons for food or money; and<br>p. persons taking cash or receipts left on tables. | |

Notably, the Plaintiffs do **not** claim that notice was provided to the Defendants when on September 15, 2013, the Georgia legislature passed O.C.G.A. § 16-5-47 requiring hotels to post sex trafficking notices "in each public restroom for the business or establishment and either in a conspicuous place near the public entrance of the business or establishment or in another conspicuous location in clear view of the public and employees where similar notices are customarily posted." The contents of the notice are prescribed by statute but must "provide information giving individuals a method to contact the National Human Trafficking Hotline and the Statewide Georgia Hotline for Domestic Minor Trafficking." Failure to comply with O.C.G.A. § 16-5-47 is a misdemeanor. This was not a requirement until AFTER the alleged trafficking period in the present matter, which is likely why the Plaintiffs omitted it.

### Claims Regarding "Specific Knowledge" of Sex Trafficking

The Plaintiffs' claims regarding the alleged "specific knowledge" of sex trafficking are even further limited (see Table 7).

**Table 7. Complaint Claims Regarding "Specific Knowledge of Sex Trafficking" and Countervailing Information**

| Specific Knowledge Claim | Countervailing Information |
|---|---|
| The Days Inn Stockbridge and its approaches were well known for crime, prostitution, and sex trafficking[255]. | All of Atlanta struggles with crime and prostitution, as well as sex trafficking to such a degree that affluent neighborhoods are relegated to hiring off-duty police officers. However, these crimes continue and even the most well intentioned communities are struggling to combat commercial sex activity. For example, one neighborhood in mid-town has called the police hundreds of times for over a decade[256], but prostitution and sex trafficking still occur (see, for example, Figure 12).  **Figure 12. Screengrab from Ring Camera Footage of a Mid-Town Atlanta Residence on May 23, 2024** |
| At the time of, and prior to, Plaintiffs' sex trafficking at the Days Inn Stockbridge, hotel employees knew or should have known that crime, prostitution, and sex trafficking were open and obvious at the Days Inn Stockbridge. | Sex trafficking is typically not open and obvious and the Plaintiffs' testimony suggests that they concealed their activities from third parties (e.g., they used pseudonyms, they hid from their parents and/or police at Rosa's, they stayed in the van when Jamaal checked them into the first hotel, they didn't give their ID or ask police for help during the first law enforcement encounter, they |

[255] A.J. and Q.C. Complaint Page 31, Paragraph 28.
[256] Atlanta First News (2019). Prostitution grows rampant in Atlanta neighborhood. Retrieved from https://mail.google.com/mail/u/1/#search/Jamie.Riley%40ajc.com/CqMvqmclKhBWgLvHrzTsxwprMpgZ ZFvPnpXXPXsJhxdNTJNKDNqzfRxqXRhnPzLBgnLbxhqZcQV?projector=1

CONFIDENTIAL

| | stayed in the rooms, etc.) A.J. testified that she never saw anything else that she would consider criminal activity while she was at the Days Inn in Stockbridge,[257] so it is unlikely that these alleged crimes were common or open/obvious. |
|---|---|
| At the time of, and prior to, Plaintiffs' sex trafficking at the Days Inn Stockbridge, Defendant knew of, condoned, and permitted widespread prostitution and sex trafficking at the Days Inn Stockbridge, including Plaintiffs A.J. and Q.C.'s minor sex trafficking. | I have not reviewed any evidence or testimony to suggest that the Days Inn staff knew of, condoned, or permitted widespread prostitution or sex trafficking. Available evidence suggests that Defendant's cooperated with law enforcement and alerted law enforcement when criminal activity was suspected. |
| Prior to Plaintiffs' sex trafficking at the Days Inn Stockbridge, Days Inn Stockbridge employees at the hotel knew or should have known that rooms at the Days Inn Stockbridge were frequently rented for short term use for commercial sex with guests, usually men, renting a room at the hotel, using it for a short period of time, and then leaving and not returning to the hotel. | I have not reviewed any evidence or testimony to suggest that the rooms were "frequently rented for commercial sex." However, short term stays can further inhibit identification and intervention through no fault of the business.<br><br>Although not discussed in the complaint, the Plaintiffs provided screenshots of negative reviews from online platforms in their document production. It is unclear if they are attempting to assert that these reviews are tantamount to "knowledge," but none of those reviews provided any evidence that could be reliably interpreted as suggestive of "sex trafficking[258]." |
| Defendants provided a market and beds for sex traffickers to sell women, boys, and girls—including minors—to buyers of commercial sex. That is why Plaintiffs' sex trafficker brought Plaintiffs to the Days Inn Stockbridge to be sold for sex. | I have not reviewed any evidence or testimony to suggest that the Defendant marketed "beds for sex traffickers" and according to the testimony, there was nothing unique about the subject property to suggest that it was complicit. Additionally, I have reviewed no evidence or testimony to suggest that there was active facilitation. |
| Before and during Plaintiffs' trafficking, employees of the Days Inn Stockbridge called sex traffickers, including Plaintiffs' trafficker, to warn them to slow down or stop buyer traffic to a particular room in order to assist the traffickers in evading detection from other guests and the police. Defendant knew or should have known that the hotel was being operated by its own employees to assist sex traffickers, including Plaintiffs' trafficker. | I have not reviewed any evidence to suggest that the Defendant's employees were charged with any crimes related to serving as a lookout for the Plaintiffs' alleged trafficker. Moreover, the alleged "buyer traffic" was minimal according to the Plaintiffs' own testimony. |
| Defendants had actual and constructive knowledge of prostitution, sex trafficking, and other criminal activity existing on the property and in the surrounding area prior to Plaintiff's sex trafficking. Defendants knew or should have known of these and other crimes occurring on their premises and approaches. | Evidence and testimony suggests that if and when the Plaintiffs had actual and constructive knowledge of criminal activity, law enforcement was alerted. I have not reviewed any evidence to suggest that the Defendants had actual and constructive knowledge of the Plaintiffs alleged sex trafficking victimization. |

---

[257] A.J. Deposition, Pages 287-288.
[258] 6/3/2022 Screenshots

CONFIDENTIAL

Ultimately, the evidence and testimony in the present matter does not suggest that the Defendant had "specific knowledge" of the Plaintiffs' alleged sex trafficking. Based on my extensive research and expertise, trafficking cases that involve true facilitation or actual and specific knowledge by a hotel or motel typically have a combination of the following facts:

1. Charging victims, sex workers, pimps, drug dealers, and/or traffickers an inflated rate[259] or receiving "kickbacks";[260]
2. Charging victims, sex workers, pimps, drug dealers, and/or traffickers a discounted rate;[261] and
3. Multiple employees working as lookouts, distributors, consumers, and/or enforcers (e.g., engaging in abuse, drug distribution, consumer solicitation, confiscating identity documents, restraining access to occupied rooms, and/or holding belongings hostage).[262]

Moreover, even though a criminal conviction is not required to pursue civil redress under the TVPRA, criminal charges of multiple employees are typically evidenced in cases involving hotelier facilitation with actual or specific knowledge.

Despite alleging in the complaint that the Defendant had actual or specific knowledge of the Plaintiffs' sex trafficking at the subject properties, there are no reliable empirical data to support this claim. Trafficking is not synonymous with commercial sex, drug use, or other forms of criminal activity and is notoriously clandestine and difficult to identify, which is largely ignored by the Plaintiffs. Unlike other forms of crime, trafficking assessments typically require a trauma informed interview, which is not possible in a traditional business setting. Trafficking victims are frequently misidentified, even by trained law enforcement. During A.J. and Q.C.'s alleged trafficking period, they even

---

[259] For example, see *United States v. Bhula*. U.S. Attorney's Office. 2023. Three Men Pled Guilty to Federal Charges Involving Maintaining a Drug-Involved Premises at Motel in Albuquerque. https://www.justice.gov/usao-nm/pr/three-men-pled-guilty-federal-charges-involving-maintaining-drug-involved-premises-motel
[260] United States Attorney's Office. 2022. Owner and Employees of the Sayville Motor Lodge Indicted for Sex Trafficking and Managing a Drug Premises. Retrieved from: https://www.justice.gov/usao-edny/pr/owner-and-employees-sayville-motor-lodge-indicted-sex-trafficking-and-managing-drug
[261] For example, see Clark, Darcel D. 2023. ALLEGED PIMPS, FORMER HOTEL EMPLOYEES CHARGED IN CHILD SEX TRAFFICKING, PROSTITUTION ENTERPRISE; 7 DAYS HOTEL ALLEGEDLY SERVED AS BROTHEL A 16-year-old Girl Had 100 "Dates" There in a Year. Retrieved from: https://www.bronxda.nyc.gov/downloads/pdf/pr/2023/18-2023%20sex-trafficking-7-Days-hotel.pdf
[262] For example, see *United States v. Bhula*. U.S. Attorney's Office. 2023. Three Men Pled Guilty to Federal Charges Involving Maintaining a Drug-Involved Premises at Motel in Albuquerque. https://www.justice.gov/usao-nm/pr/three-men-pled-guilty-federal-charges-involving-maintaining-drug-involved-premises-motel; United States Attorney's Office. 2022. Owner and Employees of the Sayville Motor Lodge Indicted for Sex Trafficking and Managing a Drug Premises. Retrieved from: https://www.justice.gov/usao-edny/pr/owner-and-employees-sayville-motor-lodge-indicted-sex-trafficking-and-managing-drug; and For example, see Clark, Darcel D. 2023. ALLEGED PIMPS, FORMER HOTEL EMPLOYEES CHARGED IN CHILD SEX TRAFFICKING, PROSTITUTION ENTERPRISE; 7 DAYS HOTEL ALLEGEDLY SERVED AS BROTHEL A 16-year-old Girl Had 100 "Dates" There in a Year. Retrieved from: https://www.bronxda.nyc.gov/downloads/pdf/pr/2023/18-2023%20sex-trafficking-7-Days-hotel.pdf

CONFIDENTIAL

encountered law enforcement without being identified as victims and denied being victimized when interviewed shortly thereafter[263].

---

[263] See, for example: Plaintiffs A.J. and Q.C. 1369- DW_D0205.wav

CONFIDENTIAL

# X. MISIDENTIFICATIONS AS SENTINEL EVENTS

As discussed in Section VI, *supra*, human trafficking is a clandestine crime, which is difficult to identify, even for trained law enforcement. Moreover, there is little research available to support any particular indicia or intervention. Even less information was available at the time of the alleged trafficking period in this case regarding the "best practices" of human trafficking identification and intervention for businesses. As a result, unwitting encounters of trafficking crimes are best conceptualized as sentinel events.

"Sentinel events" can be generally defined as occurrences that signal the need for immediate investigation and response.[264] These occurrences are unexpected, adverse, and typically blamed on operator errors. An operator error can be defined as a mistake made by the human user of a complex system. An operator error proliferated through an organization or across agencies can manifest into a sentinel event. However, the effects of normal operator errors can be potentially contained with appropriate institutional safeguards; thus reducing the risk of proliferating a mistake or mistakes into a full-blown sentinel event. Originating from the medical field, sentinel event reviews provide the opportunity to analyze the root causes of these errors and identify mechanisms for reducing future risk.

Charles Perrow's Normal Accident Theory is used to conceptualize organizational structures that contribute to the proliferation of sentinel events in certain organizations.[265] With the criminal justice backdrop,[266] human trafficking victims are identified as an underserved victim population, who are adversely affected by a number of sentinel events, including misidentification and erroneous criminalization. Missed opportunities for intervention can also be viewed as "sentinel events."

With 20/20 hindsight, observers and/or administrators are inclined to point out what the actor should have done differently.[267] In fact, according to Charles Perrow (1999) 60-80 percent of accidents are attributed to "operator error." However, this blame placing fails to recognize the underlying issues that may contribute to the process of a normal mistake manifesting into a sentinel event. While an operator error may be erroneously accused of

---

[264] For example, see New York State. Sentinel Events. Office of Mental Health. Available here: https://omh.ny.gov/omhweb/dqm/bqi/sentinel_events.html
[265] Perrow, C. (1999). *Normal accidents: Living with high risk technologies*. Princeton University Press.
[266] See, for example, Doyle, J. M. (2010). Learning from error in American criminal justice. J. Crim. L. & Criminology, 100, 109.
[267] Perrow, C. (1999). *Normal accidents: Living with high risk technologies*. Princeton University Press.

CONFIDENTIAL

being the proximate "cause" of an accident,[268] these errors may not be the root cause. In response to sentinel events, operators often become the scapegoats, even though their actions were not the root cause.

Certain types of organizational systems are more prone than others to sentinel events. According to Charles Perrow (1999) organizations with complex, tightly coupled, and interdependent systems are more likely to have normal accidents proliferated throughout the organization, which in turn may result in more frequent sentinel events.[269] The criminal justice system is one example of a group of organizations with complex, interdependent, and tightly coupled relationships. For example, in the criminal justice system, a mistake made by a police officer, if left unchecked, can affect the decision by a magistrate, prosecutor, jury, judge, correctional officer, and service provider. Police officers may be viewed by some as infallible, which may also contribute to the proliferation of the mistake, due to bounded rationality of other organizational actors. These types of problematic interactions are similar across disciplines. In studying the underlying processes associated with behavior, ethnographers recognize that people:

(1)     Assume things are as they appear unless they have a reason to believe otherwise.
(2)     Will be bounded by their rationality, or information they have at their disposal at the time.
(3)     Will assume that others see things as they do.

A hotel can also be described as an organization with complex, interdependent, and tightly coupled organizational structures, which can make this type of business at risk of sentinel events.

Given the clandestine nature of trafficking crimes, even the evolving "best practice" barriers are recognized as being imperfect. Risks can be mitigated by using differing layers and types of defense, also known as the "Cumulative Act Effect" or the "Swiss Cheese Effect," these risks cannot be eliminated entirely (see Figure 13[270]).



**Figure 13. "Swiss Cheese Effect" Regarding Trafficking Intervention**

In the present matter, documents suggest that the Defendant had multiple layers of security on the premises including, but not limited to: surveillance cameras; law enforcement

---

[268] Doyle, J. M. (2010). Learning from error in American criminal justice. J. Crim. L. & Criminology, 100, 109.
[269] Marais, K., Dulac, N., & Leveson, N. (2004, March). Beyond normal accidents and high reliability organizations: The need for an alternative approach to safety in complex systems. In Engineering Systems Division Symposium (pp. 1-16). MIT Cambridge, MA.
[270] Adapted from CC BY-SA 4.0.

CONFIDENTIAL

involvement with criminal trespass[271]; identification requirements; locking doors, etc[272].

Evidence and testimony suggests that the Defendant's staff demonstrably intervened against criminal activity when there was articulable suspicion (e.g., the brandishing of a weapon[273] or hearing a domestic violence incident[274]), consistently with state-of-the-art practices within the hospitality industry during the alleged trafficking period. However, trafficking is typically a clandestine crime and there are no evidence based methods that are presently used to inform interventions, much less during the alleged trafficking period in the present matter. As such, under typical circumstances, if trafficking is encountered, the encounter is more likely than not unwitting.[275] Therefore, sentinel events, such as missed opportunities for trafficking identification and intervention, should not be viewed through the lenses of hindsight bias or confirmation bias, but rather analyzed to inform best practices moving forward.

---

[271] See Incident Number: 14017051, 14019455, and 14018588.

[272] Alpesh Patel's deposition was remarkably limited, so I reserve the right to supplement this section if additional discovery or testimony becomes available. Documents were maintained for seven years; therefore some records, such as employee files, video, DNR lists, etc. no longer exist.

[273] See Incident Number: 13009758.

[274] See Incident Number: 14019455.

[275] "[T]raffickers in all 50 states are taking advantage of **unwitting** hotel franchisees…" Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* (July 2018), retrieved from: https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf.

CONFIDENTIAL

# XI.  CONCLUSION

Due to the clandestine nature of the crime, sex trafficking victims are frequently misidentified or unidentified and often self-identify as "prostitutes" or co-conspirators during their trafficking period. As a consequence of misidentification, sex trafficking victims are typically denied services and erroneously criminalized, while facing multiple missed opportunities for intervention and rescue—a phenomenon known as a sentinel event. Even law enforcement, medical and mental health providers, educators, and social workers frequently misidentify and under identify victims of trafficking, including minors.

To retroactively correct the erroneous criminalization faced by human trafficking victims in the criminal justice system, an increasing number of states have passed vacatur statutes and safe harbor laws,[276] including Georgia. These laws can provide post-conviction relief for survivors of human trafficking by completely erasing criminal convictions related to their victimization. By 2013, 18 states had passed safe harbor laws.[277]

Despite raising awareness and legal adjustments, victims of sex trafficking continue to be misidentified and erroneously criminalized. It is extremely difficult to identify a victim of sex trafficking without in-depth information and/or self-identification. Sex traffickers go to great lengths to conceal their exploitation. Indicia of prostitution and/or drug addiction are often erroneously conflated with indicia of sex trafficking. Extant indicia of sex trafficking have not been evaluated for sensitivity or specificity in the hospitality industry, but they are hypothesized to be low.

The majority of trainings for hoteliers were not available until mid-2016 and still have yet to be validated for sensitivity and specificity. Extant information suggests that trainings available to the hospitality industry presently and earlier contained misinformation and were likely to have low rates of sensitivity and specificity, as discussed previously.  Law enforcement had just started to be trained on trafficking prior to the Plaintiffs' alleged victimization, yet the Plaintiffs appear to be attempting to hold the Defendant to a higher standard than law enforcement. Forcing an unproven standard supported by myths and erroneous "statistics", without establishing an evidence base, is a systemic issue that has historically resulted in a negative impact on criminological interventions in the United States. The passage of Stop Enabling Sex Traffickers Act (SESTA) and Fight Online Sex Trafficking Act (FOSTA), for example, was intended to impede the sale of children online, but resulted in the displacement of advertisements to overseas platforms and dispersed these ads across the Internet and the dark web, which has further inhibited the ability of

---

[276] Mehlman-Orozco, Kimberly B. and Simon Hedlin. (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." The Houston Chronicle.

[277] Mehlman-Orozco, Kimberly B. (2015) "Safe Harbor legislation for juvenile victims of sex trafficking: A myopic view of improvements in practice." *Social Inclusion*. 3. 1: 52-62.

CONFIDENTIAL

law enforcement to catalyze rescues and arrests[278]. Similarly, while efforts by businesses to adopt trainings developed by anti-trafficking non-profits are understandable, there is no reliable empirical evidence that these trainings have any significant impact on the prevention of crimes, much less the detection of offenders or victims. In fact, some of these trainings have been publicly criticized for resulting in erroneous profiling, as discussed in the foregoing sections.

Ultimately, while the Plaintiffs attempt to draw causal inference between the limited time they allegedly spent at the Days Inn property and their damages, there is no reliable empirical evidence to support any such contention. Additionally, the Plaintiffs ignore the multiple missed opportunities at prevention and intervention by other actors, such as by the Plaintiffs' friends, family, educators, neighbors, law enforcement, and others who encountered A.J. and Q.C. before, during, and shortly after their alleged victimization. Based on my review of the evidence in this case, each one of these actors had more knowledge and direct involvement with the Plaintiffs than the Defendant's employees.

---

[278] See, for example: GAO. 2021. Sex Trafficking Online Platforms and Federal Prosecutions. Government Accountability Office Report to Congressional Committees. Available at: https://www.gao.gov/assets/gao-21-385.pdf Also, this GAO report corroborated my accurate predictions made prior to the passage of SESTA and FOSTA. See, for example: Mehlman-Orozco, Kimberly. 2019. OPINION: Legislation Aiming to Stop Sex Trafficking Would Hurt Investigations. Homeland Security Today. Available at: https://www.hstoday.us/subject-matter-areas/law-enforcement-and-public-safety/legislation-stop-sex-trafficking-would-hurt-investigations/

CONFIDENTIAL

# APPENDIX A. Curriculum Vitae

## DR. KIMBERLY B. MEHLMAN-OROZCO

(703) 362-9405  ▪  kim@mehlmanorozco.com  ▪  www.mehlmanorozco.com

EDUCATION

**Doctor of Philosophy**                    Criminology, Law and Society
                                            George Mason University
*Dissertation:* The "Crimmigration" Affect: An Analysis of 287(g) and Latino/a Representation in the U.S. Juvenile Justice System
*Expertise:* Human Trafficking, Human Smuggling, Immigration, Survey Methods and Systematic Review

**Master of Arts**                          Justice, Law, and Crime Policy
                                            George Mason University
*Thesis:* Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia

**Bachelor of Science**                     Administration of Justice
                                            George Mason University

*Cum Laude*

TEACHING EXPERIENCE

**Surviving and Thriving Beyond Sex Trafficking** SP18
                                            Ph.D. Research Course
                                            Sustainability Education
                                            Prescott College

**CRIM307 Social Inequality, Crime, and Justice** FA17
                                            Criminology, Law and Society
                                            George Mason University

**CRIM405 Law and Justice Around the World** SP17, SP18
                                            Criminology, Law and Society
                                            George Mason University

**CRIM308 Human Rights and Justice**        FA16
                                            Criminology, Law and Society
                                            George Mason University

**CCJS100 Intro to Criminal Justice**       FA12-SP14
                                            Department of Criminology & Criminal Justice
                                            University of Maryland College Park

CONFIDENTIAL

**CCJS370 Race and Crime**                      FA12-SP14
                                                Department of Criminology & Criminal Justice
                                                University of Maryland College Park

**CCJS432 Law of Corrections**                  FA12
                                                Department of Criminology & Criminal Justice
                                                University of Maryland College Park

**CCJS418J Foreign Nationals and Crime**        FA12-SP13
                                                Department of Criminology & Criminal Justice
                                                University of Maryland College Park

**CRIM490 Foreign Nationals and Crime**         SU09, SU10, SU11, SU12
                                                Criminology, Law and Society
                                                George Mason University

**GED, Work Place Essential Skills,
and Adult Basic Education**                     SU05-SU06
                                                Adult Detention Center
                                                Prince William County

RESEARCH EXPERIENCE

**CEO**                                         FA19– Present
                                                Break the Chain

**Executive Director**                          WI18– Present
                                                Freedom Light

**Partner/Human Trafficking Expert Witness**    FA16– WI18
                                                Mahn, Mehlman & Associates

**Human Trafficking Subject Matter Expert**     SU16-FA17
                                                RAND Corporation

**Executive Director/Human Trafficking Consultant**   WI12– FA16
                                                The Justitia Institute

**Director**                                    FA10 – WI12
                                                Latino Policy Institute
                                                Roger Williams University

**Research Associate**                          SU11 – WI12
                                                Cochrane Collaboration College for Policy
                                                George Mason University

**Lead Clinical Trials Search Coordinator**     SU10 – WI12
                                                Justice Health Field
                                                The Cochrane Collaboration

**Senior Research Associate**                   SU08 – SU11
                                                OJJDP Census of Juveniles on Probation
                                                George Mason University

CONFIDENTIAL

| | |
|---|---|
| **Graduate Research Assistant** | SU10 – FA10<br>Violence and Victimization Research Division<br>National Institute of Justice (On Contract)<br>Office of Justice Programs |
| **Senior Fellow** | SU08 – FA10<br>The Lloyd Society |
| **Graduate Research Assistant** | SU06 – SU08<br>Trinidad & Tobago Crime Reduction Project<br>George Mason University |
| **Graduate Research Assistant** | WI07-SP07, SP08<br>OJJDP Vaccines for Children Project<br>George Mason University |

<u>PUBLICATIONS</u>

**Mehlman-Orozco, Kimberly** (2024). Sex Trafficking or Secondary Exploitation: The Truth Behind America's Failing War Against Modern Slavery. International Journal of Academic Research in Public Policy and Governance.

**Mehlman-Orozco, Kimberly** (2024). Sex trafficking and prostitution are happening all over Atlanta: Residents and businesses do their best to deter commercial sex work, but police often don't do much. The Atlanta Journal—Constitution.

**Mehlman-Orozco, Kimberly** (2023). 'Sound of Freedom' is a box office hit. But does it profit off trafficking survivors? USA Today.

Lowery-Keith, Jennifer and **Kimberly Mehlman-Orozco** (2022). 'Justice Denied': A Sex Trafficking Survivor Tells Her Story. The Crime Report.

**Mehlman-Orozco, Kimberly B** and Greg Bristol. (2021). Suing Social Media Sites Won't Curb Sex Trafficking: Advocates. The Crime Report.

**Mehlman-Orozco, Kimberly B** and Marisa A. Trasatti. (2021). "Does 'Nirvana' Lawsuit Undermine Struggle Against Trafficking?" The Crime Report.

**Mehlman-Orozco, Kimberly B** and Marisa A. Trasatti. (2021). "Britney Spears, human trafficking and the law." New York Daily News.

**Mehlman-Orozco, Kimberly B**. (2021). "The 'Racialization' of Sex Trafficking in America." The Crime Report.

**Mehlman-Orozco, Kimberly B**. (2021). "COVID-19, the Commercial Sex Industry and Sex Trafficking." The Crime Report.

**Mehlman-Orozco, Kimberly B**. (2019). "Jeffrey Epstein's deal with Alexander Acosta wasn't out of line with what I have seen." USA Today.

**Mehlman-Orozco, Kimberly B.** and Sheriff William D. Snyder. (2019). "Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie." USA Today.

CONFIDENTIAL

**Mehlman-Orozco, Kimberly B.** and William D. Snyder. (2019). "Legalizing prostitution could end sex-trafficking investigations." The Hill.

**Mehlman-Orozco, Kimberly B.** (2019). "How to Fight Sex Trafficking." Politico.

**Mehlman-Orozco, Kimberly B.** (2019). <u>The Jihadi Next Door: How ISIS is Forcing, Defrauding, and Coercing Your Neighbor into Terrorism</u>. SkyHorse.

**Mehlman-Orozco, Kimberly B.** (2018). "Sex trafficking bill likely to do more harm than good." The Baltimore Sun.

**Mehlman-Orozco, Kimberly B.** (2018). "Why cracking down on websites won't stop online sex trafficking." *Thomson Reuters Foundation*.

**Mehlman-Orozco, Kimberly B.** (2018). "Legislation Aiming to Stop Sex Trafficking Would Hurt Investigations." *Homeland Security Today*.

**Mehlman-Orozco, Kimberly B.** (2017). "Trafficking victims get lost under unjust criminal convictions." *The Hill*.

**Mehlman-Orozco, Kimberly B.** (2017). "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers." *Trends in Organized Crime*.

**Mehlman-Orozco, Kimberly B.** (2017). <u>Hidden in Plain Sight: America's Slaves of the New Millennium</u>. ABC-CLIO/Praeger.

**Mehlman-Orozco, Kimberly**. (2017). "Why we should question the FBI's recent human trafficking sting." *Thomson Reuters*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalize sex work to bring trafficking victims out of the shadows." *The Hill*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalizing sex work would help bring victims out of the shadows." *The Washington Post*.

**Mehlman-Orozco, Kimberly B.** (2017). "Why the Stop Enabling Sex Traffickers Act is the Wrong Solution." *The Crime Report*.

**Mehlman-Orozco, Kimberly B.** (2017). "Identifying Victims of Human Trafficking." *Dimensions of Dental Hygiene*.

Syme, Sheryl, Camardese, Susan, and **Kimberly Mehlman-Orozco.** (2017). "Human Trafficking: Red Flags for Dental Professionals." *Decisions in Dentistry*.

**Mehlman-Orozco, Kimberly B.** (2017). "Vilifying Backpage.com won't help fight sex trafficking" *The Washington Post*.

**Mehlman-Orozco, Kimberly B.** (2017). "Child Trafficking: The Tragedy of 'Princess'" *The Crime Report*.

**Mehlman-Orozco, Kimberly B.** (2017). "To sue or not to sue third-party businesses for sex

CONFIDENTIAL

trafficking?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Hunting the Internet's Sex Predators." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "Will shutting down Backpage.com end the scourge of child sex trafficking in America?" *Thomson Reuters Foundation.*

**Mehlman-Orozco, Kimberly B.** (2017). "Sex Trafficking: A Surprising Rescue Story." *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2017). "What every parent should know about sex trafficking." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** and Simon Hedlin. (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." *The Houston Chronicle.*

**Mehlman-Orozco, Kimberly B.** (2017). "Why Do We Criminalize Young Victims of Sex Trafficking?" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Plight of Sex-Trafficking Survivors." *The Gay and Lesbian Review Worldwide.*

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Trafficking is often hidden in plain sight." *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "Will Legalized Prostitution End the Sex Trafficking Scourge?" *The Huffington Post.*

**Mehlman-Orozco, Kimberly B.** (2016). "What happens after a human trafficking victim is rescued?" *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Reality of Sex Trafficking in Washington's Red Light District." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** (2016). "America's Symbolic, Not Effective, Anti-Trafficking Policy. *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2016). America's Anti-Trafficking Efforts: Hollow victories for public accolade. *Connection Newspapers*: Chantilly, Centerville, Great Falls, Herndon, McLean, & Vienna.

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Slaves or Prostitutes?: How Human Trafficking is Hidden in Plain Sight in America's Capital." *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2015). "Safe Harbor Legislation for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice. *Social Inclusion.*

**Mehlman-Orozco, Kimberly B.** (2015). "Tor and the Bitcoin: An Exploration into Law Enforcement Surveillance Capability Online". *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2015). "My nail salon may be a front for a brothel." *The*

79

CONFIDENTIAL

*Washington Post.*

**Mehlman-Orozco, Kimberly B**. (2014). "Human Trafficking in the Philippines: A Blemish on Economic Growth". *Diplomatic Courier, Recovery in the Philippines.*

**Mehlman-Orozco, Kimberly B.** (2014). "Devoid of Research: An Evaluation of Human Trafficking Interventions". *Diplomatic Courier, Special Issue: Breaking the Cycle of Human Trafficking.*

Martinez, Ramiro, and **Mehlman-Orozco, Kimberly B.** (2014). "Hispanic Immigration and Crime". <u>Oxford Handbook of Ethnicity, Crime, and Immigration</u>. Eds. Michael Tonry and Sandra Bucerius. Oxford University Press.

**Mehlman-Orozco, Kimberly B.** (Contributing Author) (2010) "Breaking It Down: Justice, Law & Society Abstracts for Policymakers and Practitioners". *Center for Justice Law and Society.*

<u>REPORTS</u>

**Mehlman-Orozco, Kimberly B.** (2024). J.M. v. Choice Hotels International and Red Roof Inns Corporation. Case No. 1:23-cv-00871

**Mehlman-Orozco, Kimberly B.** (2024). R.C. v. Choice Hotels et. al., Case No. 5:23-cv-00872

**Mehlman-Orozco, Kimberly B.** (2024). Karla Norambuena et. al. v. Western Iowa Tech Community College et. al. 5:20-cv-04054

**Mehlman-Orozco, Kimberly B.** (2023). A.P. vs. K&S of Aiken, Inc. DBA Kozy Kort Motel, et. al. 2020CP0201021

**Mehlman-Orozco, Kimberly B.** (2023). S.C. v Wyndham Hotel & Resorts, Inc.; Days Inns Worldwide, Inc.; La Quinta Franchising, LLC; Choice Hotels International, Inc.; Six Continents Hotels, Inc.; Holiday Hospitality Franchising, LLC; Crowne Plaza, LLC; Red Roof Inns, Inc.; and Red Roof Franchising, LLC, (N.D. Ohio) 23-cv-00871

**Mehlman-Orozco, Kimberly B.** (2023). M.A. v. Wyndham Hotels and Resorts, Inc. et. al., 19-cv 00849

**Mehlman-Orozco, Kimberly B.** (2023). E.M. v. Tucker Inn Inc. 1:22-cv-02559-WMR

**Mehlman-Orozco, Kimberly B.** (2023). D.H. v. Tucker Inn Inc. 1:22-cv-03419-JPB

**Mehlman-Orozco, Kimberly B.** (2023). H.B. v. Red Roof Inns, Inc.; FMW RRI I, LLC; and RRI West Management LLC, 1:22-cv-01181-JPB

**Mehlman-Orozco, Kimberly B.** (2023). Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A. and JP Morgan Chase Bank, N.A. v. James Edward Staley Case No. 22-cv-10904-JSR

**Mehlman-Orozco, Kimberly B.** (2023). Jane Doe 1 v. JP Morgan Chase & Co. Case No. 1:22-cv-10019-JSR

CONFIDENTIAL

**Mehlman-Orozco, Kimberly B.** (2023). Expert Report for J.C. as mother and legal guardian of I.R. (a minor), v. RITI, INC d/b/a AMERICAN INN & SUITES, 1:22-cv-00848-MHC

**Mehlman-Orozco, Kimberly B.** (2023). Expert Report for G.W. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05232-JPB

**Mehlman-Orozco, Kimberly B.** (2023). Expert Report for A.G. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05231-JPB

**Mehlman-Orozco, Kimberly B.** (2023). Expert Report for Community Legal Services of Ottawa file No. 20220503-C-0015992R.

**Mehlman-Orozco, Kimberly B.** (2022). W.K. et. al., v. Red Roof Inn, et. al. Civil Action Number 1:20-cv-5263.VHC.

**Mehlman-Orozco, Kimberly B.** (2022). Jane Does 1-4. v. Red Roof Inn, et. al. Civil Action Number 1:21-cv-04278-WMR.

**Mehlman-Orozco, Kimberly B.** (2022). J.A.. v. Red Roof Inn, et. al. Civil Action Number 1:21-cv-03655-TWT.

**Mehlman-Orozco, Kimberly B.** (2022). N.Z. v. Red Roof Inn, et. al. Civil Action Number 02642.

**Mehlman-Orozco, Kimberly B.** (2022). G.D. v. Red Roof Inn, et. al. Civil Action Number 02631.

**Mehlman-Orozco, Kimberly B.** (2022). Jane Doe v. Fairfax County Police. 1:21cv1150(AJT/JFA).

**Mehlman-Orozco, Kimberly B.** (2022). S.Y. v. Inn of Naples Hotel LLC and Inn of Naples, LLC. Case No.: 2:20-cv-00609-JES

**Mehlman-Orozco, Kimberly B.** (2022). S.Y. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00608

**Mehlman-Orozco, Kimberly B.** (2022). C.S. v. Inn of Naples Hotel, LLC and Inn of Naples, LLC 2:20-cv-00629

**Mehlman-Orozco, Kimberly B.** (2022). C.S. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00631

**Mehlman-Orozco, Kimberly B.** (2022). The People of the State of California v. Rachele Eschenburg. Case Number: FCR350232

**Mehlman-Orozco, Kimberly B.** (2022). People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312

**Mehlman-Orozco, Kimberly B.** (2022). Casilao et. al. v. Hotelmacher LLC, et. al. Case No.: CIV-17-800-SLP

**Mehlman-Orozco, Kimberly B.** (2022). Jane Doe v. TRX Insurance Services, Inc and Richard

CONFIDENTIAL

Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB

**Mehlman-Orozco, Kimberly B.** (2021). Expert Witness Report. *Heidi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe,  v. U.S.A Taekwondo, Inc.,* District of Colorado. 1: 18-cv-00981-CMA-MEH

**Mehlman-Orozco, Kimberly B.** (2020). Expert Witness Report. *M.B. v.  Roosevelt Inn, LLC, et al.*.

**Mehlman-Orozco, Kimberly B.** (2017). Expert Witness Report. Keo Ratha et. al. v. Phatthana Seafood Co., et. al. Case No. 16-2-28453-1 KNT.

**Mehlman-Orozco, Kimberly B.** (2017). Expert Witness Report. *State of Ohio v. Michael Moore*. CR 16-3191.

**Mehlman-Orozco, Kimberly B.** (2011). The Effects of In-State Tuition for Non-Citizens: A Systematic Review of the Evidence. *Latino Policy Institute at Roger Williams University*. http://www.rwu.edu/depository/lpi/lpi-report.pdf

**Mehlman-Orozco, Kimberly B.** (2008). Race and Reporting Burglary, Robbery, and Assault in Trinidad and Tobago. (Completed under a grant from the Trinidad and Tobago Government*).*

### SCHOLARLY/ PRACTITIONER PRESENTATIONS

**Mehlman-Orozco.** (Forthcoming). Invited Speaker.  Lies, Damn Lies, and Statistics: The Truth Behind America's Failing War Against Sex Trafficking and Opportunities for Innovative Evidence-Based Prevention.  ASIS International Crime Prevention Council.

**Mehlman-Orozco.** (Forthcoming). Invited Panelist.  The Real Face of Child Trafficking in the United States: Understanding how all states are impacted by trafficking and coercion tactics. Public Policy Exchange.

Michael Haggard, Adam Finkel, Lawrence Burkhalter, Shane O'Neill. Mock Testimony of **Kimberly Mehlman-Orozco** and Russell Kolins (2024). Security Expert Testimony— From Intake to Trial. IAPSC Conference.

**Mehlman-Orozco, Kimberly**, Elisa Batista (UltraViolet), Renee Williams (National Center for Victims of Crime), et. al. (2024). Invited Presenter and Panelist. Public Policy Exchange Webinar: Forced Marriage.

Connor, James and **Kimberly Mehlman-Orozco.** (2023). X Stage Presentation: Ambient.AI and Sex Trafficking. Global Security Exchange (GSX).

**Mehlman-Orozco, Kimberly.** (2023). Lies, Damn Lies, and Human Trafficking Statistics: The Truth Behind America's Failing War Against Modern Slavery.  Global Security Operations Security Leadership Conference.

**Mehlman-Orozco, Kimberly B.** and Greg Bristol. (2023). Lies, Damn Lies, and Human Trafficking Statistics: The Truth Behind America's Failing War Against Modern Slavery. International Association of Professional Security Consultants' (IAPSC) 38th Annual Conference.

CONFIDENTIAL

Trasatti, Marisa and **Mehlman-Orozco, Kimberly B**. (2022). Hotel Industry and Human Trafficking. South Carolina Bar Convention.

Trasatti, Marisa and **Mehlman-Orozco, Kimberly B.** (2021). Human Trafficking Is Growing Exponentially: What your Corporation and Clients Need to Know about the Evolving Litigation Landscape. Lawyers for Civil Justice Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Harvey, Brittany. (2021). Human Trafficking: The Silent Risk. RIMS Annual Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Yesowitch, Irene, Vorndran, Maryann, and Miller, Graham. (2020). Training to Combat Human Trafficking at Your Commercial Premise. Cyber, Management & Professional Liability Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Clark, Fran, et. al. (2020). Training to Combat Human Trafficking at your Commercial Premise– Learn the Emerging Risks, Litigation Issues and Preventative Measures. Claims and Litigation Management Alliance Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Ewing, Lance. (2020). Human Trafficking: The Silent Risk. Claims and Litigation Management Alliance Conference.

**Mehlman-Orozco, Kimberly B.** (2019). Keynote Speaker: National Capital Region Threat Intelligence Consortium  (NTIC) Human Trafficking Seminar.

**Mehlman-Orozco, Kimberly B.** (2019). Law Enforcement's Role in Combating Human Trafficking and Assisting Victims. Police Executive Research Forum (PERF).

**Mehlman-Orozco, Kimberly B.** and Marisa Trasatti (2019). Human Trafficking: The Silent Risk. The RIMS (Risk Management Society) Conference.

**Mehlman-Orozco, Kimberly B.** (2019). Social Policy and Justice Panelist. Harvard College Project of Asian and International Relations. Harvard University.

**Mehlman-Orozco, Kimberly B.** (2018). Women in Homeland Security Human Trafficking Symposium Panelist. Marymount University.

**Mehlman-Orozco, Kimberly B.** (2017). Human Trafficking Symposium Panelist. Liberty University School of Law.

Martin, Favian, **Mehlman-Orozco, Kimberly**, and Wooditch, Alese. (2014). Mexican Migration to the United States: An Exploratory Study into Illegal Border Crossings. Academy of Criminal Justice Sciences. Philadelphia, PA

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Systematic Review Methods," Presented at the annual colloquium of the Cochrane and Campbell Collaborations: Keystone, CO.

**Mehlman-Orozco, Kimberly B.** (2010). "Open Access Systematic Reviews for Juvenile Probation Information," Presented at the first annual OJJDP Probation Summit: Washington, D.C.

**Mehlman-Orozco, Kimberly B.,** Chirieleison, J., Sebold, C. M., Douds, A., Gallagher, A.M., and

CONFIDENTIAL

Gallagher, C.A. (2010). "Characteristics of Juveniles on Probation: Collecting Data from Atlantic to Pacific". Presented at the 2010 American Probation and Parole Association Conference: Washington, D.C.

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Search Methods: PubMed and More," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

Gallagher, C.A., Douds, A.S., **Mehlman-Orozco, Kimberly B.,** Chirieleison, J., and Olaghere, A. (2010). "Justice Health Bibliographic Data Mapping," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

**Mehlman-Orozco, Kimberly B.** (2010). "Smuggling and the Likelihood of Detention among Undocumented Migrants," Law and Society Association Conference: Chicago, IL.

Douds, Anne S. and **Mehlman-Orozco, Kimberly B.** (2010). "FASD in Justice Facilities: What does the research tell us?", Meeting of the Interagency Coordinating Committee on Fetal Alcohol Spectrum Disorders: Rockville, MD.

Gallagher, Catherine, Taxman, Faye, Kinner, Stuart, Doyle, Jodie, Pardo-Rengifo, Monica, **Mehlman-Orozco, Kimberly B.**, Olaghere, Ajima, Royle, Nick, Gabriel Cuervo, Luis. (2009). "Knowledge mapping for research prioritization: examples from the Network for Justice Health". 17th Cochrane Colloquium, Singapore.

**Mehlman-Orozco, Kimberly B.** (2009). "Justice Health Systematic Review Methods," Presented at the International Network for Justice Health Meeting: Orlando, FL.

**Mehlman-Orozco, Kimberly B.** (2008). "Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia," American Society of Criminology Conference: St. Louis, MO.

OTHER PRESENTATIONS

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking Provided to the Advancing the Business of Healthcare Medical Coding Chapter in Woodbridge, Virginia (2 CEUs).

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking for the Canadian Police College Human Trafficking Investigator's Course, Royal Canadian Mounted Police and Halifax Regional Police, Canada.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Annual Speaker for the College of Humanities and Social Sciences Degree Celebration, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Presenter for the Well Library Honors Event, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Training Presentation on Human Trafficking Red Flags for Prevent Abuse and Neglect through Dental Awareness (P.A.N.D.A).

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker for Human Trafficking Awareness Event with Kappa Delta Phi International Sorority, George Mason University.

CONFIDENTIAL

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Mother's Union International Conference Human Trafficking Forum.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Keeping Our Youth Safe Conference. Bernadette's House.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for Girls at High-Risk of Sex Trafficking. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Woodbridge Woman's Club.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Soroptimist International, Alexandria Chapter.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Republican Women of Clifton.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking in Northern Virginia. Westminster at Lake Ridge.

**Mehlman-Orozco, Kimberly B.** (2016). Keynote Speaker. Soroptimist Human Trafficking Awareness Event.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker on Human Trafficking. Trinity Episcopal Church.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker on Mapping Suspected Human Trafficking Networks through Advertisements. Homeland Security Investigations, DHS, Buffalo, NY.

**Mehlman-Orozco, Kimberly B.** (2013). Exhibitor. Governor's Summit on Human Trafficking. Richmond, VA.

**Mehlman-Orozco, Kimberly B.** (2013). Invited Guest Speaker on Labor Trafficking. St. Francis of Assisi Catholic Church.

**Mehlman-Orozco, Kimberly B.** (2011). Keynote Speaker. First Annual Quetzal Award Gala. Guatemalan Center of New England.

EXPERT WITNESS CASES—CONSULTATION[279] AND/OR TESTIMONY

---

[279] Disclosed consultation only.

CONFIDENTIAL

| | |
|---|---|
| 2024 | Rachel Ramsbottom, Alexis Bowling, and Jenna Houston v. Lorin Ashton. Case No.:  3:21-cv-00272 |
| 2024 | T.S. v. Eighty Eight, L.P.; Eight, Inc.; G6 Hospitality Franchising LLC.; G6 Hospitality LLC; and Ramara, Inc., individually, and d/b/a North American Motor Inns Civil Action No. 01208 |
| 2024 | N.J. v. G6 Hospitality Property LLC d/b/a Motel 6—Charleston North; and, G6 Hospitality Property LLC d/b/a Motel 6—Columbia. Civil Action No. 2:22-cv-03180-BHH |
| 2024 | J.M. v. Choice Hotels International and Red Roof Inns Corporation. Case No. 1:23-cv-00871 |
| 2024 | R.C. v. Choice Hotels et. al., Case No. 5:23-cv-00872 |
| 2024 | Karla Norambuena et. al. v. Western Iowa Tech Community College et. al. |
| 2023 | A.P. vs. K&S of Aiken, Inc. DBA Kozy Kort Motel, et. al. 2020CP0201021 |
| 2023 | S.C. v Wyndham Hotel & Resorts, Inc.; Days Inns Worldwide, Inc.; La Quinta Franchising, LLC; Choice Hotels International, Inc.; Six Continents Hotels, Inc.; Holiday Hospitality Franchising, LLC; Crowne Plaza, LLC; Red Roof Inns, Inc.; and Red Roof Franchising, LLC, (N.D. Ohio) 23-cv-00871 |
| 2023 | M.A. v. WYNDHAM HOTELS & RESORTS, INC. et. al., 19-cv-00849 |
| 2023 | U.S.A. v. Lacey CR-18-00422-001-PHX-DJH |
| 2023 | E.M. v. Tucker Inn Inc. 1:22-cv-02559-WMR |
| 2023 | D.H. v. Tucker Inn Inc. 1:22-cv-03419-JPB |
| 2023 | H.B. v. Red Roof Inns, Inc.; FMW RRI I, LLC; and RRI West Management LLC, 1:22-cv-01181-JPB |
| 2023 | J.C. as mother and legal guardian of I.R. (a minor), v. Skye Hospitality, LLC d/b/a Southside Inn, 1:22-CV00849-MLB |
| 2023 | J.C. as mother and legal guardian of I.R. (a minor), v. RITI, INC d/b/a AMERICAN INN & SUITES, 1:22-cv-00848-MHC |

CONFIDENTIAL

| | |
|---|---|
| 2023 | G.W. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05232-JPB |
| 2023 | A.G. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05231-JPB |
| 2023 | Free Speech Coalition, et al., v. Angela Colmenero, In Her Official Capacity as Interim Attorney General for the State of Texas |
| 2023 | Expert Report for Community Legal Services of Ottawa file No. 20220503-C-0015992R. |
| 2023 | Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A. and JP Morgan Chase Bank, N.A. v. James Edward Staley Case No. 22-cv-10904-JSR |
| 2023 | Jane Doe 1 v. JP Morgan Chase & Co. Case No. 1:22-cv-10019-JSR |
| 2023 | People of the State of California v. Angelina Avila Case No. BA508653-02 |
| 2023 | M.H. v. G6 Hospitality LLC, et. al. United States District Court Eastern District of Texas Sherman Division. 4:22-cv-198 |
| 2023 | United States of America v. Kamal Bhula, et al. United States District Court, For the District of New Mexico. Case No. 1:19-cr-01631-DHU |
| 2023 | United States of America v. Mei Xing, United States District Court for the Central District of California. No. 2:20-CR-0228(A)-FMO |
| 2023 | Jane Doe v. Fairfax County Police. 1:21cv1150(AJT/JFA). |
| 2022 | Charity Pearrow v. ESA P Portfolio LLC, et. al. 21-cv-62276-BLOOM/Valle |
| 2022 | K.R. v. 4200 Roosevelt LLC, et. al. Case Number 00552 |
| 2022 | C.A. v. 4200 Roosevelt LLC, et. al. Case Number 03355 |
| 2022 | B.H. v. 4200 Roosevelt LLC, et. al. Case Number 03356 |
| 2022 | K.C. v. 4200 Roosevelt LLC, et. al. Case Number 01926 |
| 2022 | T.E. v. 4200 Roosevelt LLC, et. al. Case Number 00994 |
| 2022 | V.S. v. 4200 Roosevelt LLC, et. al. Case Number 00997 |

CONFIDENTIAL

| | |
|---|---|
| 2022 | Sherman, Gozun, and Nash v. Trinity Teen Solutions, Inc. Case Number 20-CV-215-SWS |
| 2022 | N.Z. v. Knights of Trevose, et. al. Civil Action Number 02642 |
| 2022 | G.D. v. Knights of Trevose, et. al. Civil Action Number 02631 |
| 2022 | Jane Doe 1-4 v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-04278-WMR |
| 2022 | W.K., et. al. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:20-cv-5263-VHC |
| 2022 | J.A. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-03655-TWT |
| 2022 | Casilao et. al. v. Hotelmacher LLC, et. al. Case No.: CIV-17-800-SLP |
| 2022 | S.Y. v. Inn of Naples Hotel LLC and Inn of Naples, LLC. Case No.: 2:20-cv-00609-JES |
| 2022 | S.Y. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00608 |
| 2022 | C.S. v. Inn of Naples Hotel, LLC and Inn of Naples, LLC 2:20-cv-00629 |
| 2022 | C.S. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00631 |
| 2022 | People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312 |
| 2021-2023 | MADELYN CASILAO, HARRY LINCUNA, and ALLAN GARCIA, on behalf of themselves and all others similarly situated, Plaintiffs, v. HOTELMACHER LLC, dba HOLIDAY INN EXPRESS; STEAKMACHER, LLC, dba MONTANA MIKE'S STEAKHOUSE; SCHUMACHER INVESTMENTS, LLC, dba WATER ZOO; APEX USA, INC.; WALTER SCHUMACHER; and CAROLYN SCHUMACHER, Defendants. UNITED STATES DISTRICT COURT WESTERN DISTRICT OF OKLAHOMA Case No.: CIV-17-800-SLP |
| 2021-2022 | Jane Doe v. TRX Insurance Services, Inc and Richard Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB |

CONFIDENTIAL

| | |
|---|---|
| 2021-2022 | The People of the State of California v. Rachele Eschenburg. Case Number: FCR350232 |
| 2021 | Heidi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe,  v. U.S.A Taekwondo, Inc., District of Colorado |
| 2019-2021 | United States v. Matthew Woods, United States District of New Mexico |
| 2019 | United States v. Adonis Baker, United States District of New Mexico |
| 2019 | United States v. Cornelius Galloway, United States District of New Mexico |
| 2018 | Woodhull Freedom Foundation et al. v. United States. |
| 2018 | RCMP Federal Serious and Organized Crime R vs. Downey & Beals C/O Human Trafficking 2016-465660, Halifax, Canada |
| 2018 | United States of America vs. Savanah April Via, U.S. District Court for the District of Arizona |
| 2018 | Commonwealth of Virginia v. Corey Cardoza, Henrico County |
| 2018 | People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, and People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County |
| 2017-2020 | United States of America v. Miguel Scott Arnold, Terrence Hawkins, Tevin Bynoe, Emonie Murphy, and Joshua Guity-Nunez, United States District Court for the Middle District of Pennsylvania. |
| 2017- 2018 | Doe v. Subh Properties, et al., Civil Litigation, State of Maryland |
| 2017-2018 | State of Ohio v. Michael Moore, Lucas County Court |
| 2017-2018 | People of the State of California Plaintiff v. Tracy Sims Superior Court of California, County of Los Angeles |
| 2017 | Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California |

CONFIDENTIAL

| | |
|---|---|
| 2017 | In re: REFLEX MEDIA, INC., a Nevada corporation, Claimant, vs. VIBE MEDIA, INC. d/b/a CityVibe.com, a California corporation; SOPHIA THOMPSON, an individual; PEAKRIDGE d/b/a SugarModels.com, an Anguilla company; DANIEL ROMAN a/k/a Daniel Romanesse, an individual; ALI ASKARI, an individual; and DOES 1 through 10, inclusive |
| 2016-2017 | J.S., S.L., and L.C. v. Village Voice Media Holdings LLC, Supreme Court of the State of Washington |
| 2016-2017 | People of the State of California Plaintiff v. James Joseph, et. Al.    Contra Costa County Court |
| 2016 | People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles |
| 2016 | People of the State of California Plaintiff v. Mixon-Givens     Santa Clara County Court |

SELECTION OF MEDIA

| | |
|---|---|
| July 27, 2024 | Canadian Center for Women's Empowerment. International awareness can prevent trafficking coerced debt, economic abuse and raise economic empowerment. |
| April 29, 2024 | NBC. 101 West: Invisible Chains, exploring human trafficking in the Valley. |
| June 20, 2023 | CBS. St. Charles police arrest five people in connection with human trafficking enterprise. |
| April 6, 2023 | Forbes. Sex Traffickers Used America's Favorite Family Safety App To Control Victims. |
| January 10, 2023 | U.S. News & World Report. Jury Hears Case Alleging 4 Cops Enabled Prostitution Ring. |
| September 1, 2022 | Court TV. Only Fans Model Murder Case. |
| July 31, 2022 | CGTN. Kimberly Mehlman-Orozco on the role of internet in human trafficking. |
| July 22, 2022 | Court TV. Crystal Kizer: Sex Trafficking Murder Case. |
| December 16, 2021 | NPR. The Facts Of, The Myths About, And The Solutions For Child Trafficking. |
| April 24, 2021 | CBS News. Manhattan District Attorney's office to stop prosecuting prostitution cases. |

CONFIDENTIAL

| | |
|---|---|
| April 10, 2021 | Fox News. Human smugglers using social media to transport migrants to US: Reports. |
| April 4, 2021 | Forbes. Inside the $4.5 Billion Erotic Massage Parlor Economy. |
| July 4, 2020 | CBS News. Epstein's alleged accomplice Ghislaine Maxwell set to be arraigned next week. |
| January 23, 2020 | Skift. Opening Closed Doors: Can Hotels Do More to Fight Human Trafficking? |
| August 9, 2019 | ABC. This Week with George Stephanopoulos. Panel discussion on Jeffrey Epstein. |
| July 9, 2019 | CBS News. Sex trafficking expert discusses Jeffrey Epstein case and sexual abuse. |
| May 10, 2019 | Hollywood Reporter. Sex Trafficking mars the Mystique of Cannes Film Festival. |
| April 12, 2019 | The Hill. Expert says it's 'very unlikely' Robert Kraft prostitution case would yield human trafficking convictions. |
| March 21, 2019 | CBS. Robert Kraft solicitation charge puts spotlight on sex trafficking. |
| March 4, 2019 | The Washington Post. Surveillance cameras, suitcases and billionaires: How an investigation into massage parlors unfolded in Florida. |
| March 1, 2019 | USA Today. From harmful fetishes to sex trafficking, Robert Kraft case highlights risks facing Asian women. |
| February 24, 2019 | CNN. Robert Kraft allegations: A sex trafficking expert weighs in. |
| January 11, 2019 | The Seattle Times. Documentary puts new attention on R. Kelly sex allegations. |
| August 22, 2018 | The Crime Report. Backpage Founders: We're Victims of Attack on Free Speech. |
| May 5, 2018 | Delaware Online. Human Trafficking Court shut down, to be merged with other treatment courts in Delaware. |
| May 1, 2018 | Delaware Online. Despite good intentions, Delaware slow to address human trafficking. |
| April 24, 2018 | ABC. Will new law protect women from sex trafficking? |

CONFIDENTIAL

| | |
|---|---|
| April 23, 2018 | The Ringer. How Sex Ads Became a Battleground for the Future of the Internet. |
| April 22, 2018 | Miami Herald. He pimped a minor at Santa's Enchanted Forest. He got slapped with federal prison. |
| April 13, 2018 | Yahoo Lifestyle. Women's March lambasted for criticizing shutdown of Backpage.com. |
| April 10, 2018 | Miami Herald. Florida's sex industry 'in a panic' after feds shut down notorious Backpage website. |
| April 9, 2018 | The Crime Report. With Backpage Closed, Where Will The Sex Slave Trade Go? |
| March 22, 2018 | Washington Post. Bill enabling prosecutors, victims to pursue websites that host sex traffickers heads to White House. |
| March 2, 2018 | Governing. 3 Cities Lead Fight Against Human Trafficking. |
| February 1, 2018 | Vanity Fair. The Republican Party is Having Another Todd Akin Fiasco. |
| February 1, 2018 | New York Magazine. Missouri GOP Senate Hopeful Goes Off the Deep End on the Sexual Revolution and Human Trafficking. |
| January 31, 2018 | Kansas City Star. Josh Hawley blames sex trafficking on 'sexual revolution' of 1960s in leaked audio. |
| January 25, 2018 | Homeland Security Today. Expert Delves Into Real Face of Human Trafficking: Victims and Perpetrators. |
| January 23, 2018 | Huffington Post. Study Finds More Than 9,000 Brothels Masquerading As Legit Businesses. |
| January 11, 2018 | International Business Times. Human trafficking: Why we are all guilty of supporting the modern slave trade. |
| January 8, 2018 | Majority Report Radio. America's Slaves of the New Millennium with Dr. Kimberly Mehlman-Orozco. |
| December 21, 2017 | Fast Company. Hotels Are Key In The Fight To End Human Trafficking. |
| December 12, 2017 | WNPR. The Colin McEnroe Show. Child Labor In America And Abroad. |
| November 4, 2017 | C-SPAN. Hidden in Plain Sight Book Talk. |

CONFIDENTIAL

| | |
|---|---|
| September 22, 2017 | Gray Media. Interview by Kyle Midura. Sex Trafficking Internet Crackdown Proposal. |
| August 8, 2017 | i24 news. Interview for Stateside with David Shuster. Model allegedly kidnapped for dark web auction. |
| August 2, 2017 | Newsy. Interview for "The Why" on human trafficking on the Internet. |
| July 30, 2017 | Al Jazeera. Segment Produced by Ruairi Casey. World Day Against Human Trafficking. |
| July 25, 2017 | Fox News Radio. Interviewed by Eben Brown. "Security America" segment on human smuggling deaths in San Antonio. |
| July 25, 2017 | Dallas News. Interviewed by Sarah Mervosh. New trick of the sex trade: Pimps can use retail gift cards to buy Backpage.com ads. |
| July 24, 2017 | WJLA. Interviewed by Stephen Loiaconi. Human smuggling deaths underscore need for immigration reform, experts say. |
| July 18, 2017 | The Washington Post. Interviewed by Tom Jackman. Under attack, Backpage.com has its supporters as anti-trafficking tool. But many differ. |
| June 11, 2017 | PJ Media. Interviewed by Karl Herchenroeder. Expert Notes Gap in Human-Trafficking Laws as Senators Press for Fund Renewal. |
| April 19, 2017 | WYPR. Interviewed by Tom Hall. Misinformation Sparked #DCMissingGirls Outrage, But It Highlights Real And Overlooked Issues. |
| March 30, 2017 | CBS. Interviewed by Jennifer Earl. Mom's warning about "human trafficking" at IKEA goes viral; what you need to know. |
| March 29, 2017 | Women's Health. Interviewed by Korin Miller. This Mom Claims She Encountered Human Traffickers At IKEA And People Are Freaking Out. |
| February 10, 2017 | Miami Herald. Interviewed by David Ovalle. Florida lawsuit targets website decried as hub for human trafficking. |
| February 3, 2017 | Miami Herald. Interviewed by David Ovalle. The 'adult' section might be closed but Miami sex workers still on the job. |

CONFIDENTIAL

| January 1, 2017 | OutSmart Magazine. Interviewed by Dr. Laura McGuire on Human Trafficking. Hidden in Plain Sight: Researcher Dr. Mehlman-Orozco Discusses the Realities of Human Trafficking. |
|---|---|
| August 15, 2013 | USA Today, Interviewed by Yamiche Alcindor. Dozens of States Pass Laws to Fight Human Trafficking. |
| June 6, 2013 | USA Today. Interviewed by Yamiche Alcindor. Blue Campaign by DHS aims to combat human trafficking. |
| June 2, 2010 | Style Weekly. Interviewed for a human trafficking story by Peter Galuszka, "The New Slavery: Virginia becomes haven for human trafficking." |

OTHER PROFESSIONAL CONFRENCES/SUMMITS/TRAININGS

**No Room for Trafficking Summit**
Summer 2023                     Summit
AHLA Foundation

**Intelligence Community Conference**
Summer 2021                     Conference
Traffik Analysis Hub

**Transportation Industry Against Human Trafficking**
Fall 2020                       Presentation
U.S. Department of Commerce

**"Freedom Together" D.C., M.D., and V.A. Regional Anti Human Trafficking Task Force Conference**
Spring 2018                     Conference
D.C., M.D., and V.A. Task Forces

**Virginia Forum on Human Trafficking**
Fall 2015                       Conference
Dept. of Criminal Justice Services

**Regional Conference of Human Trafficking Task Forces**
Fall 2015                       Conference
DMV Anti-Trafficking Working Group

**Maryland Freedom Conference**
Winter 2015                     Conference
Towson University

**Sharing Lessons, Sharing Responsibility: Combating Human Trafficking**
Spring 2013                     Conference
Migration Policy Institute

**Freedom Network Annual Conference**
Spring 2013                     Conference
Freedom Network

**Human Trafficking Panel Discussion**
Spring 2013                     Working Group
George Washington Law

**Analytic Statistics and Meta Analysis**
Spring 2011                     Paid Training
Stata

CONFIDENTIAL

**Systematic Review and Meta Analysis**                    GMU
Spring 2009, Fall 2010              Independent Graduate Study


**PubMed, NLMGateway, ToxNet and ClinicalTrials.gov**   National Library of Medicine
Summer 2009              Search Certifications

**Ovid, ProQuest, and Web searches**                   AHRQ
Summer 2009              Search Certifications

**Introduction to ArcGIS Workshops**                   George Mason University
Fall 2009-Summer 2010

**Hand Searching Systematic Review Workshop**          Cochrane Collaboration
Fall 2009              Search Certifications


<u>AWARDS</u>

*Independent Publisher Award, 2019*    Silver Medal for Current Events (<u>Jihadi Next Door</u>).

*Independent Publisher Award, 2018*    Bronze Medal for Social Issues/Humanitarian (<u>Hidden in Plain Sight: America's Slaves of the New Millennium</u>).

*Dissertation Completion Award,* 2012    George Mason University, College of Humanities and Social Sciences.

*Deans Challenge Award,* 2009    George Mason University, College of Humanities and Social Sciences.

<u>SERVICE</u>

Peer Reviewer                    Office of Justice Programs (OJP), 2020-Present

Panel of Expert Witnesses        Los Angeles Superior Court, WI2017-Present

Reviewer                         Journal of Human Trafficking, FA2014-Present

Invited Peer Reviewer            Office of Justice Programs, SP2020-Present

Advisory Board Member            Empower Her Network, FA2017- Present

Volunteer                        Prince William County Police Santa Cops, WI2021 & WI 2022

Advisory Board Member            Dressember (Anti-trafficking foundation), SP2017-SU2021

Reviewer                         Taylor & Francis Books, SP2021

Reviewer                         Justice Quarterly, WI2018- FA2019

Survey Methodologist Advisor     United Against Slavery, FA2017-FA2019

CONFIDENTIAL

| | |
|---|---|
| Member | Prince William County Human Trafficking Task Force, SU2013-SU2018 |
| Member | Prince George's County Human Trafficking Task Force, SU2012-SU2014 |
| Member and Former President | Soroptimist International of Woodbridge, FA2015-SP2018 |
| Reviewer | American Journal of Evaluation, FA2014-FA2015 |
| Member | Prince George's County Human Trafficking Task Force, SU2013-2015 |
| Reviewer | Columbia University Press, FA2013 |
| President and Founding Officer | Student Center for Immigration Research, George Mason University, FA2008 – FA2010 |
| Member | Criminology, Law & Society Student Association, George Mason University, FA2009 – WI2012 |
| Volunteer | Prince William County Jail, Classification Department, 500 hours, SP 2005 |

SAMPLE OF PEER REVIEW SERVICE

| | |
|---|---|
| 2024 | "That's not the Point of This" Complicating and Critiquing Coercive Humanitarianism in the Practice of Service Providers in the U.S. Anti-Trafficking Movement. *Journal of Human Trafficking*. |
| 2024 | "Where do we Start?" Utilizing GIS to visualize the Wage and Labor Compliance Action Dataset to Inform Proactive Law Enforcement Efforts and Social Service Outreach in Combatting Labor Trafficking in Mississippi. *Journal of Human Trafficking*. |
| 2023 | A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign. *Journal of Human Trafficking*. |
| 2023 | Survivor Women's Experience on the Pathways of Trafficking in Bangladesh. *Journal of Human Trafficking*. |
| 2021 | Sex Trafficking Myths and Realities. *Journal of Human Trafficking*. |
| 2020 | Modern Slavery or Forced Labour? Mechanisms of power and the criminal family firm in the United Kingdom. *Journal of Human Trafficking*. |
| 2018 | Commercial Sexual Exploitation and Sex Trafficking of Children in South East Asia: A Review of the Literature. *Journal of Human Trafficking*. |

CONFIDENTIAL

| | |
|---|---|
| 2017 | Preparedness to Serve Commercially Sexually Exploited Children (CSEC): An Integrative Review. *Journal of Human Trafficking*. |
| 2016 | Evaluation of a Curriculum for Healthcare Professional Training on Child Sex Trafficking. *Journal of Human Trafficking*. |
| 2015 | Women and Child Trafficking in Nigeria: What Progress? *Journal of Human Trafficking*. |
| 2015 | Experiences of survivors of human trafficking of non-sexual purposes. *Journal of Human Trafficking*. |

PROFESSIONAL MEMBERSHIP

National Society for Collegiate Scholars
Phi-Alpha Delta Pre-Law Fraternity
Alpha Chi Honors Fraternity
American Society of Criminology
National Criminal Justice Honors Fraternity
Alpha Phi Sigma Honors Society

CONFIDENTIAL

# APPENDIX B. Expert Witness Testimony

***I have testified and/or issued a report in the following cases, but have been retained in many others:***

**Criminal Prosecution**

United States of America v. Kamal Bhula, et al. United States District Court, For the District of New Mexico. Case No. 1:19-cr-01631-DHU

People of the State of California Plaintiff v. Mixon-Givens Santa Clara County Court

People of the State of California Plaintiff v. Joseph, et. Al. Contra Costa County Court (Case No: 5-160639-1)[280]

People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, Bronx County[281]

People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County[282]

Commonwealth of Virginia v. Corey Cardoza, Henrico County[283]

United States v. Cornelius Galloway, United States District of New Mexico[284]

State of Ohio v. Michael Moore, Lucas County Court (Case No. CR 16-3191)

**Criminal Defense**

United States v. Lacey, United States District of Arizona CR-18-00422-001-PHX-DJH

United States of America v. Mei Xing, United States District Court for the Central District of California. No. 2:20-CR-0228(A)-FMO

People of the State of California v. Angelina Avila, Superior Court of the State of California, in and for the County of Los Angeles (Case No. BA508653-02)

---

[280] Testified at grand jury on 4/13/2016 and at trial on 7/12/2017. Prosecutor's name is Aron DeFerrari: ADeFerrari@contracostada.org.
[281] Testified at Frye motion for another expert witness on behalf of the prosecution.
[282] Testified at Frye motion for another expert witness on behalf of the prosecution.
[283] Testified at Daubert hearing and prevailed as an admitted expert. Case settled before trial.
[284] Testified at Daubert hearing and prevailed as admitted expert.

CONFIDENTIAL

United States of America v. Emonie Murphy, U.S. District Court for the Middle District of Pennsylvania

People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles (Case No: 6CJ10198-01)[285]

United States of America v. Landrum et. Al. Via. U.S. District Court for the District of Arizona (Case No. 4:16-cr-01560-RM-JR)

The People of the State of California v. Rachele Eschenburg. Case Number: FCR350232

People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312[286]

**Civil Defense**

Rachel Ramsbottom, Alexis Bowling, and Jenna Houston v. Lorin Ashton. Case No.: 3:21-cv-00272

T.S. v. Eighty Eight, L.P.; Eight, Inc.; G6 Hospitality Franchising LLC.; G6 Hospitality LLC; and Ramara, Inc., individually, and d/b/a North American Motor Inns Civil Action No. 01208

N.J. v. G6 Hospitality Property LLC d/b/a Motel 6—Charleston North; and, G6 Hospitality Property LLC d/b/a Motel 6—Columbia. Civil Action No. 2:22-cv-03180-BHH

J.M. v. Choice Hotels International and Red Roof Inns Corporation. Case No. 1:23-cv-00871

R.C. v. Choice Hotels et. al., Case No. 5:23-cv-00872

Karla Norambuena et. al. v. Western Iowa Tech Community College et. al. 5:20-cv-04054

A.P. vs. K&S of Aiken, Inc. DBA Kozy Kort Motel, et. al. 2020CP0201021

S.C. v Wyndham Hotel & Resorts, Inc.; Days Inns Worldwide, Inc.; La Quinta Franchising, LLC; Choice Hotels International, Inc.; Six Continents Hotels, Inc.; Holiday Hospitality Franchising, LLC; Crowne Plaza, LLC; Red Roof Inns, Inc.; and Red Roof Franchising, LLC, (N.D. Ohio) 23-cv-00871

M.A. v. Wyndham Hotels and Resorts, Inc. et. al., 19-cv 00849

E.M. v. Tucker Inn Inc. 1:22-cv-02559-WMR

---

[285] Testified in trial on 11/7/2016 and 12/2/2017.
[286] Declaration only, not report.

CONFIDENTIAL

D.H. v. Tucker Inn Inc. 1:22-cv-03419-JPB

H.B. v. Red Roof Inns, Inc.; FMW RRI I, LLC; and RRI West Management LLC, 1:22-cv-01181-JPB

Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A. and JP Morgan Chase Bank, N.A. v. James Edward Staley Case No. 22-cv-10904-JSR

Jane Doe 1 v. JP Morgan Chase & Co. Case No. 1:22-cv-10019-JSR

J.C. as mother and legal guardian of I.R. (a minor), v. RITI, INC d/b/a AMERICAN INN & SUITES, 1:22-cv-00848-MHC

G.W. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05232-JPB

A.G. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05231-JPB

Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A. and JP Morgan Chase Bank, N.A. v. James Edward Staley Case No. 22-cv-10904-JSR

Jane Doe 1 v. JP Morgan Chase & Co. 1:22-cv-10019-JSR

M.H. v. G6 Hospitality LLC, et. al. 4:22-cv-198

Charity Pearrow v. ESA P Portfolio LLC, et. al. 21-cv-62276-BLOOM/Valle

K.R. v. 4200 Roosevelt LLC, et. al. Case Number 00552

C.A. v. 4200 Roosevelt LLC, et. al. Case Number 03355

B.H. v. 4200 Roosevelt LLC, et. al. Case Number 03356

K.C. v. 4200 Roosevelt LLC, et. al. Case Number 01926

T.E. v. 4200 Roosevelt LLC, et. al. Case Number 00994

V.S. v. 4200 Roosevelt LLC, et. al. Case Number 00997

Sherman, Gozun, and Nash v. Trinity Teen Solutions, Inc. Case Number 20-CV-215-SWS

N.Z. v. Knights of Trevose, et. al. Civil Action Number 02642

G.D. v. Knights of Trevose, et. al. Civil Action Number 02631

Jane Doe 1-4 v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-04278-WMR

W.K., et. al. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:20-cv-5263-VHC

J.A. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-03655-TWT

Casilao et. al. v. Hotelmacher LLC, et. al. Case No.: CIV-17-800-SLP

S.Y. v. Inn of Naples Hotel LLC and Inn of Naples, LLC. Case No.: 2:20-cv-00609-JES

S.Y. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00608

C.S. v. Inn of Naples Hotel, LLC and Inn of Naples, LLC 2:20-cv-00629

C.S. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00631

M.B. v. Roosevelt Inn LLC (MARCH TERM, 2017 NO.: 00712)

Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California.[287]

Jane Doe v. TRX Insurance Services, Inc and Richard Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB

Heidi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe, v. U.S.A Taekwondo, Inc. and Steven Lopez. United States District Court for the District of Colorado. Civil Action No. 1: 18-cv-00981-CMA-MEH

**Civil Plaintiff**

Free Speech Coalition, et al., v. Angela Colmenero, In Her Official Capacity as Interim Attorney General for the State of Texas[288]

Woodhull Freedom Foundation et al. v. United States[289]

---

[287] I was also deposed in this case. Dismissed on summary judgement.
[288] Not an expert witness report, but rather a declaration.
[289] Not an expert witness report, but rather a declaration: https://www.eff.org/document/declaration-dr-kimberly-mehlman-orozco-support-woodhull-et-al-motion-preliminary-injunction

CONFIDENTIAL

Jane Doe v. Fairfax County Police 1:21cv1150(AJT/JFA)[290]

---

[290] Pro Bono case, which has received national media attention. See, for example:
https://www.newsweek.com/virginia-cops-protected-sex-trafficking-ring-return-free-sex-victims-lawsuit-1661937

CONFIDENTIAL

# APPENDIX C. Materials Reviewed and Considered

In addition to the materials specifically cited or mentioned in my report, I considered the following documents in forming my opinions:

- Complaint
- A.J. Deposition Transcript and Video
- Q.C. Deposition Transcript and Video
- Alpesh Patel Deposition Transcript
- Plaintiffs' Reponses to Interrogatories
- Plaintiffs' Document Production
- Defendant's Reponses to Interrogatories
- Clayton County DA Subpoena Responses
- Cobb County DA Subpoena Responses
- Q.C. Medical Records (Wellstar and Emory)
- A.J. Medical Records (Wellstar, Eagles Landing, Georgia Baptist, and Piedmont Henry Hospital)

CONFIDENTIAL

# APPENDIX D. International Labour Office's Operational Indicators of Commercial Sexual Exploitation of Children

## Indicators of trafficking of children for sexual exploitation

*Exploitation is inherent to the situation of children under 18 used or offered for prostitution or pornography and there is no need for indicators to prove it. The indicators of additional exploitation below are given to characterize other elements of exploitation children may suffer. In addition, the Palermo Protocol specifically states that, in the case of children, there is no need to prove "the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability" in order to establish the crime of trafficking. Nevertheless, it was decided to retain indicators of deception, coercion and abuse of vulnerability in order to analyse trafficking in children with harmonised tools within Europe.*

**INDICATORS OF DECEPTIVE RECRUITMENT**
Strong Indicator
Deceived about the nature of the job or location
Medium Indicators
Deceived about access to education opportunities
Deceived about conditions of prostitution
Deceived about content or legality of work contract
Deceived about family reunification
Deceived about housing and living conditions
Deceived about legal documentation or obtaining legal migration status
Deceived about travel and recruitment conditions
Deceived about wages/earnings
Deceived through promises of marriage or adoption

**INDICATORS OF COERCIVE RECRUITMENT**
Strong Indicators
Abduction, forced marriage, forced adoption or selling of victim
Debt bondage
Isolation, confinement or surveillance
Threats of violence against victim
Violence on victims
Medium Indicators
Confiscation of documents
Threat of denunciation to authorities
Threats to inform family, community or public
Violence on family (threats or effective)
Withholding of money

**INDICATORS OF RECRUITMENT BY ABUSE OF VULNERABILITY**
Medium Indicators
Abuse of cultural/religious beliefs
Abuse of difficult family situation
Abuse of illegal status
Abuse of lack of education (language)
Abuse of lack of information
Control of exploiters
Difficulties in the past
Difficulty to organise the travel
Economic reasons
False information about law, attitude of authorities
False information about successful migration
Family situation

General context
Personal situation
Psychological and emotional dependency
Relationship with authorities/legal status

**INDICATORS OF ADDITIONAL EXPLOITATION**
Strong Indicator
Hazardous work
Medium Indicators
Bad living conditions
Excessive working days or hours
Low or no salary
No social protection (contract, social insurance, etc.)
Very bad working conditions
Wage manipulation

**INDICATORS OF COERCION AT DESTINATION**
Strong Indicators
Confiscation of documents
Debt bondage
Forced into illicit/criminal activities
Forced tasks or clients
Isolation, confinement or surveillance
Threats of violence against victim
Under strong influence
Violence on victims
Medium Indicators
Forced to act against peers
Forced to lie to authorities, family, etc.
Threat of denunciation to authorities
Threat to impose even worse working conditions
Threats to inform family, community or public
Violence on family (threats or effective)
Withholding of wages

**INDICATORS OF ABUSE OF VULNERABILITY AT DESTINATION**
Strong Indicator
Dependency on exploiters
Medium Indicators
Difficulties in the past
Difficulty to live in an unknown area
Economic reasons
Family situation
Personal characteristics
Relationship with authorities/legal status

CONFIDENTIAL

## APPENDIX E. ERASE Child Trafficking Incorporation of Dr. Mehlman-Orozco's Book into Law Enforcement, Beginning in 2018



CONFIDENTIAL

# APPENDIX F. Preliminary Analysis: Law Enforcement Training May Increase Hotline Reporting

In 2017, according to Shared Hope International 19 states and the District of Columbia statutorily mandated that police officers receive training on human trafficking and 21 states made human trafficking training available and/or optional for law enforcement[291]. According to these data, 10 states had no mandatory or voluntary human trafficking training available for law enforcement.

Using these data, combined with data from the human trafficking hotline and data from the FBI Uniform Crime Report, the present analyses conducted a series of independent sample T-tests to determine whether there were statistically significant differences between the states that had mandatory, voluntary, or no human trafficking training for law enforcement. Specifically, the following research question was posited:

> *RESEARCH QUESTION 1: Is there a statistically significant difference in the rates of hotline reporting between states with mandatory human trafficking training for law enforcement compared to states with no available human trafficking training for law enforcement?*

For this research question, the analysis accounted for the population size of the state. Population size was accounted for by dividing the rate of hotline reporting in 2017 by the ACS 5-Year state population estimates in 2017[292]. This was done because it was possible that more populous states may have been more likely to have higher rates of reporting and may adopt mandatory training policies more quickly than smaller states. ***Results suggest that there is a statistically significant and moderate difference between reporting rates for states that have mandatory law enforcement human trafficking training compared to states that have no training for <u>law enforcement</u>. Rates of hotline reporting in states with mandatory law enforcement human trafficking training had higher rates of reporting to the hotline, even when accounting for population size.***

When accounting for population size, the average or mean rate of reporting in states with mandated training policies for law enforcement was higher for states with mandated training when compared to states without any training—.0108 and .0066, respectively. This difference was statistically significant with a P-Value of .04[293].

---

[291] http://sharedhope.org/wp-content/uploads/2016/03/NSL_Survey_Law-Enforcement-Officer-Human-Trafficking-Training.pdf

[292] https://data.census.gov/table/ACSST5Y2017.S0101?q=population%20by%20state%20in%202017&tp=true

[293] Rounded from 0.0421215

CONFIDENTIAL

t-Test: Two-Sample Assuming Unequal Variances

|                              | NONE        | MANDATORY   |
|------------------------------|-------------|-------------|
| Mean                         | 0.00655579  | 0.01084769  |
| Variance                     | 6.2265E-06  | 6.7841E-05  |
| Observations                 | 10          | 20          |
| Hypothesized Mean Difference | 0           |             |
| df                           | 25          |             |
| t Stat                       | -2.1420167  |             |
| P(T<=t) one-tail             | 0.02106075  |             |
| t Critical one-tail          | 1.70814076  |             |
| P(T<=t) two-tail             | 0.0421215   |             |
| t Critical two-tail          | 2.05953855  |             |

The pooled standard deviation was calculated using the following formula:

$$S_p = \sqrt{\frac{(N_1 - 1) \cdot S_1^2 + (N_2 - 1) \cdot S_2^2}{N_1 + N_2 - 2}}$$

And the Cohen's D effect size was calculated as follows:

$$D = \frac{M_1 - M_2}{S_p}$$

The general guidelines for interpreting the Cohen's D effect size are as follows:

        0.2 = small effect
        0.5 = moderate effect
        0.8 = large effect.

The Cohen's D for the difference between reporting rates for states with mandatory law enforcement training on human trafficking and states with no law enforcement training on human trafficking was 0.619247789, which suggests a moderate effect.

CONFIDENTIAL

# APPENDIX G. Preliminary Analysis: Hotelier Training May Have No Effect on Hotline Reporting

In 2019, according to ECPAT:

- o   13 states had laws mandating human trafficking awareness signage in lodging facilities: California, Connecticut, Georgia, Louisiana, Maine, Minnesota, New Mexico, New Jersey, New York, North Carolina, South Carolina, Texas, West Virginia
- o   7 states had laws mandating human trafficking awareness signage in lodging facilities that have been cited as a public nuisance: Alabama, Arkansas, Maryland, Michigan, Missouri, Pennsylvania, Rhode Island
- o   12 states had voluntary human trafficking awareness signage in lodging facilities: Kansas, Massachusetts, Michigan, Montana, Nebraska, New Jersey, New York, Ohio, Tennessee, Vermont, Washington, Wisconsin
- o   14 states had penalties for failing to meet the human trafficking awareness signage mandates: Alabama, Arkansas, California, Connecticut, Georgia, Louisiana, Maine, Maryland, Michigan, Missouri, North Carolina, Pennsylvania, Rhode Island, South Carolina
- o   4 states had statutes mandating training regarding human trafficking for individuals working in the lodging industry: California, Connecticut, Minnesota, New Jersey; and
- o   11 states had voluntary training laws for individuals working in the lodging industry: Colorado, Iowa, Kansas, Louisiana, Michigan, Missouri, Oregon, Pennsylvania, Rhode Island, Texas, Vermont[294].

These data suggest that in 2019, 23 states and the District of Columbia had no anti-trafficking signage requirements for hoteliers and 35 states and the District of Columbia had no mandatory or voluntary human trafficking training for hoteliers.

Using these data, combined with data from the human trafficking hotline and data from the FBI Uniform Crime Report, the present analyses conducted a series of independent sample T-tests to determine whether there were statistically significant differences between the states that had mandatory and no human trafficking training for hoteliers. Specifically, the following research question was posited:

> *RESEARCH QUESTION 1: Is there a statistically significant difference in the rates of hotline reporting between states with mandatory human trafficking training for hoteliers compared to states with no required human trafficking training for hoteliers?*

The analysis accounted for the population size of the state using data from the 2019 ACS 5-Year population estimates. ***Results suggest that there is NOT a statistically significant difference between reporting rates for states that have mandatory hotelier human trafficking training compared to states that have no training requirements for <u>hoteliers</u>. Moreover, even though not statistically significant, the average/mean rate of hotline reporting in states with***

---

[294] https://www.ahla.com/news/ecpat-usa-issues-report-state-human-trafficking-laws-lodging-industry

CONFIDENTIAL

***mandatory hotelier human trafficking training was actually  LOWER than states without any training requirement for hoteliers when accounting for population size.***

t-Test: Two-Sample Assuming Unequal Variances

|  | *None* | *Mandatory* |
|---|---|---|
| Mean | 0.00950309 | 0.00706216 |
| Variance | 2.0815E-05 | 1.3698E-05 |
| Observations | 36 | 4 |
| Hypothesized Mean Difference | 0 | |
| df | 4 | |
| t Stat | 1.22004194 | |
| P(T<=t) one-tail | 0.14472966 | |
| t Critical one-tail | 2.13184679 | |
| P(T<=t) two-tail | 0.28945932 | |
| t Critical two-tail | 2.77644511 | |