IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| A.J. and Q.C.,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>MASP, LLC,<br><br>　　　　Defendant. | CIVIL ACTION FILE NO.<br><br>1:23-CV-04247-JPB |

**DEFENDANT MASP, LLC'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED AND PLAINTIFF'S THEORIES OF LIABILITY**

COMES NOW, MASP, LLC, ("Defendant"), and pursuant to Fed. R. Civ. P. 56, hereby files this its Statement of Material Facts as to Which There is No Genuine Issue to be Tried and Plaintiffs' Theories of Liability, pursuant to Local Rule 56.1(B), showing this Court as follows:

**THEORIES OF LIABILITY**

Defendant is entitled to summary judgment as to all claims in Plaintiffs' Complaint, including, claims for a violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA") under 18 U.S.C. §1595 and attorney's fees and punitive damages. Plaintiffs Q.C. and A.J. were trafficked for sex by Craig Hill and T'Keyah Adams in March of 2013 at the Defendant's hotel, which was

1

operated as the Days Inn Stockbridge. Plaintiffs allege the Defendant knowingly benefitted financially from participation in a venture with the sex trafficker by the act of renting a hotel room to her, thus, providing a venue for Plaintiff's sex trafficking. Plaintiffs further allege the Defendant knew or should have known that Plaintiffs were being trafficked for sex at its property. Plaintiff alleges that the Defendant had the opportunity to see the Plaintiffs at the hotel, interacting with and without their traffickers, assisted the traffickers and saw the frequent male visitors that came in and out of their motel rooms and thus had knowledge of the trafficking. For these claims, Plaintiffs seek to recover for monetary damages, attorneys' fees, and punitive damages.

Summary judgment is proper on both Counts of Plaintiffs' Complaint because Plaintiffs have produced no evidence to support that the Defendant had actual or constructive knowledge that the venture for which it received a financial benefit and participated in the sex trafficking of Plaintiffs. Plaintiffs failed to produce any evidence that the Defendant knew or should have known that Craig Hill was trafficking Plaintiffs for sex on the property. There is no evidence of observations made by the hotel that should have alerted Defendant to Plaintiffs' trafficking.

In addition, Plaintiffs' claims for punitive damages also fail because an award of punitive damages is predicated on a finding of liability and they have

failed to properly allege what specific actions of the Defendant constitute willful and wanton behaviors. Accordingly, Defendant prays that this Court GRANT its Motion for Summary Judgment as to all claims alleged in this case.

## STATEMENT OF UNDISPUTED FACTS

1.

MASP, LLC was formed in 2007 when the hotel known as the Days Inn Stockbridge was purchased. (30(b)(6) Deposition extracts of Alpesh Patel ("MASP depo."), 16: 16-20, attached to the Brief as Exhibit "A".)

2.

MASP owns and operates the Days Inn located at 7385 Hanover Parkway N. Stockbridge, Georgia and has done so at all times pertinent to this litigation. (Complaint ¶ 4; MASP depo., 16: 21-22.) It also operates the hotel. (Id., 17: 3-5.)

3.

It had no knowledge of the allegations as described in the Complaint until served with this lawsuit. (MASP Interrogatory Response No. 5, attached to the Brief as Exhibit "B").

4.

In 2013, Q.C. lived with her mother lived and siblings. (Deposition extracts of Plaintiff Q.C. ("Q.C. depo."), 13: 19-24 and 16: 1-2, attached to the Brief as Exhibit "C").

5.

She had a normal relationship her mother and testified that her mother provided everything she needed. (Id., 45: 4-11).

6.

They ate meals together as a family and generally got along. (Id., 43: 6-11; 49:1-2.)

7.

In 2013, when she was 14 years old, she ran away from home because she missed the school bus and was afraid of getting in trouble. (Id., 46: 18-24.)

8.

Her mother took education very seriously. (Id., 47: 7-8) Attending school was non-negotiable for her and missing school violated her mom's rules. (Id., 53: 2-10).

9.

After missing the bus, she went to the house of a Hispanic female adult friend, who she referred to as "Rosa". (Id., 47: 22-23; 48:1-2; 55: 16-17.)

10.

Rosa lived in a trailer park located behind her neighborhood and Q.C. would go to her house once or twice a week. (Id. 48: 3-5; 21-25.)

11.

Q.C. felt safe at Rosa's house. (Id., 57: 3-9).

12.

On the day she missed school, Q.C. left Rosa's house and returned home. (Id., 49: 11-13.)

13.

She met her mother in the driveway and, after an argument about her missing school, Q.C.'s mother slapped her face and took her phone away. (Id., 49: 15-17; 52: 2-3; 78: 25-79: 1-3.)

14

As a result, Q.C. left home again without any clothes or personal items and returned to Rosa's house. (Id., 49: 20-22; 50:5 and 67: 1-3.)

15.

Notably, she did not tell Rosa that she had run away or about the argument with her mother. (Id. 58: 10-13.)

16.

Q.C. was embarrassed that she let her mom down and she wanted to be alone and think about what she had done. (Id., 51: 1-4.) She also wanted to give her mother time to calm down because she was angry. (Id., 51: 5-7.)

17.

While Q.C. was at Rosa's, the police came looking for her. (Id., 57: 18-23.) Rosa, who spoke little English, did not tell the police that Q.C. was there. (Id., 60: 13-19.)

18.

Q.C. hid from the police because she was scared of getting in trouble and thought she would go to jail for running away. (Id., 60: 20-25; 66: 1-2.)

19.

After the police left, she came out of hiding and spent the night at Rosa's house. (Id., 65: 5-8.)

20.

She did not call her mother and tell her where she was. (Id., 66: 8-10.)

21.

This was the only night that Q.C. stayed with Rosa. (Id., 56: 6.)

22.

The next day, Q.C. borrowed Rosa's cell phone and logged onto her Facebook account, where she learned that her friend, A.J., had coincidentally also run away from home after an argument with her mother and was at a nearby Walmart. (Id., 70: 1-6, 72: 17-19 and 92: 20-22.)

23.

Q.C. and A.J., who lived in the neighborhood behind Q.C., had been friends since middle school. (Id., 70: 17-18; 71: 1-2.)

24.

Q.C. messaged A.J. and told her what happened. (Id., 72: 5-10.)

25.

Q.C. then got a ride from Rosa's house to the Walmart from a guy she knew from the neighborhood in order to meet A.J. (Id., 72: 7-10 and 76: 5-10.)

26.

At Walmart, Q.C. found A.J. in a gray van with a man who was unknown to Q.C. (Id., 89: 21-23.)

27.

She entered the van and the man drove them to a neighborhood where they spent the night outside. (Id., 21: 4-5; 104: 14-20; 106: 16-21.)

28.

Next, they met with A.J.'s friend Jamaal who eventually took them to hotel and rented them a room. (Id., 99: 14-18, 108: 17-20 and 109: 1-3.)

29.

Over the next two days, the Plaintiffs stayed at the Travelodge and then the Southside Inn. (Id., 127: 18-21.)

30.

While at the Southside Inn, Plaintiffs' heard noises outside their door and believed someone was trying to break into their room. (Id., 134: 14-16.)

31.

The Plaintiffs called the front desk to report the attempted break-in and the front desk called the police. (Id., 134: 16-17.)

32.

When the police arrived, at least one police officer came to their room and Q.C. spoke with them while inside the room. (Id., 134: 21-24.)

33.

The police told the Plaintiffs that they would watch their room and Q.C. felt better because she knew the police would help her. (Id., 135: 8-9; 137: 1-3.)

34.

They only stayed at the Southside Inn for one night. Q.C. was in the same clothes that she had been in when she ran away. (Id., 138: 21-24.)

35.

The next day A.J contacted Craig Hill, a man she had not met before, on a Web site called DateHookup.com. (Id., 128: 5-13).

36.

Hill and his girlfriend, T'keyah Adams, came to the Southside Inn with a baby, picked up Plaintiffs, and drove them to the Days Inn. (Id., 138; 12-12; 141: 1-5; 142: 1-3.)

37.

It was Q.C.'s understanding that Hill had promised to give them clothes, fix their hair, feed them, get them a job, and provide a place for them to stay. (I.d.,139: 5-10).

38.

A.J. was also fourteen years old at the time of the alleged trafficking. (Deposition of Armani Johnson ("A.J" depo.), 72: 4-9, excerpts attached to the Brief as Exhibit "D".)

39.

Unlike Q.C., A.J. had run away before and had been previously rescued from a sex trafficking operation at a different hotel. (Id., 86: 18-24; 88: 3-6; Plaintiff A.J.'s Responses to Interrogatory No. 23, excerpts attached to the Brief as Exhibit "E".)

40.

In March of 2013, A.J. lived with her mother and stepfather and considered Q.C. to be her best friend. (Plaintiff A.J.'s Interr. Responses No. 1; A.J. depo. 92: 2-4.)

41.

In March of 2013, she ran away from home again. (Id., 91: 12-16.)

42.

When A.J. left home, she took some clothes and toiletries, but did not take any money. (Id., 99: 1-5; 21-23).

43.

The Plaintiffs provided conflicting testimony regarding where and when they met up after running away, but it is undisputed that they were together within a day of running away. (Id., 102: 4-8.)

44.

At some point, the Plaintiffs went to Q.C.'s old neighborhood and went to a friend's house until his mother came home and they had to leave. (Id., 107: 10; 111: 1-3.)

45.

The next day, they met A.J.'s friend, Jamaal, who took them back to his apartment and allowed them to take showers and sleep until he left for work. (Id., 116: 25-117: 1-4; 12-24.)

46.

He then took them to Southside Inn, I rented a room for them, and left. (Id., 118: 13-15; 120:17-21.)

47.

While at the Southside Inn someone tried to break into their room, so they called the police for help. (Id., 123: 4-7.)

48.

Two police officers came to their door and spoke with them. (Id., 124: 8-24.) Interestingly, the police did not ask their names or ages, or inquire why these young girls were at the hotel. (Id., 124: 25-125: 1-3.)

49.

Plaintiffs were scared at the Southside Inn. (Id., 122: 21-23).

50.

A.J. contacted Craig Hill and he picked the Plaintiffs up and took them to the Days Inn on March 20, 2013. (Portion of Investigative Summary of Police Interview with A.J.'s Redacted , attached to the Brief as Exhibit "F".)

51.

A.J. and Q.C. were taken to the Days Inn in Stockbridge by Craig Hill, who ultimately became their trafficker, after he and A.J. communicated on DateHookup.com. (A.J.'s depo. Id., 128: 2-9.)

52.

When they arrived at the Days Inn, a room was already rented, so they were not involved in the check in process and neither Plaintiff went to the hotel lobby or front desk. (Id., 145: 3-6, 24-25; 146: 1-3; 135: 23-25; 217: 9-12.)

53.

Once in the room, A.J. and Q.C. were told to shower because they had to take pictures for Hill to post them as advertisement. (Id., 140: 3-5.)

54.

It was at this point that A.J. and Q.C. were told they would have to contribute. (Id., 140: 6-8. and Q.C.'s depo. 147: 12-15.)

55.

Specifically, Adams told them that nothing was free so they were going to see dates to exchange sex for money. (Q.C. depo. 148: 1-4; 166: 12-15.)

56.

Plaintiffs were together in the same room the entire time while at the Days Inn. (A.J.'s depo. Id., 156: 1-4.)

57.

Q.C. had sex with four men at the Days Inn before the police came. (Id., 167: 15-17.)

58.

A.J. was also involved in each of Q.C.'s four encounters but she also had additional encounters separate from Q.C. and was unsure how may men she had sex with while at the Days Inn. (Id., 168: 17-18.)

59.

After A.J. had sex with men for money, Hill would collect the money. (Id., 161: 16-18.)

60.

A.J. did not know why they were taken to this hotel. (Id., 157: 1-7.)

61.

A.J. and Q.C. had limited interaction with the staff at the Days Inn. Housekeeping came to their room daily to provide fresh towels and bed sheets, and the front desk called to see if they needed garbage removed. (Id., 157:20—5; 175:24-25; 177:18-20.)

62.

On one occasion, A.J. and Q.C. locked themselves out of the room and had to go the front desk to get access to the room. (Id., 158:10-13).

63.

This was the only interaction Q.C. had with the front desk staff. (Q.C. depo. 192: 15-19.)

Respectfully submitted, this 11th day of October, 2024.

                        SWIFT, CURRIE, McGHEE & HIERS

                        By:  <u>*Marissa H. Merrill*</u>
                              Kori E. Wagner
                              Georgia State Bar No. 155438
                              Marissa H. Merrill
                              Georgia State Bar No. 216039
                              Tracy A. Gilmore
                              Georgia State Bar No. 633193
                              **Attorneys for Defendant MASP, LLC**

1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Tel:   404.888.6162
Fax:  404.888.6199
kori.wagner@swiftcurrie.com
marissa.merrill@swiftcurrie.com
tracy.gilmore@swiftcurrie.com

## **CERTIFICATE OF COMPLIANCE**

Counsel hereby certifies that this document has been prepared with one of the font and point selections approved by the Court pursuant to L.R. 5.1(C) of the Northern District of Georgia, specifically, 14 point, Times New Roman font.

                           SWIFT, CURRIE, McGHEE & HIERS

                    By:  *Marissa H. Merrill*
                           Kori E. Wagner
                           Georgia State Bar No. 155438
                           Marissa H. Merrill
                           Georgia State Bar No. 216039
                           Tracy A. Gilmore
                           Georgia State Bar No. 633193
                           **Attorneys for Defendant MASP, LLC**

1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Tel:   404.888.6162
Fax:  404.888.6199
kori.wagner@swiftcurrie.com
marissa.merrill@swiftcurrie.com
tracy.gilmore@swiftcurrie.com

**CERTIFICATE OF SERVICE**

This are to certify that on the 11th day of October, 2024, I have caused to be served upon counsel for all parties a true and correct copy of the foregoing **DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED AND PLAINTIFFS' THEORIES OF LIABILITY MOTION FOR SUMMARY JUDGMENT** by filing same through use of the Court's online filing system, the CM/ECF system for the United States District Court for the Northern District of Georgia, which will serve all counsel of record.

    SWIFT, CURRIE, McGHEE & HIERS

    By: *Marissa H. Merrill*
        Kori E. Wagner
        Georgia State Bar No. 155438
        Marissa H. Merrill
        Georgia State Bar No. 216039
        Tracy A. Gilmore
        Georgia State Bar No. 633193
        ***Attorneys for Defendant MASP, LLC***

1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Tel:  404.888.6162
Fax:  404.888.6199
kori.wagner@swiftcurrie.com
marissa.merrill@swiftcurrie.com
tracy.gilmore@swiftcurrie.com

4893-7677-5406, v. 2